UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL ACTION NO. 04-10166-RGS


**UNITED STATES OF AMERICA**

**v.**

**DAVID CARL ARNDT**

**MEMORANDUM AND ORDER ON GOVERNMENT'S
MOTION FOR DETENTION**


**AUGUST 8, 2004**


**BOWLER, Ch.U.S.M.J.**

On or about, June 2, 2004, defendant David Carl Arndt (the "defendant"), was arrested pursuant to a two count Indictment returned in this district on May 27, 2004.  In Count One the defendant is charged with conspiracy to distribute and to possess with intent to distribute methamphetamine in violation of Title 21, United States Code, Section 846.  Count Two charges the defendant with possession of methamphetamine with intent to distribute in violation of Title 21, United States Code, Section 841 (a)(1).  In addition the defendant is subject to the

forfeiture provisions of Title 21, United States Code, Section
853.

The defendant had his initial appearance before this court
on June 2, 2004.  He was represented by retained counsel.[1]  The
government moved to detain the defendant on the grounds that
there is no condition or combination of conditions that will
reasonably assure (1) the safety of any other person and the
community and (2) the appearance of the defendant.  18 U.S.C. §§
3142 (f)(1)(B), (f)(1)(C) and (f)(2)(A).  The government moved
for a three day continuance and a detention hearing was scheduled
before this court on June 4, 2004.

On that date this court commenced a hearing on the issue of
detention.  The defendant was represented by retained counsel.
The government called one witness speaking to the issue of
detention.  At the conclusion of the first day of testimony the
hearing was continued until June 14, 2004, by agreement of
counsel.  On that date the matter was continued until June 18,
2004, by agreement of counsel.  On June 18, 2004, counsel sought
a further continuance until June 22, 2004.

This court heard further testimony on June 22 and June 28,
2004.  The defendant did not call witnesses.  At the conclusion

---

[1]  Throughout the proceedings the defendant has been represented by retained counsel, albeit
not the same attorney at each hearing.  At the time of the issuance of this ORDER the docket
reflects that three attorneys appear as counsel of record.  Each of them appeared either alone or
with another at the various hearings between June 2, 2004 and June 28, 2004.

of the testimony on June 28, 2004, this court took the issue of detention under advisement.

DISCUSSION

I.    A.    Under the provisions of 18 U.S.C. § 3142(c), "[t]he judicial officer may not impose a financial condition that results in the pretrial detention of the person."  Thus, a defendant must be released under the provisions of 18 U.S.C. § 3142(b) or (c), or be detained pending trial under the provisions of 18 U.S.C. § 3142(e) and after a hearing pursuant to 18 U.S.C. § 3142(f).  See 18 U.S.C. § 3142(a).

Under 18 U.S.C. § 3142(e), a defendant may be ordered detained pending trial if the judicial officer finds one of the following three conditions to be true that: (1) by clear and convincing evidence, after a detention hearing under the provisions of § 3142(f), ". . . no condition or combination of conditions (set forth under 18 U.S.C.§ 3142(b) or (c)) will reasonably assure the safety of any other person or the community . . .;" (2) by a preponderance of the evidence, after a detention hearing under the provisions of 18 U.S.C. § 3142(f), ". . . no condition or combination of conditions (set forth under 18 U.S.C. § 3142(b) or (c)) will reasonably assure the appearance of the person as required . . .;" or (3) there is a serious risk the

defendant will flee.[2]  This determination is made by the court at the conclusion of a detention hearing.

B.  The government is entitled to move for detention in a case that:

(1)  involves a crime of violence within the meaning of 18 U.S.C. § 3156(a)(4);[3]

(2)  involves an offense punishable by death or life imprisonment;

(3)  involves an offense prescribed by the Controlled Substances Act or the Controlled Substances Import and Export Act for which the maximum authorized punishment is imprisonment for

---

[2]  The distinction between the former and the latter are made clear by the very language of 18 U.S.C. § 3142(f).  In the last paragraph of that section, Congress has stated there must be <u>clear and convincing</u> evidence to authorize pretrial detention when the question is whether any condition or combination of conditions "will reasonably assure the <u>safety of any other person and the community</u> . . .."  (Latter emphasis added.)  By not requiring that same standard <u>vis</u> <u>a</u> <u>vis</u> an assessment of risk of flight, it is clear that a lesser standard--i.e., preponderance of the evidence-- applied.  That is precisely the holding in the Second Circuit.  <u>See</u> <u>e.g.</u>, <u>United States v. Jackson</u>, 823 F.D. 4, 5 (D.C.Cir. 1987); <u>United States v. Berrios-Berrios</u>, 791 F.2d 246, 250 (2d Cir. 1986), <u>cert</u>. <u>dismissed</u>, 107 S.Ct. 562 (1986); <u>see also</u> <u>United States v. Patriarca</u>, 948 F.2d 789, 792 (1st Cir. 1991).

[3]  Section 3156 of Title 18 of the United States Code defines a crime of violence as:

(A)  an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another, or

(B)  any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 3156(a)(4).

ten years or more;[4] or

    (4)   involves any felony alleged to have been committed after the defendant has been convicted of two or more crimes of violence, or of a crime, the punishment for which is death or life imprisonment, or a ten year [or more] offense under the Controlled Substances Act or the Controlled Substances Import and Export Act.

    Additionally, the government or the court <u>sua</u> <u>sponte</u> may move for, or set, a detention hearing where there is a serious risk of flight, or a serious risk of obstruction of justice or threats to potential witnesses.  <u>See</u> 18 U.S.C. § 3142(f).


    C.  In determining whether there are conditions of release which will reasonably assure the appearance of the person and the safety of any other person and the community, this court must take into account:

             (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

             (2) the weight of the evidence against the accused;

             (3) the history and characteristics of the person, including--

---

[4] The maximum penalty is that provided by the statute defining and/or providing the punishment for the substantive offense--not the sentence, or even the maximum sentence, which might otherwise be imposed under the federal Sentencing Guidelines.  <u>See</u> <u>United States v. Moss</u>, 887 F.2d 333, 336-7 (1st Cir. 1989).

