UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. )          Criminal No. 04-CR-10166 (RGS)
)
DAVID CARL ARNDT )
)
    Defendant. )

## UNITED STATES' OPPOSITION TO DAVID C. ARNDT'S MOTION FOR REVOCATION OF MAGISTRATE'S DETENTION ORDER OR, IN THE ALTERNATIVE, AMENDMENT OF DETENTION ORDER TO GRANT CONDITIONAL RELEASE

    David C. Arndt is a 43 year old, former orthopedic surgeon, and resident of Boston, Massachusetts. Arndt's license to practice medicine was suspended in August of 2002 by the Massachusetts Board of Registration in Medicine. Despite the longstanding support of caring and well-to-do parents, and the opportunities and accolades bestowed upon him throughout his life, Arndt has generated a substantial criminal history ranging from a federal criminal fraud conviction to multiple charges for child rape. Defendant now also faces serious drug distribution charges that mandate a minimum sentence of 10 years imprisonment.

    On May 27, 2004, defendant was indicted by a Massachusetts federal grand jury. Contrary to defendant's continued insistence that the charges in the Indictment are identical to those charged in Middlesex County, Count One arose out of a much broader

1

conspiracy investigation that began after the August 2003 incident charged in Middlesex County. Count One charges defendant with a conspiracy to distribute and to possess with intent to distribute over 500 grams of crystal methamphetamine, a conspiracy in which defendant would regularly travel to New York City to purchase methamphetamine personally from sources there. Count Two charges defendant with possession of over 500 grams of methamphetamine, which was secreted in a pink pinata and received by Arndt through Express Mail from a different source in Los Angeles, California in August 2003.

On August 8, 2004, United States Chief Magistrate Judge Marianne B. Bowler issued an order detaining the defendant. The Magistrate conducted three days of detention hearings in which the defendant was represented by Richard A. Egbert. In the detention order, found at United States v. Arndt, 329 F.Supp.2d 182 (D. Mass. 2004), the Magistrate meticulously and exhaustively analyzed the record and the basis for detention. Considering each of the factors under 18 U.S.C. §3142(g) in turn, the Magistrate carefully determined that defendant posed a danger to the community and there were no conditions or combination of conditions that will assure the safety of any person or the community or that will assure the appearance of the defendant as required. Id. 197-200. The Order is clearly supported by the record and should be affirmed. Thus, the government hereby

2

opposes the defendant's Motion for Revocation of the Magistrate's Detention Order.

## I.  THE GOVERNMENT'S CASE AGAINST DAVID C. ARNDT[1]

### A.  COUNT I: ARNDT'S RECEIPT OF METHAMPHETAMINE IN PINK PINATA FROM LOS ANGELES SOURCES

On August 7, 2003, a package addressed to Frank Castro, c/o the Chandler Inn, 26 Chandler Street in Boston was intercepted by a United States Postal Inspector in Los Angeles.  329 F.Supp.2d at 189.  The return address listed the sender as Hector Medina, 1605 Martel Avenue, # 7 Los Angeles, California.  Id.  The package contained approximately two pounds of 94 percent pure crystal methamphetamine.  Id.  This methamphetamine was secreted inside a pink pinata.  See Id.  Postal Inspector Michael McCarran in Boston conducted a controlled delivery of this package to Arndt at the Chandler Inn.  See Id. at 189-190.  On August 8, 2003, Arndt was registered at the Chandler Inn and signed for the package.  See Id. at 190.  Arndt was subsequently approached by Inspector McCarran.  Id.

Arndt made a number of statements to the Inspector.  Arndt flatly denied that the package was for him, denied that he had made the inquiries about the package, and denied that he had sent

---

[1]  The facts set forth are based on the Magistrate's findings, the testimony of Inspector McCarran, the transcripts of which are attached to the Defendant's Motion, and the detention exhibits, some of which are produced again with this brief as Exhibits A-D, and F.

any package to Los Angeles (payment for the drugs), insisting that the package was for Frank Castro who was coming forthwith to the hotel to pick up the package. See Id. at 190-92. These were all lies as revealed by McCarran's testimony during the detention hearing as follows: (a) toll records show that defendant's cellular phone demonstrated that on six occasions prior to picking up the package, defendant call the "800" package tracking number (Id. at 190); (b) Frank Castro never appeared at the Chandler Inn (Id.); (c) the real Frank Castro, a physician who had attended college with Arndt, verified that he had not been in recent contact with Arndt and had not been planning to be in Boston, having had seven surgeries scheduled on August 8th and being on-call on the 8th and 9th (Id. at 191); (d) during the execution of the search of Arndt's computer, McCarran found postal receipts for a package sent to Los Angeles on August 5th from the Kendall Square Post Office (Id.); and (e) McCarran obtained surveillance films for this post office for August 5th and on the videotape he observed Arndt mailing a package (Id.).

## B.  ARNDT'S CONSPIRACY TO DISTRIBUTE METHAMPHETAMINE WITH NEW YORK CITY SOURCES

After Arndt's arrest on August 8, 2003 arising out of the Chandler Inn incident, he was charged in Middlesex County for possession with intent to distribute drugs. Inspector McCarran then initiated a broader investigation into the defendant, along

4

with the Drug Enforcement Administration and Federal Bureau of Investigations. Law enforcement later secured the cooperation of four (4) cooperating witnesses, hereinafter designated CW-1 through CW-4, who described Arndt's drug dealing as extending far beyond the Chandler Inn incident. The investigation revealed Arndt to be an "experienced drug dealer and not a casual drug user", dealing pound quantities of methamphetamine "a highly addictive stimulant produced in clandestine laboratories in the western part of the United States." Id. at 197 & 199.

McCarran reviewed tape recordings of telephone conversations made by Arndt while he was in custody at the Nashua Street jail in Boston between August 13, 2003 and September 14, 2003. During one conversation defendant stated that he took a loss of "forty or fifty" because of the package. Id. at 191. In another conversation, Arndt told his former partner, Alfredo Fuentes, that Arndt had someone take drugs out of their apartment so that the drugs would not be found. Id. at 192.

CW-1 named Arndt as one of his customers who traveled to New York City on at least five or six occasions to purchase a pound of methamphetamine at a cost of approximately $25,000. Id. Arndt paid in cash, in stacks of $2,000. Id. CW-1 was corroborated by Arndt's travel records reflecting his travel between Boston and New York City, Id., as well as toll records showing calls between CW1, CW1's partner, and Arndt for that time

5

period, corresponding with Arndt's travel to New York City. Furthermore, Arndt was searched at Logan Airport on June 19, 2003, traveling to New York City and was found with $19,000 "artfully concealed on his person in his jacket and throughout his carry-on bag". (Id. at 192; See also Incident Report at Exhibit C[2]).

CW-2, corroborated CW-1's testimony, and CW-2 also told law enforcement that he purchased "high quality" methamphetamine from Arndt on a number of occasions at Arndt's home on 26 Rutland Square, in Boston during the same time period Arndt was purchasing from CW-1 in New York City. See 329 F.Supp.2d at 192. CW-2 observed a kilogram of methamphetamine at Arndt's home on one occasion. Id. Arndt related his "rules of drug dealing" to CW-2. Id. CW-2 further stated that after Arndt's arrest in August of 2003, Arndt purchased a half ounce of crystal methamphetamine for $1,600 from CW-2 and Arndt subsequently resold it for $1,800. Id. at 193.

CW-2 also stated that Arndt told CW-2 that he was practicing "back alley" medicine. Id. This "back alley" medicine was described as Arndt "treating people who would get shot and could not or did not want to go to the hospital." (Exhibit D[3], p. 10). Arndt described this as a "growing business." (Exhibit D, p.

---

[2] Entered as Government's Exhibit 4 at the detention hearing.

[3] Entered as Defendants Exhibit D at the detention hearing.

6

10).

CW-3 and CW-4 further corroborated Arndt's significant drug dealing, both having made numerous purchases of crystal methamphetamine from Arndt during the period at issue.  See 329 F.Supp.2d at 193.  CW-4 stated that defendant told him that he traveled to New York every other week to purchase methamphetamine.  Id.  CW-4 also stated that Arndt stated he would have no problem "disemboweling" anyone who "ratted" on him with a "quick swipe of the scalpel."  Id. at 194.

Arndt's drug dealing spread to his practice of medicine. Charles Ghera was arrested at the Swiss Hotel in Boston on January 10, 2002 with crystal methamphetamine, ketamine, numerous prescription drugs, $110,000 in US currency and drug ledgers. Id. at *193.  The drug ledgers and paperwork of Charles Ghera included blank prescriptions of David Arndt and notes that "Dave Arndt owes!", among other ledgers that showed Arndt was writing illegal prescriptions for Ghera to sell these drugs "on the street."  See Id.; see also ledgers at Exhibit F[4].  McCarran testified that Ghera was never a patient of Arndt, according to medical records subpoenaed.  329 F.Supp.2d at 193.  CW-2 corroborated that Arndt misused his position as a physician to write prescriptions and sell Oxycontin.  CW-2 stated that he went to Arndt's home and purchased two 40 mg Oxycontin tablets from

---

[4] Entered as Government's Exhibit 5 at the detention hearing.

Arndt and that Arndt stored these tablets in a container which had in excess of 100 tablets.  Id. at 193-194.

## C.  ARNDT'S CRIMINAL HISTORY

Arndt has engaged in a litany of criminal activities that is shocking both in is breadth and depth, ranging from a federal fraud conviction, to charges for child rape, to the current substantive drug distribution charges.  The Magistrate provided a detailed chronology of Arndt's criminal history.  Id. at 187-189. Defendant was charged in Middlesex Superior Court in October 2002, with contributing to delinquency, possession of a Class B controlled substance, possession of a Class A controlled substance, using a drug for sexual intercourse, indecent assault and battery on a person attaining age 14 and four counts of rape of a child ("Middlesex case").