(A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and

(4) the nature and seriousness of the danger to any other person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

D.  The burden of persuasion remains with the government to establish "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  The burden then rests on the defendant to come forward with evidence indicating that these general findings are not applicable to him for whatever reason advanced.  The government must satisfy its position with respect to risk of flight by a preponderance of the evidence and with respect to dangerousness by clear and convincing evidence.  See supra footnote 3.  This court must then weigh all relevant factors [set forth under § 3142(g)] and determine whether "any condition or combination of conditions will reasonably assure the appearance of the [defendant] as

6

required and the safety of any other person and the community."
The decision is an individualized one based on all relevant
factors.  United States v. Patriarca, 948 F.2d 789, 794 (1st
Cir. 1991); see United States v. Jessup, 757 F.2d 378, 387-88
(1st Cir. 1985).

Moreover, one may be considered a danger to the community
even in the absence of a finding by clear and convincing evidence
that the accused will engage in physical violence.  Conversely,
as noted by the Committee on the Judiciary (Report of the
Committee on the Judiciary, United States Senate), on S. 215.
98th Congress, Report No. 98-147 (May 25, 1983):

> The concept of defendant's
> dangerousness is described throughout
> this chapter by the term "safety of
> any other person or the community."
> The reference to safety of any other
> person is intended to cover the
> situation in which the safety of a
> particular identifiable individual,
> perhaps a victim or witness, is of
> concern, while the language referring
> to the safety of the community refers
> to the danger that the defendant might
> engage in criminal activity to the
> detriment of the community.  The
> Committee intends that the concern about
> safety be given a broader construction
> than merely danger of harm involving
> physical violence....  The Committee
> also emphasizes that the risk that a
> defendant will continue to engage in
> drug trafficking constitutes a danger to
> the "safety of any other person or the
> community."

Id. (Emphasis added; footnotes omitted); see United States v.

7

Patriarca, 948 F.2d 789, 792, n.2 (1st Cir. 1991) (danger to community does not refer only to risk of physical violence); see also United States v. Tortora, 922 F.2d 880, 884 (1st Cir. 1990) (stating danger in context of 18 U.S.C. § 3142(g) not meant to refer only to physical violence); United States v. Hawkins, 617 F.2d 59 (5th Cir.), cert. denied, 449 U.S. 962 (1980) (trafficking in controlled substances).[5]

The issue critical to determining whether to detain a defendant is therefore, whether, with respect to the defendant, based on the guidelines set forth supra in part C of this Order, any condition or combination of conditions of release exist that will reasonably assure the safety of any person and the community and the presence of the defendant. 18 U.S.C. § 3142(e).

E. "Where, as here, a defendant is charged with a controlled substance offense punishable by a maximum term of 10 years or more, the government is aided by § 3142(e)'s rebuttable flight presumption."[6] United States v. Palmer-Contreras, 835

---

[5] A defendant may be ordered detained as a danger to the safety of another or to the community, however, only if the judicial officer determines that a detention hearing is appropriate under the provisions of moved under 18 U.S.C. § 3142(f)(l), and the judicial officer has determined that a hearing is appropriate under that latter section. See United States v. Ploof, 851 F.2d 7 (1st Cir. 1988).

[6] The presumption reflects Congressional findings that persons who deal in drugs often have the necessary resources and foreign ties to escape to other countries. United States v. Palmer-Contreras, 835 F.2d 15, 17 (1st Cir. 1987) (per curiam). Consequently, imposing "a large bond is often ineffective in deterring flight." United States v. Perez-Franco, 839 F.2d 867, 869-70 (1st

F.2d 15, 17 (1st Cir. 1987) (per curiam).  The presumption is not
limited to risk of flight.  Rather, the presumption has two
components.  One component is that the person poses a risk of
flight and the second component is that the person "represents a
danger to the community."  United States v. Moss, 887 F.2d 333,
335 n.3 (1st Cir. 1989) (per curiam).

Thus, under section 3142(e) the judicial officer must
consider the rebuttable presumption that no condition or
combination of conditions will reasonably assure the appearance
of the person as required and the safety of the community if the
judicial officer finds that there is probable cause to believe
that the person has committed an offense for which a maximum term
of imprisonment of ten years or more is prescribed by the
Controlled Substances Act or the Controlled Substances Import and
Export Act or an offense under 18 U.S.C. § 924(c), the use of a
firearm to commit a felony.  18 U.S.C. § 3142(e).

The presumption raised as a result of finding probable cause
that a defendant committed the relevant narcotics offense is
always entitled to evidentiary weight, the amount of which, if at
all, depends on the nature of the production by the defendant and
the other factors set forth under § 3142(g).  The defendant,
however, "bears only the burden of production."  United States v.
Perez-Franco, 839 F.2d 867, 870 (1st Cir. 1988).  As explained by

Cir. 1988).

9

the United States Court of Appeals with regard to the statutory

presumption of section 3142(e):

> Section 3142(e), however, only imposes a burden of
> production on a defendant.  The burden of persuasion
> remains with the government.  Nevertheless, even after
> a defendant has introduced some evidence to rebut the
> flight presumption, the presumption does not disappear,
> but retains evidentiary weight--the amount depending on
> how closely defendant's case resembles the congressional
> paradigm, Jessup, 757 F.2d at 387--to be considered along
> with other factors.

United States v. Palmer-Contreras, 835 F.2d at 17-18; see also

United States v. Perez-Franco, 839 F.2d at 869-70.

Finally, it is important to note that the presumption is

triggered by the statutory penalty prescribed irrespective of the

actual or likely sentence imposed upon the particular defendant.

See United States v. Moss, 887 F.2d 333, 337 (1st Cir. 1989) (per

curiam).  The fact that a defendant may receive a sentence of

less than ten years does not make the presumption inapplicable.

Id. at 337.  Rather, this court may consider such a factor with

regard to the weight this court gives to the presumption.  Id. at

337.