This case involves Arndt's alleged drugging and sexual assault of a fifteen year-old boy on September 5, 2002.  (See Commonwealth's Statement of Case & Cambridge Police Report at Exhibit A[5], p. 1).  The Commonwealth of Massachusetts has alleged that the defendant showed the boy and another fourteen year old boy how to use a pipe to smoke crystal methamphetamine and gave the pipe to the boys to smoke.  (Id. at p. 2).  The fifteen year old boy described himself as being "out of it" after inhaling

_____

[5] Entered as Government's Exhibit 7 at the detention hearing.

twice.  (<u>Id.</u>).  The fourteen year old boy told Arndt that he had to go home, so Arndt dropped him off and drove the other boy to a side street and pulled over.  (<u>Id.</u>).  Arndt then proceeded to sexually assault this boy.  (<u>Id.</u>).  On September 10, 2002, this boy identified the defendant and his car to the Cambridge Police.  (<u>Id.</u> at p. 3).  After being read his Miranda rights, Arndt admitted to being with two boys on September 5, 2002.  (<u>Id.</u>).  Although he denied any sexual activity, Arndt also admitted that he drove them around Cambridge and talked to with them.  (<u>Id.</u>).  This case is pending.

In August of 2003, Arndt was charged in the Boston Municipal Court with possession with intent to distribute a Class B controlled substance.  This charge arose from only Count II of the Indictment, the Chandler Inn incident, contrary to Arndt's assertion that the charges in the indictment merely replicate this state charge.  The Boston Municipal Court revoked defendant's bail in the Middlesex case and Arndt served 60 days in prison.  <u>See</u> <u>Id.</u> at 188.  In August, Arndt was also indicted on the Chandler Inn incident in Suffolk Superior Court ("Suffolk Case").

Arndt attempts to minimize his prior criminal activity at every turn.  He states in his Motion that he "has no prior felony convictions", Defendant's Motion, p. 14, then in a footnote admits that he was convicted of a federal misdemeanor in 1998 for

his involvement in the submission of fraudulent INS documents. Arndt's perfunctory attitude toward his criminal activity is again demonstrated by his apparent view of a federal crime to be of little gravity if it is a misdemeanor and not a felony.

Similarly in a footnote in his Motion, Arndt appears to admit that he was arrested for assault and battery in Provincetown in 1998, after ripping the screen off of the door of one Roger Volzer's residence and striking Volzer in the head. (Defendant's Motion, p. 14, FN 6). Arndt, however, states that "he never admitted to assaulting the alleged victim". Id. This belies the fact that the Provincetown Police report, properly relied upon by the Magistrate, 329 F.Supp.2d at 196, states that when officers approached Arndt after the incident, Arndt stated "You must be looking for me" that "I did something very dumb, I know" and that "I went down to that guys house". (Provincetown Report at Exhibit B[6], p. 2). Significantly, Arndt does not deny that he assaulted the victim. He merely asserts that he has not admitted to it. Again, this only demonstrates Arndt's complete failure to date to take any responsibility for his criminal activity. Moreover, the Magistrate properly noted that the circumstances of the event demonstrates "defendant's proclivity for impulsive, if not violent behavior." 329 F.Supp.2d at 196, n. 14.

---

[6] Entered into evidence as Government Exhibit 9 at the detention hearing.

In sum, even a brief look at Arndt's chronology of events with the criminal justice system demonstrates that he cannot control his behavior.  In 1998, Arndt was convicted of a federal fraud charge.  In 2002, Arndt lost his medical license.  Also in 2002, defendant was charged with multiple child rape charges in Middlesex County that are still pending.  Arndt was released under court supervision, but was undeterred from committing the instant serious drug crimes, endeavoring to distribute large quantities of crystal methamphetamine throughout the Boston area.  In August 2003, Arndt was then charged in Suffolk County for the Chandler Inn incident, thus violating his bail conditions in the Middlesex case.  Arndt's bail was revoked and he then served 60 days in custody.  Arndt was released again in October of 2003 under the supervision and conditions of two courts, Middlesex and Suffolk County.  Yet again, Arndt disregarded both courts' authority and began to sell methamphetamine. (See Id. at 192-193; see also McCarran testimony, dated June 4, 2004, at Exhibit E, p. 17).  Arndt's continued criminal history demonstrates that there are no conditions or combinations of conditions that will reasonably assure the safety of any other person or the community.

## II. THE APPLICABLE LEGAL PRINCIPLES

The standard of review for the district court's review of an order of detention by the magistrate court is de novo.  United

States v. Tortora, 922 F.2d 880, 883 n. 4 (1st Cir. 1990); United States v. Pierce, 107 F.Supp.2d 126, 128 (D. Mass. 2000). Requiring the district court to conduct a de novo review does not mean that it must conduct a de novo hearing. Nor does it mean that the district court must disregard the magistrate's fact finding and the inferences to be drawn therefrom. The thrust of Tortora is thus that the district court should not act as if it were an appeals court reviewing the acts of a district court and thereby constrained by the evidence presented and fact finding conducted below. Tortora mandates that the district court must instead make an independent determination of the detention decision, unconstrained by the limits of the magistrate's conclusions or the record established in the original detention hearing. "Recognizing that appellate courts are ill-equipped to resolve factbound disputes, this standard cedes particular respect, as a practical matter, to the lower court's factual determinations." Tortora, 922 F.2d at 882-83.

"Where, as here, a defendant is charged with a controlled substance offense punishable by a maximum term of 10 years of more, the government is aided by § 3142(e)'s rebuttable flight presumption." United States v. Palmer-Conteras, 835 F.2d 15, 17 (1st Cir. 1987). Although the burden of persuasion regarding detention remains with the government, United States v. Jessup, 757 F.2d 378, 381 (1st Cir. 1985), the rebuttable presumption

shifts the burden of production to the defendant. <u>Palmer-Conteras</u>, 835 F.2d at 17-18. The defendant failed in his burden of production and the Magistrate properly determined that the government met its burden of persuasion. The Magistrate Judge's order to detain Arndt pending trial was proper and should not be revoked.

### III. ARGUMENT

A. <u>**The danger to the community presented by the defendant**</u>

The Magistrate properly held that the "defendant did not proffer any credible evidence to detract from the government's assertion that he has committed a serious drug crime involving a narcotic drug and that he is a danger to the community or any person. 329 F.Supp.2d at 198. The Magistrate also determined the government's case to be "strong". <u>Id.</u> at 197. The Magistrate set forth in detail, <u>Id.</u> at 189-192, the factual basis for the charges, consistent with the detention hearing testimony of Inspector McCarran, attached to Defendant's Motion. The Magistrate properly concluded that Arndt's level of planning and scope of drug dealing showed him to be an "experienced drug dealer and not a casual drug user." <u>Id.</u> at 197.

The Magistrate set forth significant evidence that defendant poses a danger to the community. <u>Id.</u> at 197-198. The defendant falsely asserts in his Motion that "[t]he Government presented no evidence to suggest, and has not alleged, that Dr. Arndt resumed

alleged drug trafficking activity after his release from detention on October 9, 2003." (Defendant's Motion, p. 13). The government has not only alleged resumed drug trafficking, but the Magistrate found that "when the defendant was released from custody. . . . [CW-2] sold the defendant a half ounce of crystal methamphetamine for $1,600 which the defendant resold for $1,800." (329 F.Supp.2d at 192-193; see also McCarran testimony, dated June 4, 2004, at Exhibit E, p. 17) (emphasis added).

The Magistrate also properly considered other personal characteristics of Arndt. Id. at 187-188. For example, Arndt's license to practice was suspended in August of 2002 by the Massachusetts Board of Registration in Medicine, after a surgery incident at Mount Auburn Hospital in which he apparently left his anaesthetized patient on the operating table during spine surgery to attend to a personal banking matter. Id. at 187.

In his Motion, defendant posits two main bases to demonstrate he poses no danger to the community if released: (1) his ample family support, their financial commitment, and ties to the community; and (2) his offer to participate in out-patient drug rehabilitation and counseling. (Defendant's Motion, p. 2). First, defendant asks the Court to believe that he can be trusted on release with the oversight of a substance abuse professional and his parents, when his entire history belies this leap of faith. Arndt relies heavily on the fact that he "is a long-

14

standing member of the Boston community, and has the full support
of his parents, who are doctors and reside in Newton,
Massachusetts," for his release.  (Defendant's Motion, p. 2).
Yet, the close presence of Arndt's family and their full support
and ample means, has had no deterrent effect on his criminal
activity in the past.  Rather, Arndt has taken the trust and
privilege that his parents have bestowed upon him, and committed
federal criminal fraud, lost his medical license, garnered
multiple charges for child rape, and engaged in serious drug
distribution crimes.  Most recently, he told CW-4 that he would
"disembowel" anyone who "ratted" on him and told CW-2 that he is
engaged in "back alley medicine."  329 F.Supp.2d 193 & 194.

Court oversight has similarly proven ineffective in
deterring Arndt from committing criminal activity.  As the
Magistrate noted, "[m]ost significantly, the circumstances giving
rise to the present charges occurred when the defendant was
already on bail facing very serious charges in the Middlesex case
under a specific condition of release that he not commit
another."  Id. at 197.