II.  The defendant, David Carl Arndt, is 43 years of age.[7]  He

was born on October 10, 1960 in New Haven, CT.  The defendant

grew up in Newton, MA, where his father, a practicing

---

[7] The information in this section is a compilation of material gathered by Pretrial Services
and submissions of the defendant to this court including the defendant's curriculum vitae.

10

dermatologist, and his mother, a psychologist, continue to reside.  The defendant has a sister residing in Washington, DC.

The defendant is single and has one child, a 21 year old son, from a previous relationship with Suzanne Greenwald.  The defendant has no contact with his son, who resides in Santa Fe, NM.

The defendant attended the University of Massachusetts at Amherst and earned a bachelor's degree in English and psychology and a master's degree in psychology from San Francisco State University in California, where he also studied premedical sciences.

In 1992 the defendant graduated from Harvard Medical School. He completed a residency in orthopedic surgery as part of the Harvard Combined Orthopedic Surgery Program and served as the chief resident in orthopedic surgery at the Beth Israel Hospital in Boston.  After finishing his residency he completed a fellowship in spine surgery at Tulane University School of Medicine in New Orleans, LA.

Upon the completion of his professional training in 1998 the defendant commenced practicing orthopedic surgery, specializing in spine surgery.  He was affiliated with Associates in Orthopaedics and Sports Medicine, Inc. in Wellesley and Harvard Vanguard Medical Associates in Boston.  The defendant remained in practice until August of 2002, when his license to practice

11

medicine was suspended by the Massachusetts Board of Registration in Medicine after "a highly-publicized incident involving a surgery at Mount Auburn Hospital"[8] in Cambridge in which it is alleged that the defendant left his anesthetized patient on the operating table in the midst of a spine surgery to attend to a personal banking matter outside the hospital.

The defendant's parents told Pretrial Services that they have been supporting the defendant financially for the last year and that since August of 2003 to the time of his arrest the defendant has been doing carpentry work around their home.

From 1988 to 1990 the defendant lived in Jamaica Plain with Steven Goldfinger ("Goldfinger").  The defendant told Pretrial Services that he has resided at 26 Rutland Square in Boston's South End since 1990.  The defendant's "partner," Alfredo Fuentes ("Fuentes"), also resides at this address.

Pretrial Services advised this court that in 1999 Fuentes, a citizen of Venezuela, pled guilty in the Eastern District of Louisiana to making false statements in an application for a United States passport (a felony).  He was sentenced to five years probation.  The supervision was transferred to this district when Fuentes moved to Massachusetts and was terminated on January 24, 2004.  Fuentes is a legal permanent resident of

---

[8] This language is taken from footnote one of the defendant's opposition to the government's motion for pretrial detention.

the United States.

According to the Pretrial Services report, the defendant's only financial asset is a bank account with a balance of $3,000. He pays monthly rent of $2,400 for the Rutland Square residence. He filed for bankruptcy (no year given) in relation to financial problems he encountered with Goldfinger. However, the case was dismissed prior to the defendant being adjudicated bankrupt.

By his own admission the defendant smoked methamphetamine from June of 2002 to August of 2003, using as much as one half gram per day. He told Pretrial Services that he has only used illegal drugs once since his release from jail in 2003. At the June 4, 2004 hearing this court ordered the defendant to provide a urine sample to Pretrial Services for drug testing. The defendant was unable to comply.

The defendant also reports a history of mental health counseling for a period of two years for treatment of an adjustment disorder.[9] In addition the defendant notes that he took Zoloft (an antidepressant) during his orthopedic residency to aid him in dealing with the death of friends from AIDS.

The defendant has a prior criminal record.

In 1998 the defendant pled guilty to a federal fraud charge (misdemeanor involving identity documents). The charge arose in the Eastern District of Louisiana and the case was transferred to

---

[9] No date is given for the period of this treatment.

13

this district for supervision.  The defendant was sentenced to a term of three years probation which was terminated on January 26, 2002.  It should be noted that the charge against the defendant was related to the charges against Fuentes described above.

In October of 2002 the defendant was charged in Middlesex Superior Court (the "Middlesex case")[10] with contributing to delinquency, possession of a Class B controlled substance, possession of a Class A controlled substance, using a drug for sexual intercourse, indecent assault and battery on a person attained age 14 and four counts of rape of a child.  Initially the defendant was released on $1,000 cash bail with the customary warning that if charged with a crime during the period of his release, his bail could be revoked pursuant to M.G.L. c. 276 § 58.  In addition the defendant was ordered not to have any unsupervised contact with children.  In October of 2003 the bail was increased to $20,000 cash, which was posted by the defendant's parents.  The case remains open.

In August of 2003 the defendant was charged in the Boston Municipal Court with possession with intent to distribute a Class B controlled substance.  This charge arose from the same set of circumstances giving rise to the above-captioned Indictment.  The Commonwealth's motion to revoke the defendant's bail in the Middlesex case, on the basis that the defendant committed a new

---

[10]  Middlesex Superior Court No. 2002-1569-001-009.

offense, was allowed on September 4, 2003, by the Honorable
Thomas Horgan ("Judge Horgan") of the Boston Municipal Court.
Judge Horgan imposed an additional bail of $500,000 surety or
cash bail of $50,000.

The defendant petitioned for review of bail before a Single
Justice of the Massachusetts Supreme Judicial Court pursuant to
M.G.L. c. 211 § 3 and on August 27, 2003 Justice Martha B. Sosman
denied the petition.  The defendant sought further review in the
Superior Court pursuant to M.G.L. c. 276 § 57.  The motion was
denied on September 18, 2003.  On the same day the defendant was
indicted on the same charge in Suffolk Superior Court (the
"Suffolk case").[11]  On October 9, 2003, the defendant was
arraigned on the Suffolk case.  At that time he was released on
$50,000 cash bail posted by his parents.  The case remains open.

III.  The relevant evidence at the detention hearing showed the
following.

The government called United States Postal Inspector Michael
J. McCarran ("McCarran") of the United States Postal Inspection
Service.  He testified that he has been so employed for the past
18 years.  He is assigned to the major crimes team in Boston,
where he focuses on prohibited mailings which involve contraband,
including narcotics, being sent through the United States mails.