Second, Arndt asserts that he is "ready and willing to
comply with the stringent conditions of release he proposes",
including signing a contract with the Physician Health Services
program to engage in behavioral and substance abuse treatment.
(Defendant's Motion, p. 2, 16).  Arndt also asserts that he has

"sought" treatment and counseling and was "engaged in all of these activities before the return of the Federal Indictment and his arrest on June 2, 2004." (Defendant's Motion, p. 6). Yet conspicuously absent from his Motion is any evidence that defendant has <u>actually</u> <u>engaged</u> in any treatment and counseling.

Arndt on the one hand appears to blame his drug use for his current predicament, but on the other hand, has completely failed to proffer any evidence of actual treatment to date. Only now, <u>six</u> years after his federal fraud conviction and assault and battery charges, <u>two</u> years after losing his medical license, <u>two</u> years after his multiple child rape charges and charge for using drug for sexual abuse, and <u>one year</u> after his Boston Municipal drug distribution charge, does he assert that he is taking responsibility for his alleged drug use and offer to enter out-patient drug rehabilitation. As the Magistrate determined "[t]he defendant's present request to participate in the PHS program which provides support and monitoring, not secure inpatient treatment, for impaired physicians is in too little too late." 329 F.Supp.2d at 198.

Arndt instead appears content to continue to blame anyone other than himself for his failure to engage in treatment. For example, Arndt states that "delay occasioned by limited court resources, not due to any inaction on the part of Dr. Arndt", prevented him from having a court clinician meet and evaluate him

16

in November 2003 during the Suffolk County Case.  (Defendant's
Motion, p. 5).  For a person with parents who are still willing
to post a $75,000 cash bail for him, it is beyond belief that
delay due to "limited court resources" has prevented Arndt from
obtaining treatment over the years.

It bears emphasizing that the definition of "danger to the
community" under the Bail Reform Act extends beyond mere physical
violence.  United States v. Patriaca, 948 F.2d 789, 792, n.2 (1st
Cir. 1991); United States v. Tortora, 922 F.2d. at 884 (citing
S.Rep.No. 225, 98th Cong., 2d Sess. 4-12, reprinted in 1984 U.S.
Code Cong. & Admin. News at 3182, 3187-95).  "The Congress was
apparently concerned with the safety not only 'of a particular
identifiable individual, perhaps a victim or witness,' but also
of the community as a whole."  United States v. Delker, 757 F.2d
1390, 1393 (3rd Cir. 1985).

The defendant's criminal history and his conduct at and
around his most recent arrest demonstrate the very real threat of
further criminal behavior and the resulting danger that the
defendant presents were he to be released under any
circumstances.  See United States v. Carswell, 144 F.Supp 2d 123,
138 (N.D.N.Y. 2001) ("elaborate conditions dependent upon good
faith compliance are sometimes insufficient when a defendant's
criminal history provides no basis for believing good faith will
be forthcoming").  Arndt's continued inability to refrain from

17

committing crime and continued disregard of judicial oversight
demonstrates there are no conditions or combinations of
conditions that will reasonably assure the safety of any other
person or the community.  Hence, the Magistrate Judge's
conclusion that the defendant was a danger to the community,
based on clear in convincing evidence, was proper.

### B. Risk of Flight

While defendant has ties to the community, he has the
incentive, ability and education, and means to flee, as the
Magistrate properly considered.  329 F.Supp.2d at 198-199.  Arndt
faces life imprisonment and a minimum mandatory term of 10 years
imprisonment on each count in the indictment.  Id. at 184.
Arndt's former partner, Alfredo Fuentes, is a Venezuelan
national.  Id. at 199.  Arndt committed federal fraud for
Fuentes.  Thus, the instant federal charges and state rape
charges that Arndt currently faces, may easily prompt him to flee
to Venezuela or elsewhere.  See Id.  Arndt has clearly had access
to large sums of cash and has the ability to travel.  See Id.  He
was stopped in Logan Airport on his way to New York City with
$19,000 of cash concealed on his person and his carry-on bag in
June of 2003.

As discussed above, Arndt has not been deterred by his
parents, court oversight, or his professional livelihood from
committing irresponsible, dangerous, and criminal acts.  This

past behavior demonstrates Arndt's complete disregard for factors that would normally keep a person from fleeing. Hence, the Magistrate Judge's conclusion that the defendant was a risk of flight, based on a preponderance of the evidence, was proper.

### IV. CONCLUSION

Based on the foregoing, the government respectfully requests that this Court deny the defendant's Motion For Revocation of the Magistrate's Detention Order.

Respectfully Submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    _____

CYNTHIA W. LIE                    9/24/04
JOHN A. WORTMANN, JR.

Assistant U.S. Attorneys

### CERTIFICATE OF SERVICE

This is to certify that on the _24_ day of September, 2004, I caused a copy of this motion to be served on Stephen Delinsky by FedEx.

By:    _____

CYNTHIA W. LIE
Assistant U.S. Attorney

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.
DEPARTMENT

SUPERIOR COURT

DOCKET NO. 2002-0569

## COMMONWEALTH

### V.

### DAVID ARNDT

---

## COMMONWEALTH'S STATEMENT OF THE CASE

---

The Commonwealth hereby files this Statement of the Case at the request of the Court as a summary of the facts only. What follows is not a Bill of Particulars and does not contain every fact that may be offered at trial.

On Thursday, September 5, 2002 fifteen year-old, ███████████, was drugged and sexually assaulted by the forty-two year-old defendant, David Arndt, in the defendant's parked vehicle in Cambridge.

At approximately 5:30 p.m. on September 5, 2002, ████ was waiting on the steps of the post office for his fourteen year-old friend, ██████. The defendant was sitting next to him smoking a cigarette and attempted to strike up a conversation. The defendant introduced himself as David and told ████ that he knew of a new drug that gets you horny and feels cool. The defendant later told ████ that the drug is crystal meth. The defendant asked ████ if he wanted to go smoke and took ████, and ██████ to his car. The defendant reached in the back of the car and took out a bag containing a glass pipe, drugs, and a lighter.

---

1

After driving to the back of Dana Park in Cambridge, the defendant told ███ and ███ how to use the pipe. He then lit it himself, smoked, and handed the pipe to ███ then to ███. The defendant was in the drivers seat, with ███ in the front passenger seat and ███ in the back seat.

By the time ███ inhaled for the second time he described himself as being "out of it." ███ could not move his legs, he could not think straight, and he did not have a care in the world. ███ vomitted on the side of the passenger seat, out the door and on his leg, but was so stupefied that he did not care.

At 8:30 pm ███ had to go home, so the defendant dropped him off and pulled over on to a side street nears ███'s house. After the defendant pulled over, ███ observed the defendant take his erect penis out of his pants and masturbate. ███ was still overpowered by the drug. ███ then realized that his own pants were unbuckled and the defendant was taking one pant leg off. The defendant began to lick and place his tongue in ███'s anal opening. The defendant then rubbed ███'s penis with his hand and placed his mouth on ███'s penis. The defendant then told ███ it was his "turn" and put his penis in ███'s mouth. With ███ still dazed, the defendant then put a lubricant on his penis and ███'s buttocks then put his penis in ███'s anal opening. The defendant's hands were on ███'s hips, moving him. The defendant took his penis out of ███'s anal opening, and then masturbated until he ejaculated in the car.

███ did not realize the time until the defendant told him it is 1:30 am, Friday. The defendant gave ███ his cell phone number and dropped him off.

For the next few days, ████ was emotional, concerned that the defendant had given him a disease, and he did not sleep. The next day, ████ told his friend ████ about the rape.

████ then went to a medical clinic and reported the rape to the Cambridge Police Department. ████ described the defendant's car and provided the defendant's first name and cell phone number. On September 10, 2002 ████ identified the defendant and his car to the Cambridge Police.

The defendant was brought to the police department and after being advised of his rights provided by *Miranda*, he gave a statement to the police. The defendant admitted to being with two boys on September 5, 2002. He stated that he drove around Cambridge for a while and talked with them. One of the boys got a phone call from his parents and went home. The other boy stayed with him, he pulled over and they talked for a while. The defendant denied smoking pot with them. He also denied having any sexual contact with them. The defendant did admit that he might have touched one of the boys on the shoulder because the boy was crying.

A search of the defendant's car revealed a black bag and metal case containing a glass pipe, a small spoon, several straws, a small vial and a plastic bag which appeared to be crystal met amphetamine. Samples of upholstery and carpeting and swabs were also taken from the interior of the defendant's vehicle which where presumptively positive for seminal fluid.