---

[11]  Suffolk Superior case # CR 2003-10951.

15

McCarran testified that during the course of his career he has participated in over 250 narcotics investigations, the majority of which involved "controlled deliveries."

McCarran testified that on August 7, 2003, he was contacted by a United States postal inspector in Los Angeles, CA. The postal inspector had intercepted a package addressed to Frank Castro, c/o the Chandler Inn, 26 Chandler Street in Boston. The package was opened and was found to contain approximately 900 grams of a white powder which field tested positive for methamphetamine.

In further testimony McCarran stated that the cardboard package, which weighed about five pounds, was forwarded to Boston and arrived on August 8, 2003. McCarran noted that the package had an Express Mail label which was handwritten. The return address listed the sender as Hector Medina, 1605 Martel Avenue, # 7, Los Angeles, CA. McCarran stated that address was a valid address but added that the local mail carrier was not familiar with an individual by the name of Hector Medina at that address. McCarran identified three photographs of the contents of the package and a report, which were admitted as Government Exhibit # 1.

McCarran described the first photograph as showing a large pink phallic shaped intact pinata, a "sex toy" and a jar of "elbow grease." The second photograph shows the mailing label on

16

the package and the pinata with a label that says "Bachelorette's Last Night Out."  The pinata has been torn open.  The third photograph shows the plastic bags containing the methamphetamine, which McCarran testified were hidden inside the pinata.

McCarran identified to the report of the National Forensic Laboratory of the United States Postal Inspection Service which is part of Government Exhibit # 1.  McCarran noted that the total weight of the methamphetamine found inside the pinata was 900 grams, approximately two pounds, and the purity was 94 percent. McCarran added that the methamphetamine is a highly addictive stimulant produced in clandestine laboratories in the western part of the United States.  It is also known as "Ice, Tina, Glass and Crystal Meth" and usually is smoked in a pipe.

In further testimony McCarran stated that surveillance officers went to the Chandler Inn in Boston on August 8, 2003 and contacted the management.  It was established that an inquiry had been made about the package by the occupant of Room 501, which had been rented by the defendant on the previous day at around 11:00 a.m.  When making the reservation the defendant asked that the name Frank Castro ("Castro") be added to the guest list for the room.  The defendant also inquired whether or not a package had arrived for him or for Mr. Castro.

McCarran testified that on August 8, 2003, at approximately 10:15 a.m., while dressed like a mailman, he approached the front

17

desk of the Chandler Inn with the package.  The hotel manager called Room 501 and there was no response.  An undercover agent ("UC") was placed at the hotel as a front desk clerk and McCarran left the package with him.  Upon leaving the hotel McCarran called United States Postal Service personnel and instructed them to "scan" the package in as "delivered."  McCarran explained that by doing this a customer using Express Mail would be able to track the status of the package and determine whether or not it had been delivered.

According to McCarran, at approximately 1:30 p.m. the defendant arrived at the Chandler Inn and was given the room key to Room 501 by the real desk clerk.  At the time he was given the key he was told there was a package for him.  The defendant went to his room without discussing or accepting the package.  About five minutes later the defendant returned and asked the desk clerk if he had mentioned something about a package.  The defendant then signed for and received the package and headed for the elevator.  McCarran and the UC then approached the defendant and identified themselves as law enforcement agents.  McCarran identified the defendant in open court as the person who accepted the package.

McCarran told the defendant, who appeared very nervous, that they needed to discuss the package outside the public view of the lobby area.  They adjourned to the defendant's room.  McCarran

18

was accompanied by other law enforcement agents.  According to McCarran, the defendant admitted making the reservation for the room but denied ever making any inquiries about the Express Mail package, but said that the package was for Castro.  He described Castro as a friend he met on an internet website called manhunt.com.  The defendant stated that he had met Castro in person but that he did not have his telephone number or any way of contacting him.

In further testimony McCarran stated that the defendant said that Castro contacted him the week before and stated that he had business in Boston.  They agreed that the defendant would reserve a room for Castro at the Chandler Inn.  McCarran noted that the defendant was not under arrest during the course of the interview, which lasted for about three hours.  McCarran noted that at one point during the interview the defendant took a telephone call from his attorney on his cellular telephone. McCarran noted that Castro never appeared at the Chandler Inn.

McCarran testified that he determined that the defendant was not telling the truth about Castro or the package.  McCarran stated that he obtained toll records for the defendant's cellular telephone which indicated that on six occasions prior to picking up the package the defendant called the "800" package tracking number that the United States Postal Service maintains to enable individuals to track packages.

In an attempt to ascertain Castro's identify McCarran obtained a federal search warrant for the defendant's computer, which was located at the defendant's Boston residence.  McCarran testified that an analysis of the computer did not reveal any information relating to a Frank Castro on manhunt.com or any E-mail between the defendant and Castro.

In further testimony McCarran said that law enforcement authorities subsequently determined that years ago the defendant went to school with an individual by the name of Frank Castro. That individual is currently working as a physician in Knoxville, TN.  He was contacted and stated that he had no intention of being in the Boston area on August 8, 2003.  In addition he provided documents from his office indicating that he had seven surgeries scheduled on August 8, 2003 and that he was on-call on the two following days.

McCarran noted that in the course of executing the search warrant for the defendant's computer several items were found in a hard briefcase which was thought to be a computer case.  The items included 25 grams of marijuana, eight plastic bags that tested positive for methamphetamine hydrochloride, several pipes and paraphernalia relating to drug use.  McCarran identified a photograph of the contents of the computer case.  The photograph was admitted as Government Exhibit # 2.

In the course of executing the search warrant McCarran noted

20

that he found another computer bag.  A postal receipt for an Express Mail package that was mailed from the Cambridge Post Office on August 5, 2003, was found in the computer bag along with a piece of paper with a California address written on it. McCarran stated that the receipt was significant because he had asked the defendant during the course of the Chandler Inn interview whether he had mailed any packages to California.  The defendant denied that he had sent any packages.