Respectfully Submitted

For the Commonwealth,

MARTHA COAKLEY
DISTRICT ATTORNEY

Jennifer B. Koiles
Assistant District Attorney
21 McGrath Highway
Somerville, MA 02143
Tel: 617-591-7700
BBO No. 632017

Dated: October ⸱⸱ , 2002

# ...bridge Police Department Investigative Report

**FILE NUMBER** 02 - 7531

| Occurrence | | | | | | 2. | | | | | | 3. Date of Report | | | | | 4. Weather Conditions | N.C.I.C./TT# |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Occurrence: ? D 5 Y 02 T 5³⁰ PM  M  2  S _ M _ T _ W _ TX F _ S  M 9 D 9 Y 02 T 6⁰⁰ PM

| 6. Location of Offense | Sector | 7. Type of Premise |
|---|---|---|
| ...ce | | Street |

**8. Business/Complainant's Name** — 10. Sex F  Race  D.O.B.

CONFIDENTIAL

**9. Business/Complainant's Address** — 11. T  Res / Bus

...g Person (If Other Than Victim)  Address

...s A Witness To The Crime?  If Yes, Check Box

with proper code on boxes provided person's relationship to investigation. (W-1: Witness #1; NI: Not Interviewed #2.
...ting Person; PK: Person w/Knowledge; V: Victim; AV: Additional Victim)

| ...viewed | D.O.B. | Address (Number and Street) | Apt.# | City, State, Zip Code | T | Res / Bus | V |
|---|---|---|---|---|---|---|---|
| | | | | | T | Res / Bus | PK |
| | | | | | T | Res / Bus | NI |

...Injury  Hospital Taken To  Attending Physician  Type of Conveyance

...t Suspects

...pect By Identified?  If Yes, Check Box
...ropriate Codes Indicate
...dentify suspect(s) (See Box 14)  **Suspect #1** ✓ NI  **Suspect #2**

...pect By Describe?  If Yes, Check Box

| ...ce | Sex | Age | Ht. | Wt. | Hair | Eyes | Other | Clothing and Unusual Characteristics |
|---|---|---|---|---|---|---|---|---|
| | M | 42 | 6 | | Bld | | Full beard | Red shorts Red Shirt |
| ...ca | Sex | Age | Ht. | Wt. | Hair | Eyes | Other | Clothing and Unusual Characteristics |

...pect Be Named?  If Yes, Check Box
...ude any A.K.A. information)  Dave  **Suspect #2 (Include any A.K.A. information)**

...the located at  ...eston  **Suspect #2 Can be located at**

...Known to The Police?  If Yes, Check Box

...t Vehicle Be Identified?  If Yes, Check Box

| ...te | | | | | | | | Year | Make | Color | Special Characteristics/V.I.N. | Stolen Car Yes No | Stolen Plate Yes No | Listing Yes No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Saab | Grn | | | | |

...port, Traceable?  ...ion of Property  N/A  Total Value  Turned Over To  Property Sheet ☐ Attached ☐ w/Victim ☑ N/A

...sical Evidence Present?  If Yes, Check Box and Explain in Narrative
...ificant Circumstantial Evidence Present?  ...OR If Yes, Check Box and Explain in Narrative
...nificant M.O.?  If Yes, Check Box and Explain in Narrative

| V/A | Point of Exit N/A | Type of Instrument Used (if known) N/A | Unusual Features of Crime |
|---|---|---|---|

...mmarize details of crime including progression of events, names of other officers or units assisting.
...nation which is an extension of any of the blocks, indicate block number in box provided at left.

reports her son ▓▓▓▓ on Thurs 9/5/02, was with a friend ▓▓▓
▓▓ at Mass + Pleasant when the suspect pulled up and began
...nversation with them. After a brief conversation this suspect asked
if they wanted to smoke, and showed them a glass pipe. Both
...eded to and entered the motor vehicle. Once inside they drove
...n Mass Ave right on to Pearl Street. They pulled over on Pearl
...by Dana Park and they smoked the pipe. After sometime ▓▓▓
...d he had to be home by 8³⁰ PM. They left this area and dropped

...er Signature  Dept #241  Badge #/Date 9/9/02  Rank/Name
...re  9·9·02  Mail In  Phone In  Walk In  CID  Juvenile  Accident Inv.

29. Is There Reason To Believe Crime May Be Resolved?
30. Is Follow Up Investigation Necessary (From Factors Listed Above)? If Yes, Check Box:
33. Responding Supervisor (If same, write same)  34. Reviewing Officer Signature  Date

031-2

DOMESTIC ABUSE
HATE CRIME

RECORDS

CONFIDENTIAL  Page _____ of _____

**mbridge Police Department Supplemental Report**

File Number ___ 02-7531

| g. Case Invest. . . . ☐ | City Solicitor . . . . . ☐ | 2S. Date of Occurrence | M | 3S. Date of Report | M | 4S. P.C.N. |
| r. Incident Report . . ☐ | Sudden Death . . . . . ☐ | M __ D __ Y __ T __ | | M __ D __ Y __ T __ | | |
| llow Up Invest. . . . ☐ | Child In Custody . . . ☐ | | | | | |

lness/Complainant's Name

Y / E / L / L

Res. Bus.

## CONFIDENTIAL

| e in Court | 7S. Judge | 8S. Court | 9S. Disposition |
|---|---|---|---|

off by his home and her son and
the suspect drove away. She states that
her son states that they pulled over
again on a one way street in a ___
residential area. At this time the subject
wearing shorts produced his penis which
was hard. ___ asked what are you
doing and he began touching him. After a short
period the suspect removed ___ pants off one
leg and then entered his rear with his penis. This
subject also performed oral sex on ___ and
them made ___ perform oral sex on him.
    This subject provided both boys with his
cellphone # 617-513-9194 and stated his name
was David and lives in Boston.
    ___ stated he called this subject on Friday
and again on Saturday and spoke to him about
what had happened and about any medical problems
he may have had. ___ states he saw this
subject on Saturday in his m/v by McDonald's in
Central Sq and again on Sunday driving in Central
Sq.

**10S. Status of Case**
Cleared: . . . . . ☐     Suspend . . . . . . ☐
Arrest . . . . . . . . ☐     Comp./War . . . . ☐
Hearing . . . . . . . . ☐     Unfound . . . . . . ☐
Station Adj. . . . . . ☐     Other . . . . . . . . ☐
Continued Inv. . . . . ☐

**11S. Property Recovered**
Yes ☐     No ☐
Total Value ___

**12S. Juvenile Card Made**
Yes ☐     No ☐

**13S. Narcotic Number**

**14S. Narcotic/Alcohol Sheet Made**
Yes ☐     No ☐

**15S. Technical Work**
| | Yes | No |
|---|---|---|
| Photo | ☐ | ☐ |
| Finger Print | ☐ | ☐ |
| Composite | ☐ | ☐ |
| Other | ☐ | ☐ |
| By Whom | | |

**16S. Victim/Comp. Cont.**
In Person . . . . . . . ☐
Letter . . . . . . . . . ☐
Phone . . . . . . . . . ☐
Call Card . . . . . . . ☐

**17S. Photo Viewed**
Yes ☐     No ☐

**18S. Citation No.**

**19S. Time Expended**
Investigation

## CONFIDENTIAL

Original Reporting Off.

| fficer's Signature | Badge #/Date | Division | 21S. Reviewing Officer's Signature | Date |
|---|---|---|---|---|
| Daye #241 | 9/9/02 | | L. J. Sullivan | 9/10/0 |

I/BS-629031-2

**idge Police Department Supplemental Report**

File Number: 02-7531

CONFIDENTIAL

Complainant's Name: D.B. BONDINO
CPD

RE:    C.P.D. FILE # 02-7531

SYNOPSIS:   RAPE OF A CHILD (3 COUNTS)
            INDECENT A&B ON A CHILD OVER 14

PERSON (S) INTERVIEWED:   DAVID ARDNT

NARRATIVE:

ON 9-10-02 AT APPROX. 11:45 AM DET. BRADY AND I WERE ASSIGNED TO WATCH A M/V IN CENTRAL SQ. WE WERE LOOKING TO IDENTIFY THE OWNER/ OPERATOR. WE MET THE VICTIM IN CENTRAL SQ. AND HE POSITIVELY IDENTIFIED THE M/V AS THE ONE HE WAS IN ON THURSDAY EVENING (9-5-02). THE M/V WAS A GREEN SAAB CONVERTIBLE THE VICTIM WAITED ACROSS THE STREET. AT APPROX. 12:20 PM I OBSERVED A MALE APPROACH THE M/V. THE VICTIM POSITIVLEY IDENTIFIED HIM. DET. BRADY AND I IDENTIFIED OURSELVES A POLICE OFFICERS. I ASKED THIS MALE IF HE WAS DAVID AND IF THIS WAS HIS M/V. THIS MALE STATED THAT HIS NAME WAS DAVID AND THAT THIS WAS HIS M/V. I THEN ASKED DAVID FOR IDENTIFICATION AND HE PRODUCED A MA. DRIVER'S LICENSE. THE NAME ON THE LICENSE WAS DAVID ARDNT. ARDNT ASKED WHAT THIS WAS ALL ABOUT, TO WHICH I TOLD HIM THAT IT WAS IN REGARDS TO A SEXUAL ASSAULT. I THEN ASKED HIM IF HE WOULD COME INTO THE POLICE STATION FOR AN INTERVIEW. ARDNT AGREED AND WE FOLLOWED HIM TO A PARKING LOT NEAR THE POLICE STATION.

AT THE POLICE STATION, I ADVISED ARDNT OF HIS MIRANDA RIGHTS. DET. BRADY AND I CONDUCTED A TAPED INTERVIEWED OF ARDNT. I ASKED ARDNT, HIS WHEREABOUTS ON THURSDAY EVENING, 9-5-02. ARDNT STATED THAT HE WAS IN HARVARD SQ, THEN PRECEDED DOWN MASS AVE. ARDNT STATED THAT HE PULLED OVER AT THE CONVIENCE STORE AT MASS AND

10S. Status of Case
Cleared; ☐    Suspend ☐
Arrest ☐    Comp./War ☐
Hearing ☐    Unfound ☐
Station Adj. ☐    Other ☐
Continued Inv. ☐

11S. Property Recovered
Yes ☐    No ☐
Total Value

12S. Juvenile Card Made
Yes ☐    No ☐

13S. Narcotic Number

14S. Narcotic/Alcohol Sheet Made
Yes ☐    No ☐

15S. Technical Work
                  Yes    No
Photo           ☐    ☐
Finger Print    ☐    ☐
Composite       ☐    ☐
Other           ☐    ☐
By Whom

16S. Victim/Comp. Cont.
In Person ☐
Letter ☐
Phone ☐
Call Card ☐

17S. Photo Viewed
Yes ☐    No ☐

18S. Citation No.