McCarran testified that the Express Mail label was of significance, based on his training and experience, because when drugs are shipped to this part of the country from another part of the country then "payment has to go out the other way." McCarran added that he also found a customer receipt for an Express Mail package "on the desk just to the right of the computer."  The label showed that a package had been mailed to Los Angeles on August 5th.

The following week McCarran contacted the Kendall Square Post Office in Cambridge and obtained surveillance films for August 5, 2003.  McCarran testified that he observed the defendant mailing a package on the videotape.  McCarran testified that he spoke with a cooperating witness ("CW"), whom he referred to as CW-2, who stated that the defendant said the reason the package was intercepted in Los Angeles was because it had a hand written label and it weighed over two pounds.  The defendant also

21

told CW-2 that Frank Castro was a fictitious name.

In resumed testimony on June 23, 2004, McCarran clarified his previous testimony regarding the two receipts that were found during the execution of the search warrant for the defendant's computer.  He noted that the first receipt, for a package sent from the Kendall Square Post Office at 11:16 a.m. on August 5, 2003, was found in the computer bag.  The second receipt, found in the defendant's partially open desk drawer, was a customer receipt for a package sent from Feral Lupien, 433 Grant Street, Newton, MA to Brant Shank, 2531 Sawtell Boulevard, Los Angeles. McCarran noted that Grant Street in Newton does exist but the numbers do not go as high as 433.

McCarran testified that in the course of his investigation he also reviewed tape recordings of telephone conversations the defendant had while he was in custody at the Nashua Street jail in Boston between August 13, 2003 and September 15, 2003.  During one conversation the defendant stated that he took a loss of "forty or fifty" because of the package.  In another conversation he also told Fuentes that he had someone take drugs out of his apartment so they would not be found.

In further testimony McCarran testified that he spoke with other CWs during the course of the investigation.  McCarran stated that CW-1, who was indicted outside of Massachusetts for distributing large quantities of methamphetamine, said that

between April of 2003 and August of 2003 the defendant traveled to New York City on a weekly basis to purchase a pound of methamphetamine.  McCarran noted that during the course of their conversation it was CW-1 who first raised the name of the defendant.

McCarran added that CW-1 was personally aware that the defendant traveled to New York City on at least five or six occasions to purchase a pound of methamphetamine at a cost of $25,000.  CW-1 noted that the defendant traveled to New York by plane, train or bus and that he usually paid for the methamphetamine in bills packed in stacks of $2,000.

McCarran was shown a sheaf of documents which was admitted as Government Exhibit # 3.  He described the documents as travel records reflecting the defendant's travel between Boston and New York City between May 10, 2003 and August 1, 2003.  The records reflect travel by bus, train and plane.  McCarran noted that the defendant also traveled to Los Angeles in July of 2003.

McCarran testified that on June 19, 2003, the defendant was searched at Logan International Airport in Boston after he aroused the suspicion of a Transportation Security Administration screener.  McCarran noted that the defendant purchased a one way ticket with cash.

According to a report of the incident, which was admitted as Government Exhibit # 4, the defendant "artfully concealed on his

23

person in his jacket and throughout his carry-on bag $19,000 in U.S. currency." The report states that the defendant had the currency "stuffed around his waist under his shirt, in his jacket and also throughout his carry-on bag." When asked how much currency he was carrying the defendant first stated $9,000 and then changed the figure to $10,000. Later it was determined that he was carrying approximately $19,000. The defendant was also carrying a passport. The defendant was allowed to continue his travel when the inspection was completed.

In further testimony McCarran stated that CW-2 went to the defendant's Boston residence in July of 2003 and purchased an "eight ball" (an eighth of an ounce) of methamphetamine from the defendant. Later on the same day he purchased a second eight ball of methamphetamine. CW-2 stated that at the time of the visit he observed a kilogram of methamphetamine. During the course of their dealings the defendant told CW-2 the rules for drug dealing: dress in business attire; do not come unannounced and do not use crystal methamphetamine before coming over.

McCarran added that over a several week period CW-2 purchased at least seven ounces of crystal methamphetamine from the defendant at a cost of $2,400 an ounce. The CW-2 reported that the drug was of a high quality and that the defendant's roommate, Fuentes, was present when he went to the defendant's residence. McCarran noted that the CW-2's final purchase was for

two ounces.  CW-2 said that the defendant then shut him off because he was getting "too big."

McCarran stated that once the defendant was arrested in August of 2003 CW-2 picked up the defendant's drug business.  CW-2 stated that when the defendant was released from custody he gave the defendant $500 and an eight ball of crystal methamphetamine.  Later he sold the defendant a half ounce of crystal methamphetamine for $1,600 which the defendant resold for $1,800.  CW-2 stated that the defendant was practicing "back alley" medicine.

McCarran testified that he interviewed another individual identified as CW-3, who said that he smoked crystal methamphetamine with the defendant on more than ten occasions between December of 2002 and the time of the defendant's August 2003 arrest.  CW-3 stated that he also made six purchases of crystal methamphetamine from the defendant.

In further testimony McCarran stated he interviewed another individual identified as CW-4, who was arrested in October of 2003 for trafficking in crystal methamphetamine.  CW-4 stated that between late 2002 and August 2003 he purchased one ounce quantities of crystal methamphetamine from the defendant.  CW-4 was aware that the defendant was traveling to New York every other week.  On one occasion CW-4 was in the apartment of CW-1's partner when the defendant arrived to purchase crystal

25

methamphetamine.

McCarran testified that during the time the defendant was practicing medicine there was an arrest of an individual by the name of Charles Ghera ("Ghera") at the Swiss Hotel in Boston on January 10, 2002.  During the course of Ghera's arrest law enforcement authorities recovered crystal methamphetamine, ketamine, prescriptions, drug ledgers and $110,000 in US currency.