19S. Time Expended
Investigation

Original Reporting Off.

Officer's Signature

Page 1 of 2

CONFIDENTIAL

**oridge Police Department Supplemental Report**   File Number _O2- 7531_

| | City Solicitor ......□ | 2S. Date of Occurrence | | M | 3S. Date of Report | P M | 4S. P.C.N. |
| ee Invest. ..□ | Sudden Death ......□ | | | | M _9_ _10_ Y _02_ _3:00_ | | |
| cident Report .□ | Child in Custody ...□ | M __ D __ Y __ T __ | | | | | |
| Up Invest. ..□ | | | | | | | Res. |
| ee/Complainant's Name | | | | | | | Bus. |

D. B. _Bombino_   **CONFIDENTIAL**
_CPD_

| Court | 7S. Judge | 8S. Court | 9S. Disposition |
|---|---|---|---|

PLEASANT ST. I ASKED IF HE TALKED TO ANYONE
THERE. HE STATED THAT TWO MALES APPROACHED
HIM WHO ASKED HIM FOR A CIGARETTE. ARDNT
THEN STATED THAT HE DROVE THESE TWO BOYS
AROUND (CAMBRIDGE) FOR A WHILE. HE PULLED
OVER AND TALKED WITH THEM, THEN ONE OF THE
BOYS GOT A CELLPHONE CALL FROM HIS PARENTS,
SO HE DROVE HIM HOME. ACCORDING TO ARDNT, HE AGAIN
DROVE AROUND AND PULLED OVER TO TALK WITH THE OTHER
BOY. ARDNT STATED THAT HE DID NOT SMOKE POT WITH THE
BOYS NOR DID HE HAVE ANY PHYSICAL CONTACT WITH THEM.
ARDNT DID SAY THAT HE MIGHT HAVE TOUCHED ONE OF THE
BOYS ON THE SHOULDER BECAUSE HE WAS CRYING WHILE
TALKING ABOUT HIS FATHER AND HIS FAMILY LIFE.

DAVID ARDNT WAS THEN PLACED UNDER ARREST FOR ABOVE
OFFENSES. ARDNT THEN CALLED HIS ATTORNEY VIA HIS
CELLPHONE. ARDNT WAS THEN BOOKED AND PROCESSED.

**CONFIDENTIAL**

10S. Status of Case: Cleared □ Arrest □ Hearing □ Station Adj. □ Continued Inv. □ Suspend □ Comp./War □ Unfound □ Other □

11S. Property Recovered  Yes □  No □  Total Value __
12S. Juvenile Card Made  Yes □  No □
13S. Narcotic Number __
14S. Narcotic/Alcohol Sheet Made  Yes □  No □

15S. Technical Work — Yes/No: Photo □□ Finger Print □□ Composite □□ Other □□ By Whom __

18S. Victim/Comp. Cont.: In Person □ Letter □ Phone □ Call Card □
17S. Photo Viewed Yes □ No □
18S. Citation No. __
19S. Time Expended Investigation __
Original Reporting Off. __

Officer's Signature _Bombino_   Badge #/Date _MCU_   21S. Reviewing Officer's Signature _Sullivan 9/14/02_

I-8/85-629001-2    RECORDS    Page _2_ of _2_

```
                POLICE OFFICER'S FORMAL REPORT        06/02/04 09:19
                PROVINCETOWN POLICE DEPARTMENT                PAGE:  1
                                                          TTY04   -667
Case#:  108042
                                         reported: MONDAY    08/31/98 04:27
rpt date: 08/31/98 06:06
     ucr: 519  ARREST / GENERAL


location: 145 COMMERCIAL ST
   follow up by: None needed           case status:  CLEARED/CLOSED NORMAL
         officer:                        rpt status:  Complete
                                      review officer:  12 SGT SUCHECKI
omp/vict notify: No                sup review officer:  12 SGT SUCHECKI
ir/involve type:
```

omplaint: MULTIPLE 911 CALLS SUBJ IN STREET REQ POLICE

```
eporting officer: 501 PTL RAPOSE        assignment: A       car: A1
  second officer: 674 OFF BUTLER        sup/back-up:
```

### *** NAMES ***

```
                                          phone        dob        ss#
   type    #ast#  name/add
======= ======  ===========================  =========  ========  =========
:FENDANT 021108 ARNDT,DAVID C              (617) 262-5242 10/10/60 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
                28 RUTLAND SQ  apt: 4 BOSTON MA 02118


         obtn:
  VICTIM 021012 VOLZER,ROGER P            (617) 424-1817 07/28/63 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
                26 GREENWICH PARK ST   BOSTON MA 02118


:MPLAINT 000501 RAPOSE,JODI J
                POLICE DEPARTMENT       PROVINCETOWN MA 02657


 WITNESS 021109 FUENTES,ALFREDO                            09/26/63
                627 TREMONT ST   apt: 2 BOSTON MA 02118
                INSIDE RESIDENCE AT TIME OF ALTERCATION.
NVOLVED 000012 SUCHECKI,PHILLIP P
                POLICE DEPARTMENT       PROVINCETOWN MA 02657


 NVOLVED 020380 BUTLER,AARON
                POLICE DEPARTMENT       PROVINCETOWN MA 02657
```

### *** NARRATIVE ***

ON MONDAY, AUGUST 31, 1998 AT APPROXIMATELY 04:27 HOURS, I
WAS ADVISED BY DISPATCHER CALDWELL TO RESPOND TO THE AREA
OF 145 COMMERCIAL STREET FOR MULTIPLE 911 CALLS, SUBJECT IN
THE STREET REQUESTING THE POLICE.

UPON MY ARRIVAL, I WOMEN IN THE RESIDENCE LOCATED AT 145
COMMERCIAL STREET SHOUTED OUT HER TOP FLOOR WINDOW, DOWN
THE ALLEY AND DIRECTED US TO THE AREA OF 143 COMMERCIAL.

AS WE APPROACHED THE RESIDENCE A MALE SUBJECT LATER
IDENTIFIED AT ROGER VOLZER MET US OUT SIDE.   MR. VOLZER



GOVERNMENT EXHIBIT 9  04-CR-10166-RGS  05/23/05

POLICE OFFICER'S FORMAL REPORT          06/02/04 09:19
PROVINCETOWN POLICE DEPARTMENT                 PAGE:  2
                                        TTY04   -667
Case#:  108042
--------------------------------------------------------------------

### *** NARRATIVE ***

SHOWED US A RIPPED SCREEN  BY HIS FRONT DOOR AND RELAYED
THE FOLLOWING TO ME.

VOLZER STATES HE WAS INSIDE HIS RESIDENCE SITTING ON THE
COUCH WITH HIS MALE FRIEND, LATER IDENTIFIED AS ALFREDO
FUENTES.  VOLZER GOT UP TO BLOW THE CANDLES OUT.  HE THEN
STATES, A MALE SUBJECT RIP HIS SCREEN, ENTER THROUGH THE
WINDOW AND ATTACKED HIM AS HE WALKED INTO HIS BEDROOM AREA.
HE STATES THIS MALE SUBJECT HAS THE FIRST NAME OF DAVID AND
IS THE EX-LOVER OF ALFREDO.  VOLZER STATED DAVID WAS
JEALOUS OF HE AND ALFRED.  VOLZER STATES DAVID GRABBED HIM,
STRUCK HIM ON THE RIGHT SIDE OF HIS HEAD WITH HIS FIST.
THE NIGHT STAND TABLE GOT KNOCKED OVER IN THE SHUFFLE
BREAKING TWO DRINKING GLASSES THAT WERE ON THE STAND.   I
OBSERVED THE TABLE IN THE UPRIGHT POSITION BUT BROKEN GLASS
ON THE FLOOR.  DAVID THEN PUSHED VOLZER OUT OF THE BEDROOM
TO THE FRONT DOOR AND THREW A CHAIR AT HIM.  VOLZER WAS
THEN ABLE TO EXIT THE DOOR AND RAN OUT OF THE HOUSE.  DAVID
RAN AFTER HIM, BUT WAS STOPPED BY ALFREDO.  VOLZER
CONTINUED TO RUN AND SHOUTED FOR SOMEONE TO CALL THE
POLICE.  VOLZER STATED ALFREDO AND DAVID THEN LEFT THE
PROPERTY.

VOLZER STATES HE KNOWS DAVID AND KNOWS WHERE HE LIVES BUT
DID NOT KNOW HIS LAST NAME.  HE STATES DAVID WAS WEARING A
WHITE T-SHIRT, JEANS, BLACK SHORT HAIR, AND HE WOULD TAKE
US TO DAVID'S RESIDENCE.

I THEN PLACED VOLZER IN THE BACK OF MY CRUISER AND HE
DIRECTED US TO THE AREA OF 19 TREMONT STREET.  HE POINTED
TO THE HOUSE DAVID LIVES IN.  MYSELF, OFFICER BUTLER AND
SGT. SUCHECKI THEN APPROACHED THE HOUSE.  WE WHERE MET ON
THE DECK BY A MALE SUBJECT DESCRIBED AS DAVID.  THE MALE
STATED "YOU MUST BE LOOKING FOR ME".  I ASKED HIM IF HE WAS
DAVID AND HE STATED, "YES".  DAVID STATED, "I DID SOMETHING
VERY DUMB, I KNOW".  SGT. SUCHECKI STATED, "WHAT DID YOU
DO"?  DAVID STATED, " I WENT DOWN TO THAT GUYS HOUSE".