McCarran was shown a set of documents which was admitted as Government Exhibit # 5.  McCarran identified the documents as photocopies of some of Ghera's notes.  McCarran testified that he reviewed the notes.  He pointed out that the first page includes the defendant's name, the address of the Mt. Auburn Hospital in Cambridge and the defendant's Drug Enforcement Administration ("DEA") number.  The notation "Dave Arndt owes!" appears at the top of the second page.  The third page is a weekly planner for the week March 24, 2002, which lists a number of prescription medications by brand name.  The list includes Ambien, Xanax, Valium, Percocet, Oxycontin 80 mg, Ritalin and Viagra.  The language "*All NAME BRAND -NO- GENERICS" appears next to the list.  Government Exhibit # 5 includes a number of blank pages from a prescription pad bearing the defendant's name and the address of the Mt. Auburn Hospital.

In further testimony McCarran stated that he subpoenaed the

26

records for prescriptions written by the defendant under his DEA number between October of 2001 and May of 2002.  McCarran discovered that Ghera filled 22 prescriptions written by the defendant during this time period.  McCarran noted that all of the prescriptions stated "No Substitutions."  McCarran opined that this is because generic drugs are not easily sold "on the street."  McCarran added that around March 26, 2002, Ghera filled a variety of prescriptions for the same drugs listed in Government Exhibit # 5.  Copies of the prescription records written for Ghera were admitted as Government Exhibit # 6.

McCarran testified that as part of the investigation he subpoenaed the medical records of the institutions where the defendant practiced medicine in an attempt to locate medical records relating to Ghera.  He was unable to find any documentation that Ghera was ever a patient of the defendant.

In added testimony McCarran stated that CW-2 said he went to the defendant's residence and purchased two 40 mg. Oxycontin tablets for $40 each.  CW-2 stated that the tablets were stored in a container which had in excess of 100 tablets.  CW-2 also stated that the defendant was writing prescriptions for his methamphetamine customers, which they would fill and bring back to him in return for crystal methamphetamine.

McCarran noted that CW-4 stated that the defendant told him that the package sent to Chandler Inn was his.  The defendant

told CW-4 that the Chandler Inn was a safe place because he had contacts there.

In further testimony McCarran stated that after CW-4 was arrested he had a conversation with the defendant in which he told the defendant that he believed that someone had "ratted" on him.  According to CW-4, the defendant stated that if someone ratted on him he would have no problem "disemboweling" the person with a "quick swipe of the scalpel."

On cross examination it was established that McCarran interviewed CW-3 and CW-4 and that he was present for part of the interview of CW-2.  McCarran noted that he read interview reports gathered by DEA agents.  He added that the CWs have signed proffers.  McCarran noted that CW-1 was indicted outside of Massachusetts for trafficking in methamphetamine.  McCarran, who did not know the amount of methamphetamine involved, stated that he was provided with a copy of CW-1's interview.  He added that CW-1's last contact with the defendant was in the summer of 2003.

Defense counsel established that CW-3 stated that he smoked crystal methamphetamine with the defendant on ten occasions and that he made six purchases of the drug from the defendant. McCarran noted that CW-3, who told the defendant that he was going before the Grand Jury, was never threatened by the defendant.

In further cross examination McCarran stated that based on

conversations he had it "appears that the defendant is addicted to crystal meth." However, McCarran noted that people did not describe the defendant as an addict. McCarran added that during the course of monitored telephone calls the defendant had while incarcerated in the Nashua Street jail the defendant said he was addicted.

Defense counsel established that the defendant was arrested by the Massachusetts State Police on August 8, 2003, after the search of his apartment. He was released on bail after approximately 60 days in custody.

In resumed cross examination on June 28, 2004,[12] McCarran stated that since his last testimony he had met with the Assistant United States Attorney handling the case and identified certain documents and reviewed certain redacted reports. During cross examination defense counsel offered various documents relating to McCarran's testimony on direct examination.

McCarran identified a document, which was admitted as Defendant's Exhibit # A, as a copy of the search warrant inventory for the August 8, 2003 search at the defendant's Rutland Square residence. Among the items listed on the inventory are a computer, a computer bag with photo ID, an Express Mail receipt and sheet of paper, a second Express Mail

---

[12] In the interim between the hearings government counsel provided defense counsel with various reports.

receipt, a computer disk case with marijuana, pills and drug paraphernalia and a plastic bag with 13 packets of pure ephedrene (sic).

Defense counsel offered two documents, which were admitted as Defendant's Exhibit # B.  The first document is a computer printout from the Massachusetts Board of Registration in Medicine (the "Board") indicating that the defendant received a "Summary Suspension" on August 7, 2002.

The second document, which bears the same date, is a news release from the Board detailing the basis for the Board's action.  The document states that the Board found that "Dr. Arndt poses an immediate threat to the public health, safety and welfare."  It continues, "In its Statement of Allegations, the Board charged that Dr. Arndt abandoned his anesthetized patient in the Mount Auburn Hospital operating room to go to a bank in Harvard Square during the surgery."  The Board's action prohibits the defendant from practicing medicine in Massachusetts until a further order of the Board.

In further cross examination McCarran identified a copy of a redacted Federal Bureau of Investigation report ("FBI 302").  The document, which was admitted as Defendant's Exhibit # C, outlines a proffer agreement interview of CW-1 conducted on March 26, 2004, according to McCarran.

According to the FBI 302, CW-1 first met the defendant in

Provincetown in 2001.  CW-1 states, "[redacted] sold 1/4 gram quantities of methamphetamine to Arndt."  CW-1 adds that from April of 2003 until the defendant's arrest in July or August of 2003 [redacted] sold approximately one pound of methamphetamine to the defendant every one or two weeks for a total of five or six sales.  CW-1 goes on to say that the sales took place in New York and the defendant paid $1,600 per ounce and usually purchased a pound for $25,500 in cash.

Defense counsel showed McCarran a document which was admitted as Defendant's Exhibit # D.  McCarran described the document as a redacted DEA report of investigation setting forth a proffer interview by CW-2.  The document reflects that it was prepared on May 20, 2004.