I THEN PLACED DAVID, IDENTIFIED AS DAVID C. ARNDT, UNDER
ARREST FOR BURGLARY WHILE ARMED, ASSAULT ON AN OCCUPANT,
CHAPTER 266-14, A&B, CHAPTER 265-13A, A&B, BY DANGEROUS
WEAPON BY MEANS OF A CHAIR, 265-15A, MALICIOUS DESTRUCTION
OF PROPERTY $ 250.00 OR LESS 266-127.

DAVID WAS THEN TRANSPORTED TO THE POLICE STATION WHERE HE
WAS BOOKED, PHOTOGRAPHED, FINGERPRINTED, AND AFFORDED THE
OPPORTUNITY TO A PHONE CALL WHICH HE REFUSED.

AT APPROXIMATELY 06:40 HOURS, I READ DAVID, MIRANDA WARNING

POLICE OFFICER'S FORMAL REPORT     06/02/04 09:19
PROVINCETOWN POLICE DEPARTMENT          PAGE:  3
                                        TTY04   -667
Case#:  108042

----------------------------------------------------------------

### *** NARRATIVE ***

AND ASKED HIM IF HE UNDERSTOOD, WHICH HE REPLIED "YES".  I
THEN ASKED DAVID IF HE WISHED TO SPEAK WITH ME.  HE STATED,
"NO, I THINK I'LL WAIT FOR MY ATTORNEY.

                    RESPECTFULLY SUBMITTED,


                    JODI RAPOSE
                    POLICE OFFICER



SUPPLEMENTAL REPORT 9-1-98 05:20 HOURS

AFTER VOLZER TOLD ME HE WAS STRUCK IN THE HEAD, I ASKED HIM IF
HE HAD ANY INJURY, HE STATED NO.   I FURTHER ASKED HIM IF HE WOULD
LIKE TO BE SEEN BY RESCUE, HE REFUSED.   I SHINNED MY FLASHLIGHT
ABOUT HIS BODY AND WAS UNABLE TO SEE ANY SIGN OF INJURY.

WHEN I EXITED THE RESIDENCE TO WAIT FOR VOLZER OUTSIDE, I
OBSERVED HIM INSIDE CRYING..

## Incident/LEO Intervention Data

Date __6/19/03__    Officer or FSD __Alexander #538__

**Type of incident**

**Arrest**
- [ ] of passengers at checkpoints
- [ ] of passengers at gates
- [ ] of passengers removed from flight
- [ ] of passengers in other parts of airport

**Other**
- [ ] Passengers removed from their flight but not arrested
- [ ] Disruptive passengers (not yet emplaned and not arrested)
- [ ] Disruptive crew members
- [ ] Disruptive non-crew airport staff

**Passenger deplanings/re-screenings**
- [ ] due to gate problem (e.g., non random screenings)
- [ ] due to concourse closure
- [ ] for other reasons

**Gate Evacuations**
- [ ] due to unattended bag resulting in positive ID of threat
- [ ] due to unattended bag resulting in NO ID of threat
- [ ] due to other dangerous item
- [ ] for other reasons

**Concourse Evacuations**
- [ ] due to unattended bag
- [ ] due to unattended bag resulting in NO ID of threat
- [ ] due to other dangerous item
- [ ] due to checkpoint closure
- [ ] for other reasons

**Other Incidents**
- [ ] Terminal evacuation and search
- [ ] Ticket lobby evacuation and search
- [ ] Other threats
- [ ] ETD alarms-explosives
- [ ] Bomb/terroristic threat
- [ ] LEO credential verification
- [x] Suspicious passenger
- [x] Suspicious item or substance
- [ ] Suspicious passenger
- [ ] Suspicious item or substance

Incident Location __B-2, US Air Shuttle, Selectee lane__

Passenger(s) Involved __David Arndt__
__26 Rutland Sq. #3, Boston, MA 02118__

Witnesses __Thomas LaFleur, TSA - Lisa LaRosse, TSA__
__Robert Machado, Acting Supervisor__

Action Taken __State Police were summoned to respond__
__to checkpoint. Passenger David Arndt had__
__artfully concealed on his person, in his jacket,__
__& throughout his carry-on bag $19,000 in U.S.__
__Currency. Responding State Police checked__
__& cleared Mr. David Arndt to continue his__
__flight. Screening Manager, Tim Burke, was also__
__Notified & responded to checkpoint. E Unit__

**Subject** DAVID ARNDT

**Street** 26 RUTLAND SQ #3

**City/State/ZIP** BOSTON MA 02118

**Telephone** 61- 262 5242    **License #** 026 48716

**DOB** 10/10/60

**Gender** M    **Date** 6/18/03

**Signature**

**Type**: ☒ Passenger  ☐ Crew  ☐ Non-crew staff  ☐ TSA Employee
☐ Other:

**Weapon Involved**
**Type**:                                    **SN**:

**Make / Model**:
                                    **Loaded?**:  ☐ Yes   ☐ No
**Ammunition Rounds**:

**Reason for carrying**:

**Explosive Substance(s) Detected**:

**Witnesses**
**#1 Name** Thomas Lafleur
**Street** Bos - TSA
**City/State/ZIP**
**Telephone**

**#2 Name** Robert Machado
**Street** TSA - Bos
**City/State/ZIP**
**Telephone**

**Involved Staff** (please print)
**Screener Name** Thomas Lafleur

**Shift Supervisor** Robert Machado / Bill Pratt

**Screening Mngr.** Tim Burke

**Airline Rep.**

**State Trooper** Alexander #538

**Prepared by**
**Signature**: Robert Machado    **Date**: 6/19/03

1440
US

# Security Incident

Notify Screening Manager and Trooper Immediately!!!

Date: 6/19/03    Time: 1440

Checkpoint: B-2    Gate: 19    Carrier: US Air    Flight # 2135

Type:
- [ ] Weapon/Explosive
- [ ] Threat
- [ ] Disturbance
- [x] Suspicious
- [ ] Unauthorized Access
- [ ] Other – please summarize:

Large Sum of U.S. Currency ($19,000 00)

**Nature of Incident** At approximately 1440 hrs. Screener Thomas Lafleur notified me of a large sum of U.S. Currency he had found on Selectee Passenger David Arndt who was traveling to LGA. Mr. Arndt had the currency stuffed around his waist under his shirt, in his jacket + a/s. throughout his carry-on bag. When asked how much U.S. Currency he had, he stated "Um $900?" which he changed to "$10,000" + later it was determined to be approximately $19,000 cash in U.S. Currency in his possession part of which was artfully concealed under his shirt, trousers, + inside his jacket.

**Action Taken** Ma State Troopers were summoned (Trooper Alexander #538). Mr. David Arndt was cleared to resume his Travel. Screening Manager Tim Burke was notified + responded to checkpoint, where he met with acting Supervisor Robert Machado

. Department of Justice
g Enforcement Administration

| REPORT OF INVESTIGATION | | | Page 1 of 12 | |
|---|---|---|---|---|

| Program Code | 2. Cross File | Related Files | 3. File No. ▓▓▓▓▓ | 4. G-DEP Identifier ▓▓▓▓▓ |
|---|---|---|---|---|
| API 100 | | | | |
| By: S/A Robert Donovan | | | 6. File Title ▓▓▓▓ | |
| At Boston, MA | | | | |

☐ Closed ☐ Requested Action Completed
☐ Action Requested By:

8. Date Prepared
05/10/04

Other Officers: S/A Mike Cashman, and TFO Shawn Murray

0. Report Re: Proffer interview of ▓▓▓▓▓▓▓ on 5-7-04

SYNOPSIS

On 5-7-04, at approximately 11:15 a.m., S/A Robert Donovan, TFO Shawn Murray, S/A Mike Cashman, Assistant United States Attorneys (AUSA) William Weinreb and Cynthia Lie conducted a Proffer interview of ▓▓▓▓▓▓. Also present was ▓▓▓▓▓'s legal counsel ▓▓▓▓▓▓.

DETAILS

Reference is made to previously submitted DEA-6's made to this file title and case number.

▓▓▓▓▓ provided some background information on himself, stating that


**REDACTED**

| Distribution: | 12. Signature (Agent) | 13. Date 05-10-04 |
|---|---|---|
| Division | S/A Robert Donovan | |
| District | 14. Approved (Name and Title) | 15. Date |
| Other | Michael McCormick Group Supervisor | |

DEA SENSITIVE
Drug Enforcement Administration

Form  - 6
1996)

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

DEFENDANT'S EXHIBIT

06/24/2004 16:44 FAX 617 748 3358

U.S. Department of Justice
Drug Enforcement Administration

# REPORT OF INVESTIGATION
*(Continuation)*

| 1. File No. | 2. G-DEF Identifier |
|---|---|
| 3. File Title | |

| 4. Page  2  of  12 | 6. Date Prepared  05/10/04 |
|---|---|

5. Program Code
API 100

**REDACTED**

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used

EA Form      - 6a
Jul. 1996)

06/24/2004 16:44 FAX 617 748 3358

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
*(Continuation)*

| 1. File No. | 2. G-DEP Identifier |
|---|---|
| | |

3. File Title

4.
Page  3  of  12

5. Program Code
  API 100

6. Date Prepared
  05/10/04

REDACTED

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

.A Form    - 6a
#. 1996)

Previous edition dated 8/94 may be used

06/24/2004 16:44 FAX 617 748 3358                                              ☒008

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
*(Continuation)*

| 1. File No. ▮▮▮▮ | 2. G-DEP Identifier ▮▮▮▮ |
|---|---|
| 3. File Title ▮▮▮▮ | |

4.
Page  4  of  12

5. Program Code
API 100

6. Date Prepared
05/10/04

**REDACTED**

1

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used

DEA Form    - 6a
Jul. 1996)

08/24/2004 16:44 FAX 617 748 3358                                    ☐007

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
### (Continuation)

| 1. File No. | 2. G-DEP Identifier |
|---|---|
| ▉▉▉▉ | ▉▉▉▉ |

| 3. File Title ▉▉▉▉ |
|---|

4.
Page  5  of  12

| 6. Date Prepared |
|---|
| 05/10/04 |

5. Program Code
API 100

**REDACTED**

2.    ▉▉▉▉▉ told ▉▉▉▉▉ that ARNDT's screen name on MANHUNT.COM was
wolfdog35. ▉▉▉▉▉ then got on the WWW.MANHUNT website and
discovering ARNDT online, engaged ARNDT in online chat. ▉▉▉▉ and
ARNDT arranged to meet at ▉▉▉▉'s residence. ▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

A Form   - 6a
J. 1996)

Previous edition dated 8/94 may be used.