According to the proffer, CW-2 was given the defendant's screen name on manhunt.com.  CW-2 then connected with the defendant, who he knew to be a drug dealer, through online chat.  They met in person in July of 2003 at the defendant's home and the defendant told CW-2 that he was a drug dealer and only sold crystal methamphetamine.  The defendant showed CW-2 a large rock of crystal methamphetamine and then broke off a piece which he gave to CW-2.  During the meeting the defendant agreed to sell CW-2 an eight ball of crystal methamphetamine for $400.  The defendant told CW-2 the procedures described previously for conducting drug business.  CW-2 made additional purchases over

31

the following days.

CW-2 stated that the defendant told him that he was treating people who would get shot and could not or did not want to go to the hospital.  However, defense counsel established that CW-2's statement that the defendant was practicing "back alley medicine" was not corroborated.

Defense counsel showed McCarran a document which was admitted as Defendant's Exhibit # E.  McCarran identified the document as a FBI 302 dated June 10, 2004, which sets forth the proffer of CW-4.  The document basically tracks McCarran's testimony regarding CW-4 but sets it forth in greater detail.

At the conclusion of the testimony the government offered three additional exhibits without objection.  The first set of documents, which was admitted as Government Exhibit # 7, includes the Commonwealth's Statement of the Case, filed in the Middlesex case[13] on October 9, 2002 and supporting police reports.  The pleading details the facts which are the basis for the pending child rape and related charges.

The pleading alleges that the defendant lured two boys, ages 14 and 15, into his car by telling them about a new drug "that gets you horny and feels cool."  He later told them that the drug was crystal meth and provided them with a pipe to smoke the crystal meth.  The defendant then dropped off one of the boys who

---

[13] This case is referred to in the criminal history portion of Section II of this ORDER.

said he had to go home.  The defendant then performed various sexual acts on the other boy, who described himself as being "out of it" from the drug.  The police reports support the allegations in the Commonwealth's Statement of the Case.

Government Exhibit # 8 includes a number of pleadings from the Middlesex case.  The pleadings include a motion, based on the defendant's indigence, for funds for trial preparation (investigation) in the amount of $15,000 and a motion to engage a psychiatrist.  The motion for funds was allowed to the extent of $1,500 on April 4, 2003 and the papers do not reflect any action taken on the motion for a psychiatrist.

Government Exhibit # 9 is a report from the Provincetown, MA Police Department dated August 31, 1998, relating to multiple 911 calls at 4:27 a.m. from the area of 145 Commercial Street.[14] According to the report, upon arriving in the area the police were directed to the residence of Roger Volzer ("Volzer"), who stated that he was sitting on a couch inside his residence with a male friend, later identified as Fuentes.

Volzer told the police that when he got up to blow out the candles a male subject ripped the window screen, entered through the window and grabbed him, striking the right side of his head with his fist.  Volzer managed to run out of the house and called

---

[14] This court notes that the defendant was not convicted of this offense.  The charges were eventually dismissed.  However, this court is considering the circumstances of the event in terms of the defendant's proclivity for impulsive, if not violent behavior.

for someone to call the police.  Volzer stated that the assailant ran after him but was stopped by Fuentes.  Fuentes and the assailant then left the property.

Volzer stated that he knew the assailant's first name to be David, where he lived and that he was the "ex-lover" of Fuentes. The police placed Volzer in the cruiser and were directed to the house where Volzer believed the assailant to live.  Officers approached the house and were met by the defendant who stated, "You must be looking for me."  The defendant added, "I did something very dumb . . . I went down to that guys (sic) house."

The report notes that the defendant was taken into custody and charged with burglary while armed, assault on an occupant, assault and battery by means of a dangerous weapon, to wit, a chair and malicious destruction of property.

At the conclusion of the detention hearing defense counsel provided this court with a multi-part submission in support of the defendant's argument for release.  The filing includes numerous state court documents and materials from Physician Health Services ("PHS"), a subsidiary of the Massachusetts Medical Society "designed to provide identification, support and monitoring services to physicians in Massachusetts who are experiencing or are at risk for health related concerns."

The materials include a letter dated June 22, 2004, to

defense counsel[15] from PHS which states that the defendant went
to PHS (no date given) "for an assessment to determine whether he
is experiencing the type of health related problem that would
benefit from the support and monitoring services offered by PHS."
The letter goes on to note that it is the assessment of PHS that
the defendant "would benefit from a PHS chemical dependency
contract with a behavioral health addendum to monitor his
compliance with a health related treatment plan."


IV.   The return of the Indictment in the United States District
Court for the District of Massachusetts in this case establishes
the existence of probable cause that the defendant committed the
crimes for which he is charged in the Indictment.

     The United States has moved for detention pursuant to 18
U.S.C. §§ 3142(f)(1)(B), (f)(1)(C) and (f)(2)(A).  The government
must prove by clear and convincing evidence that if released the
defendant would pose a serious danger to any person or the
community.  In contradistinction, the government must demonstrate
only by a preponderance of evidence that the defendant, if
released, constitutes a serious risk of flight or failure to
appear.  The two different standards are used because of the
clear language expressed in the last paragraph of 18 U.S.C. §
3142(f) which states "that no condition or combination of

---

[15] The letter indicates that it was prepared at the request of defense counsel.

35

conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." Congress, by not attaching that language to the risk of flight clause, infers that a lower standard of proof is all that is necessary to establish the government's case.

A. Danger to the Community

This court first addresses the likelihood that the defendant, if released, would be a danger to another person or the community.

The government's case against the defendant is strong. The defendant accepted an Express Mail package containing approximately of one pound of methamphetamine. He appears to have carefully orchestrated the arrival of the package, by sending it to a hotel addressed to the name of an old schoolmate who has no current connection to Boston, to minimize possible detection of his own involvement. This type of planning is typical of an experienced drug dealer and not a casual drug user.

McCarran's testimony that CWs knew that the defendant traveled to New York on at least five or six occasions to purchase pound quantities of methamphetamine for $24,000 or $25,000 while he was on release in on the Middlesex case is very disturbing. Again this is not the conduct or a user, but the conduct of an experienced drug dealer. It would appear that the

has defendant applied his considerable intellectual acumen to
conducting criminal activity.