☰008

06/24/2004 16:44 FAX 617 748 3358

.S. Department of Justice
rug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. ████ | 2. G-DEP Identifier ████ |
| | 3. File Title ████ | |

| | |
|---|---|
| 4. **Page 6 of 12** | 6. Date Prepared .05/10/04 |
| 5. Program Code API 100 | |

████ knew that ARNDT was a narcotics dealer but pretended not to know because he wanted to make a connection with ARNDT for crystal methamphetamine. That meeting occurred around the first or second week of July 2003. In addition, ████ stated that at that time, he knew ARNDT was Dave, but it was not until later that he discovered that ADRNT was a physician.

23. During that first meeting in July 2003, ARNDT told ████ that he was a drug dealer, that he only sold methamphetamine and produced a large (according to ████, approximately 2-3 gram size) crystal rock of methamphetamine. ARNDT broke off a piece for ████ to have.

24. During that first meeting, ████ convinced ARNDT to sell him crystal methamphetamine. ARNDT told ████ that he would sell him an eightball (1/8 of an ounce) for $400.00 United States Currency (USC). At this time, ████ related the rules ARNDT told ████ to follow in the drug business. ARNDT told ████: Never arrive at his house without calling; Always be appropriately dressed; there are certain times when ████ should never call; No one is to know ARNDT's name.

25. ████ was able to acquire the $400.00 USC and he went to 26 Rutland Street, Boston, MA (ARNDT's residence) to purchase the eightball from ARNDT. ████ stated that ARNDT's residence consisted of a third and fourth floor and that ARNDT was in the process of putting on a roof deck. ARNDT made ████ wait downstairs in his residence for a long while. ████ also reported that two male individuals were present in the residence, a Rob LNU, a.k.a. Construction ROB and an Alfredo LNU. ████ also stated that ARNDT searched ████'s person before selling him any crystal methamphetamine.

26. ████ described the inside of ARNDT's residence as very beautiful and contained many pieces of artwork and valuable furniture. The residence had a curved stairway leading to the upper floors which contained the master bedroom, a bathroom and an office. ████ went on to state that he went to the upstairs office and observed ARNDT sitting at a desk, facing a computer. ████ told ARNDT how much he wanted and ARNDT opened a desk drawer to get the crystal

EA Form      - 6a
(4-1995)              This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used

.S. Department of Justice
rug Enforcement Administration

**REPORT OF INVESTIGATION**

*(Continuation)*

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title | |

4.
Page 7 of 12

5. Program Code
API 100

6. Date Prepared
05/10/04

methamphetamine. ▮▮▮▮ stated that when ARNDT opened the drawer,
▮▮▮▮ observed a cigar box in the drawer and inside the cigar box
was a large pile of crystal methamphetamine which ▮▮▮▮ estimated
to be approximately one kilogram. The cigar box was lined with a
plastic bag. ARNDT also had a tackle box behind his chair where he
kept plastic bags for his customers crystal methamphetamine.

7. ▮▮▮▮ reported that he purchased the eightball from ARNDT and in
about two hours went back for another eightball, again paying $400.00
USC. In another day or two, ▮▮▮▮ stated that he returned to
ARNDT's residence and purchased one-half ounce of crystal
methamphetamine from ARNDT for $1,600.00 USC. ▮▮▮▮ stated that in
an approximate ten day period he purchased the two eightballs, a
half-ounce quantity twice, paying $1,600.00 on both occasions and
then he finally purchased a full ounce of crystal methamphetamine
paying $2,400.00 USC. ▮▮▮▮ reported that these were ARNDT's
standard prices for those quantities. ARNDT also gave ▮▮▮▮ a small
black colored scale to use because ▮▮▮▮ did not have a scale of
his own. ARNDT referred ▮▮▮▮ to a website called
www.saveonscales.com.

8. Given ▮▮▮▮'s purchases in that ten day period, ARNDT added more
rules for ▮▮▮▮ to follow: never sell to the friend of a friend; do
not talk on the telephone; do not ever send anything through the
mail; and do not be noticeable. ▮▮▮▮ added that during those
purchases from ARNDT, Alfredo LNU was always present. ▮▮▮▮
understood that ARNDT and Alfredo LNU had an intimate relationship at
one time. Rob LNU was also always present, but ▮▮▮▮ was not sure
of ARNDT and Rob LNU's relationship. ▮▮▮▮ also stated that every
time he made a purchase of crystal methamphetamine from ARNDT they
used the drug as well. ▮▮▮▮ stated that ARNDT always asked ▮▮▮▮
to use 100 dollar bills and that if ▮▮▮▮ would use 100's he would
give ▮▮▮▮ a break in the price.

9. ▮▮▮▮ stated that after that initial ten day period, he purchased
an ounce of crystal methamphetamine approximately every other day and
then every three days, totaling approximately seven to twelve ounces.
During his last ounce purchase from ARNDT, ▮▮▮▮ purchased two

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used

DEA Form - 6a
1996)

06/24/2004 16:44 FAX 617 748 3358

**U.S. Department of Justice**
**Drug Enforcement Administration**

## REPORT OF INVESTIGATION
*(Continuation)*

| | |
|---|---|
| 1. File No. ███████ | 2. G-DEP Identifier ███████ |
| 3. File Title ███████ | |

4.
Page 8 of 12

5. Program Code
API 100

6. Date Prepared
05/10/04

ounces because ARNDT told ████████ he was going to shut him off. When
ARNDT was first arrested, he got nervous and told ████████ that he was
going out of business but that ████████ could still make purchases
from time to time. ████████ understood that to mean that ARNDT was
going to shut him off.

30. During the time of those purchases, ████████ did not know who was
ARNDT's source of supply.

## REDACTED

3. After ARNDT was bailed from jail, ARNDT told ████████ about purchasing
an ounce of crystal methamphetamine from a friend (possibly a
psychiatrist friend) for $1,800.00 USC an ounce and the quality was
poor. At that time, a friend of ARNDT's named Bing LNU stepped in and
helped ARNDT meet a friend of Bing LNU's in California.

4. ████████ related that ARNDT flew to California, rented a room at the
Beverly Hills Hotel and "wined and dined" the unknown male in
California. ARNDT later told ████████ that the California male is a
chemist and makes his own crystal methamphetamine. While in
California, ARNDT made a purchase of crystal methamphetamine from the
unknown male and made arrangements for the unknown male to send the
drugs to him. The unknown male sent the drugs to ARNDT UPS or USPS in

DEA SENSITIVE
Drug Enforcement Administration
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated

A Form    - 6a
1. 1996)

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
### (Continuation)

| 1. File No. | 2. G-DEP Identifier |
|---|---|
| ▮▮▮▮ | ▮▮▮▮ |

3. File Title ▮▮▮▮▮

| 4. Page 9 of 12 | 6. Date Prepared 05/10/04 |
|---|---|

5. Program Code
API 100

a fictitious name that ARNDT made up and ARNDT was subsequently arrested.

35. At a later time, ▮▮▮▮ asked ARNDT what happened and ARNDT told ▮▮▮▮ that he got a room at the Chandler Inn (▮▮▮▮ stated that BASIL owned the Chandler Inn) and when the package arrived he came down, picked up the package and then he was stopped by the police. ARNDT stated that he told authorities that he didn't know who was getting the package, that the package was in his friends name. ARNDT specifically told ▮▮▮▮ that the friends name was made up.

36. During the last few weeks before ▮▮▮▮ was arrested, he and ARNDT were together everyday. ▮▮▮▮ had given ARNDT $500.00 USC and an eightball of crystal methamphetamine when ARNDT was first released from jail. ARNDT then began selling his furniture to ▮▮▮▮ and ▮▮▮▮ was paying ARNDT in crystal methamphetamine. On a few occasions, ARNDT did purchase crystal methamphetamine from ▮▮▮▮ for Jib LNU.

37. During the time that ▮▮▮▮ knew ARNDT, he knew ARNDT to be prescribing oxycontin to ▮▮▮▮, and others that ▮▮▮▮ knows. ARNDT had stockpiled oxycontin and continued to sell them even after he lost his medical license.

38. About one week before ▮▮▮▮ was arrested, he sold ARNDT an ounce of crystal methamphetamine for $1,800.00 which ARNDT in turn sold to Jib LNU. Also around that time, ARNDT told ▮▮▮▮ that Alfredo LNU had left ARNDT with some of his more valuable artwork.