Most significantly, the circumstances giving rise to the
present charges occurred when the defendant was already on bail
facing very serious charges in the Middlesex case under a
specific condition of release that he not commit another crime.
It is clear to this court that in the past the defendant has been
unable to abide by conditions of release.

Defense counsel proffers that the defendant is in need of
drug treatment and suggests the outpatient treatment program
offered by PHS as an alternative to detention.  It would appear
that to this court that the defendant has had ample opportunity
to seek treatment.

According to the Pretrial Services report, the defendant was
using drugs from June of 2002 through August of 2003.  This court
notes that the defendant's license to practice medicine was not
suspended until August 7, 2002.[16]  Thus it would appear that the
defendant was practicing medicine at a time when he was using
drugs.  Having had his medical license suspended he might of
sought treatment in August of 2002, when it appeared his hard
earned  professional career was falling apart.  Within a few
months he was charged with a violent sex crime on a juvenile.

---

[16] His privileges at the Mount Auburn Hospital were summarily suspended on July 11, 2002,
according to Defendant's Exhibit # B.

From Government Exhibit # 7, the Commonwealth's Statement of the Case, it appears that methamphetamine was a factor in this crime, the facts of which are among the most reprehensible that this court has ever seen.  But after being placed on bail the defendant did not enter treatment but instead became involved not only in using methamphetamine but in dealing in methamphetamine on a large scale.

Finally after being arrested in August of 2003 on drug charges and being incarcerated for almost two months, the defendant had another chance to enter into drug treatment.  But he did not.  The defendant's present request to participate in the PHS program which provides support and monitoring, not secure inpatient treatment, for impaired physicians is in too little too late.

In August of 2002 the Board of Registration in Medicine found the defendant posed "an immediate threat to the public health, safety and welfare" to the public seeking medical care. From that point forward the defendant's life has spiraled down, first being charged with a violent sex crime involving a juvenile, then with a major drug crime and a period of incarceration in the state system.  This court believes that the defendant is unable to abide by conditions of release, as has been shown by his past conduct, and therefore continues to present a danger to the community.

38

The defendant did not proffer any credible evidence to
detract from the government's assertion that he has committed a
serious drug crime involving a narcotic drug and that he is a
danger to the community or any person.  This court finds by clear
and convincing evidence that there is no condition or combination
of conditions that will assure the safety of any person or the
community if the defendant is released.

B. Risk of Flight

Next, this court turns to risk of flight or failure to
appear.

Although the defendant has ties to the community and has
appeared for court as required in the past, this court has some
doubt about whether he will appear as required in light of the
present circumstances.

The defendant faces a lengthy term of incarceration if
convicted.  This in itself provides an incentive to flee.  The
defendant is a highly educated individual who appears to have
traveled frequently in the past.  The testimony at the detention
was replete with references to the defendant traveling by plane,
train and bus in recent months at a time when he was on bail,
unemployed and representing to the court that he was indigent.

It must also be noted that the defendant's partner is a
Venezuelan national.  It is possible that the prospect of a long

period of incarceration might prompt the defendant and his partner to flee to Venezuela, where the defendant might be beyond the reach of extradition.

It is of particular significance to this court that in February of 2003, defendant's counsel in the Middlesex case filed a motion for the Commonwealth to furnish funds for trial preparation (Middlesex Docket Entry # 13) on the basis that "the defendant finds himself before this Honorable Court, without funds for investigation and other matters, to prepare for trial." Yet just over four months later when traveling through Logan Airport on his way to New York City on June 19, 2003, while on bail and unemployed, the defendant was found to be carrying $19,000 in cash carefully concealed on his person and in his carry-on bag.  This court has heard nothing to explain this unusual behavior.

In addition the statements of the CWs indicate that the defendant was handling large sums of money and crystal methamphetamine during this period at the very time when he was already on bail.  This suggests that the defendant may have access to large sums of money which would provide the means to flee.  This was considered by Justice Sosman in her August 27, 2003 denial of the defendant's state bail petition.  She stated,

> While the defendant proffers ostensibly
> innocent explanations for what would
> otherwise look like a serious flight
> risk, the circumstances strongly

40

> suggest a substantial risk of flight,
> and, where the defendant apparently
> had access to considerable sums of money
> (either from alleged drug dealing or,
> as he contends, by way of loans from
> friends), a significant dollar amount
> of bail is appropriate to address that
> risk.

Finally, this court addresses the defendant's personal characteristics. By his own admission during a monitored telephone call at the Nashua Street jail the defendant admitted to being addicted to crystal methamphetamine, a highly addictive stimulant, according to McCarran. In the past the defendant has a history of irresponsible behavior such as the Provincetown home invasion and abandoning his patient in the operating room, irrespective of the alleged criminal behavior. Whether fueled by crystal methamphetamine or other reasons, the defendant's conduct is unexplainable, particularly in light of his education and training. This court does not believe that the defendant can be relied upon to appear as required.

Based on the totality of the circumstances this court finds by a preponderance of the evidence that there is no condition or combination of conditions that will assure the appearance of the defendant as required.

V. Conclusion

The government has satisfied this court by clear and

convincing evidence that no condition or combination of conditions of release (set forth under 18 U.S.C. § 3142(b) or (c)) will reasonably assure the safety of any other person or the community if the defendant is released.  In addition, this court has found, at least by a preponderance of the evidence, that there is no condition or combination of conditions that will assure the appearance of the defendant as required.

Having evaluated the factors set forth in 18 U.S.C. § 3142(g), this court orders the defendant detained subject to the following conditions:

> (1)  The defendant be, and hereby is, committed to the custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

> (2)  The defendant be afforded reasonable opportunity for private consultation with his counsel; and

> (3)  On Order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined shall deliver the defendant to an authorized Deputy U.S. Marshal for the purpose of any appearance in connection with a court proceeding.

_____/s/_____
**MARIANNE B. BOWLER**
Chief United States Magistrate Judge