39. ▮▮▮▮ stated that the crystal methamphetamine he was arrested with was to be sold in the following manner: one ounce to ARNDT for furniture, one-half ounce for ▮▮▮▮, one quarter pound for a ▮▮▮▮ ▮▮▮▮ and an ounce for a ▮▮▮▮ ▮▮▮▮

40. ▮▮▮▮ also described several other individuals he knew during his time selling narcotics. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ very big in ▮▮▮▮▮

DEA SENSITIVE
Drug Enforcement Administration

A. Form    - 6a
1996)

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used

☑012

U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF INVESTIGATION**

*(Continuation)*

| | |
|---|---|
| 1. File No. | 2. G-DEP Identifier |
| 3. File Title | |

4.
Page  10  of  12

5. Program Code
API 100

6. Date Prepared
05/10/04

1.  Also during the days
before he was arrested, ███████ related that ARNDT told him he was
doing "back room doctoring." ARNDT told ████████ that he was treating
people who would get shot and could not or did not want to go to the
hospital. ████████ found out about this because on one occasion he had
been trying to reach ARNDT all night long but he could not reach him.
When he finally reached ARNDT the next day, ARNDT told him the story
about practicing "back alley medicine." ARNDT told ████████ it was a
growing business.

2.  At that time, the interview moved from discussing ARNDT to discussing

**REDACTED**

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Form  - 6a
1996)

REDACTED

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |
| | 3. File Title | |

| 4. Page  11  of  12 | 6. Date Prepared  05/10/04 |
|---|---|
| 5. Program Code  API 100 | |

**REDACTED**

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used

Form   - 6a
1996)

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No: CC-04-0070 | 2. G-DEP Identifier UGA3D |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. File Title ████████████ | |
| 4. Page 12 of 12 | | |
| 5. Program Code API 100 | 6. Date Prepared 05/10/04 | |

# REDACTED

A Form    - 6a
(1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

E

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**Criminal No. 04-10166-RGS**

UNITED STATES OF AMERICA    .
        Plaintiff    .

                .

        v.    .

                .

DAVID ARDNT    .
        Defendant    .

. . . . . . . . . . . . .

### TRANSCRIPT OF DETENTION HEARING (PARTIAL)
### BEFORE THE HONORABLE MARIANNE B. BOWLER
### UNITED STATES MAGISTRATE JUDGE
### HELD ON JUNE 4, 2004

APPEARANCES:

For the Government:  John Wortmann, Esquire, Cynthia Lie, Esquire, U.S. Attorney's Office, One Courthouse Square, Ste. 9200, Boston, MA  02210, (617) 748-3965.


For the Defendant:  Stephen Delinsky, Esquire, Eckert, Seamans, Cherin & Mellott, LLC, 18th Floor, One International Place, Boston, MA  02110, (617) 342-6825.

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1  Q    Was anyone else present during these transactions

2  according to the CW?

3  A    According to CW-2, his roommate, Alfredo Fuentes, was

4  present during several of these transactions.

5  Q    And what was the quality of this crystal methamphetamine?

6  A    From CW's own personal experience of using it himself and

7  from his clientele, his customers, the quality was, it was very

8  good.

9           THE COURT:  CW-2?

10          THE WITNESS:  CW-2, yes, your Honor.  It was very

11 good quality crystal methamphetamine.

12 BY MS. LIE:

13 Q    And what happened to the CW-2's dealings with the

14 defendant?

15 A    The last purchase that CW-2 made from Dr. Arndt was for

16 two ounces, and at that time, according to CW-2, the doctor

17 shut him off because he was getting too big, big of a dealer.

18 Q    What other significant things did this CW-2 tell you about

19 the defendant?

20 A    Once the doctor got arrested, CW-2 pretty much took up his

21 clientele and he developed a very good crystal methamphetamine

22 business, but after the doctor got out of Nashua Street jail

23 after his arrest on August 8th, subsequently got out of Nashua

24 Street Jail in early October 2003, some time after, he got out

25 of Nashua Street Jail, CW-2 gave Dr. Arndt $500 plus an eight

Direct - McCaron                                                    17

1   ball, one-eighth ounce of crystal methamphetamine.

2   Q    ·Did the CW-2 sell any other amounts of drugs to the

3   defendant after he got out of prison from the August 2003

4   incident?

5   A    Following that initial freebee, he termed as a freebee he

6   gave to Dr. Arndt, he sold, he later sold a half ounce of

7   methamphetamine to the doctor for $1,600 which he, which the

8   doctor in turn sold to someone else for $1,800.

9   Q    Who is this person?

10  A    His name was, the CW-2 gave his name as Jib.

11  Q    According to the CW-2, were there any other plans for a

12  distribution from CW-2 to the defendant after his August 2003

13  arrest?

14  A    Yes, there was plans to sell Dr. Arndt an ounce of

15  methamphetamine, but those plans were interrupted because CW-2

16  got arrested in February of 2000, of this February.

17  Q    Were there any other conversations that CW-2 had with the

18  defendant after the August 2003 arrest?

19  A    Yes.  There was conversations regarding the package that

20  was sent from California.  CW-2 stated that the doctor told him

21  that he had developed a new source out in Los Angeles and that

22  he and another associate from the Boston area traveled to LA to

23  meet this, what he termed as a chemist and they made

24  arrangements to set up deals for methamphetamine.

25  Q    Any deals specifically?

Direct - McCaron                                                    18

1    A    The deal specifically for the package that was

2    subsequently mailed from Los Angeles on August 6th, 2003.

3    Q    Did CW-2 convey specifically what the defendant had told

4    him about the package related to the August 8th, 2003 incident?

5    A    Yes.  He told him that the package itself got intercepted

6    first because it was over two pounds and it had a handwritten

7    label.  He also told him that the addressee, Frank Castro, was

8    just a fictitious name.

9    Q    Did the CW-2 convey to you or other agents any other

10   conversations that he had, he or she had with the defendant

11   post August 2003?

12   A    Yes, he did.

13   Q    What was that?

14   A    There was one conversation in which Dr. Arndt told CW-2

15   that he was, as the CW-2 termed "back alley medicine" where the

16   doctor was treating overdoses and gun shot victims.

17   Q    Anything else that the CW-2 relayed to you or other agents

18   about conversations that the defendant and CW-2 had after

19   August 2003?

20   A    At this time I can't recall.

21   Q    Now, did you and other agents further corroborate the

22   defendant's drug dealing with other cooperators?

23   A    Yes, they did.

24   Q    And who was that?

25        MR. EGBERT:  Judge, could that be reframed?  Instead

F

THE BOOK — march 2002

DAILY TO DO LIST ↑

Get K 49.1 6766

300 mt Auburn St
Suite 416
Cambridge MA 02238

※ Put product into storage ※



~ ▓▓▓▓▓▓▓▓▓▓

→ Rafael pick up product

- Bobbie    50g
- Gary    amour
- Woody    50g ? said new
- Ricky    50g
- mike ↑ ?
- Alex / Fionne   40 tix

SUNDAY

Look @ Motorcycles
Cars   Porche Jag
Mercedes, Audi,
BMW

## WEEKLY PLAN

| DATE | | | |
|---|---|---|---|
| 3 24 02 | See to do list for yesterday. Can not do banks until Monday. | Possibly NO Dale/pAul | |
| 3 25 02 | CVS/walgreens Laundry | 8000, & 500 weekend | |
| 3 26 02 | *BANKS* | | |
| 3 27 02 | | | |
| 3 28 02 | | | |
| 3 29 02 | TO DO: Banks, Sears, Voicestream Laundry 5pm Staples/Office Ed Clem | PEOPLE: Matty, Jeb— Johnny Billy Larry Sean | Western Union/ laptop rebate CONRAD/DAVE BOOKS! |
| 3 30 02 | Banks, Sears, Voicestream Staples/Office Depot | CALL JohnW Phone number 12 NOON | 3005840 See List #3 PRINT OUT |

## WEEKLY PLAN

## MEDS: Minnie + Sharletah

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| send #'s to Mike by 9:45 it's now 10:45 and Not due one hundred | 24050 30700 280070 | 12,100 - room + BANK 3/29 |



125







1:30 ? Dave Buried Treasures

440  280   Mt Bottles Perfume
60
240  180   Baggies
1680
1680   Scale
→ Celeste has Apartment
Dave → Park Safe
Anthony → Go pay for Trade
Paul Moorey  Trade 100 for 100
# 250 V-ES = 875
(Dave Patrick if more)?
Alex wants 1/4 C for 350   [57]
Jeff my Jeff nut help selling plus wont him
Raphael thin want chs speed - Resell house
                    cake
Paul Lombardi  Scripts)  Anthony pump
Rob D/Paul Lab    60 the k's
Matty  Brand New for chill times
Bill Murphy  work  236-1500
           cell  816 8387
Nairi —  Zaure = 28-6065   1680
Patrick Roscoe Mc's ? + 250 Vigs  1680
                                    875
Igornan    + Anthony - 1 of New Batch
Ricky = Debts = Pete - Matt

Telephone (617) 491-5755

David C. Arndt, M.D.

CAMBRIDGE, MA 02238

300 MT. AUBURN ST., SUITE 416

AGE _____

NAME _____

DATE _____

ADDRESS _____

Rx

_____ M.D.

DEA#:

REFILL     NR     TIMES          INTERCHANGE IS MANDATED UNLESS THE PRACTITIONER
                                 WRITES THE WORDS "NO SUBSTITUTION" IN THIS SPACE

Telephone (617) 491-6766

**David C. Arndt, M.D.**

300 MT. AUBURN ST., SUITE 416                                      CAMBRIDGE, MA 02238

NAME _____ AGE _____

ADDRESS _____ DATE _____

℞

_____ M.D.

DEA#:

REFILL    NR    TIMES          INTERCHANGE IS MANDATED UNLESS THE PRACTITIONER
                               WRITES THE WORDS "NO SUBSTITUTION" IN THIS SPACE