```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2

 3     *  *  *  *  *  *  *  *  *  *  *  *  *  *
       *UNITED STATES OF AMERICA    *
 4                                  *   CRIMINAL ACTION
                  v.                *   No. 04-10166-RGS-1
 5     *                            *
       DAVID CARL ARNDT             *
 6                                  *
       *  *  *  *  *  *  *  *  *  *  *  *  *  *
 7

 8

 9           BEFORE THE HONORABLE RICHARD G. STEARNS
                 UNITED STATES DISTRICT JUDGE
10                        DISPOSITION
                     December 19, 2006
11

12     APPEARANCES:

13           UNITED STATES ATTORNEY'S OFFICE, (By AUSA Nancy
       Rue), 1 Courthouse Way, Suite 9200,  Boston,
14     Massachusetts  02210, on behalf of the United States of
       America
15

16           ECKERT SEAMANS CHERIN & MELLOTT, LLC, (By Stephen
       R. Delinsky,  Esq., and Robert Delahunt, Esq.), 99
17     Summer Street, Suite 1800, Boston, Massachusetts
       02110, on behalf of the Defendant
18

19

20                                  Courtroom No. 21
                                    1 Courthouse Way
21                                  Boston, Massachusetts 02210

22
                        James P. Gibbons, RPR, RMR
23                         Official Court Reporter
                        1 Courthouse Way, Suite 7205
24                       Boston, Massachusetts  02210
                            jmsgibbons@yahoo.com
25
```

```
 1              P R O C E E D I N G S
 2          THE CLERK:  Court is open.  You may be seated.
 3          This is United States of America versus David
 4   Arndt, Criminal No. 04-10166.
 5          Would counsel please identify themselves for the
 6   record.
 7          MS. RUE:  Good afternoon, your Honor.  Nancy
 8   Rue for the United States.
 9          MR. DELINSKY:  Stephen Delinsky for the
10   defendant, David Arndt, your Honor.
11          MR. DELAHUNT:  Good afternoon, your Honor.
12   Robert Delahunt with Mr. Delinsky.
13          THE COURT:  I'm sorry for the brief delay.  I
14   had just been faxed Dr. Fayne's evaluation, which I had not
15   seen, and I wanted to be certain I read it prior to this
16   hearing.
17          Obviously, I read the presentence report, as I know
18   all counsel and Dr. Arndt have done.
19          I have read the sentencing memorandum submitted by
20   the defendant as well as the memorandum that was submitted
21   earlier today by the government.
22          I have read, which is attached to the presentence
23   report, Dr. Amador's evaluation, which is presented at some
24   length.
25          As we know, the original plea agreement had been
```

 1   premised on the assumption that the safety valve provision

 2   would apply.  I think it's been since determined by the

 3   Probation Office that it does not.  So what was originally a

 4   Guideline calculation, as I recall, of 108 to 135 months,

 5   recognizing that the Guidelines calculations are advisory at

 6   this point in our jurisprudence, rather now the Probation

 7   Office recalculates the Guideline range as 151 to 188

 8   months.

 9            Putting aside the basis for that calculation, I

10   know a number of objections of a factual nature were

11   submitted by the defendant, most of them of a historical

12   nature, and it appears to me they have been addressed fairly

13   thoroughly by the probation officer in the addendum to the

14   presentence report.

15            There is, without the safely valve, of course, the

16   complicating factor that there is a minimum mandatory

17   sentence, as I recall, of ten years that attaches to two of

18   the counts of conviction.

19            MS. RUE:  Yes, your Honor.

20            THE COURT:  Ms. Rue, why don't we begin with

21   the government.

22            Mr. Delinsky, you were going to call a witness, I

23   believe?

24            MR. DELINSKY:  Yes.  I was going to call

25   Dr. Amador.

1          THE COURT:  Just to set a parameter, let me

2  begin with the government's recommendation to the Court, and

3  then we will proceed with the defendant's presentation.

4          MS. RUE:  Your Honor, the government

5  recommends a sentence of 170 months.

6          This is a case in which the defendant has had

7  numerous opportunities to conform his conduct to the law.

8  There are so many defendants that appear in front of this

9  Court who have never breathed the possibilities of the

10  opportunities that related to this defendant, and yet he

11  became a methamphetamine user and he became a

12  methamphetamine dealer.

13          This is a devastating drug.  It's had a crippling

14  effect on the gay community in Boston.  It's had a crippling

15  effect on society, and we believe that a sentence under the

16  Guidelines at the middle of the guideline range is

17  appropriate.

18          We believe that the items submitted as mitigating

19  by the defendant are not, in fact, mitigating for the

20  reasons submitted in our sentencing memorandum.

21          This is a defendant who's had multiple

22  opportunities to conform his conduct.  He has chosen not to

23  do so, and a Guidelines sentence is appropriate.

24          THE COURT:  Mr. Delinsky.

25          MR. DELINSKY:  Yes, your Honor.

1          We also submitted electronically some sentencing

2     letters to the Court yesterday.

3               THE COURT:  I did not see those.

4               MR. DELINSKY:  I am going to give the

5     originals to you now.  The government has been provided

6     them.  There are three letters.

7               THE COURT:  If you do not mind pausing while I

8     read them.

9               MR. DELINSKY:  Sure.

10          (Pause in proceedings.)

11               THE COURT:  Dr. Silen's letter, Dr. Biolio's

12     letter and Rabbi Goodman's letter, and those will become

13     part of the record.

14               MR. DELINSKY:  Thank you, your Honor.

15          I am going to approach my argument, Judge, from a

16     very basic premise.

17          Both the government and I, when we negotiated the

18     plea agreement, believed that Dr. Arndt qualified for the

19     safety valve, and it was so stated in the plea agreement.

20          And at the plea itself, you asked Assistant United

21     States Attorney Cynthia Lie what her calculation of the

22     proper level would be based upon her knowledge, and she said

23     it would be Level 30, 31, and that was consistent with our

24     understanding of the application of the safety valve in this

25     case.

1          Subsequently, the Probation Department determined

2     that some of the offense conduct occurred when Dr. Arndt was

3     on probation from a federal misdemeanor conviction in New

4     Orleans, and according to the Guidelines, if such an event

5     happens it causes a triggering event to increase the

6     criminal history score, and that's what the Probation

7     Department determined.  And one of the qualifications in

8     order to be qualified for the safety valve is to have a

9     criminal history score no greater than I.

10          So that necessitated a hearing before this Court

11     where Dr. Arndt said that he felt obligated not to withdraw

12     his plea and that he was prepared for all consequences that

13     could occur, notwithstanding the advice that he had been

14     given that may not have been correct, and then we proceeded.

15          So I think it's quite dramatic that at one time you

16     have the government being prepared to support a safety valve

17     and an appropriate sentence thereunder, and now with no

18     additional facts, except the application of the Guidelines,

19     to say it's a 170-month sentence.

20          We have made various arguments, two key arguments,

21     why this Court can grant David Arndt the safety valve.

22          The first argument is based upon constitutional

23     avoidance, and the series of United States Supreme Court

24     cases that talk about prior criminal history and the effect

25     that those cases have today in light of Booker, in light of

1    Fan Fan, and in light of some of the dissenting opinions

2    that occurred from some of the majority of the Supreme Court

3    when the Almendarez-Torres case was first decided in 1998.

4         I have stated in the sentencing brief all of the

5    cases, all of the dissents, as recently as Judge Souter's

6    comment about constitutional avoidance and trying to deal

7    with these issues; both the statement of Justice Thomas and

8    Justice Scalia, talking about, primarily in the Shepard case

9    decided in 2005, Justice Thomas, who was part of the

10   majority in the Almendarez-Torres case, stated, "Innumerable

11   criminal defendants have been unconstitutionally sentenced

12   under the flawed rule of Almendarez-Torres, despite the

13   fundamental imperative that the court maintain absolute

14   fidelity to the protections of the individual afforded by

15   the notion of trial by jury and beyond a reasonable doubt

16   requirements."

17        As a result of those cases and of the case law that

18   has occurred post Booker, our contention is that the prior

19   conviction that occurred in New Orleans in 1999 that serves

20   as a trigger to take Dr. Arndt out of the safety valve

21   should have been charged either in the indictment or

22   admitted to in the plea colloquy according to these

23   constitutional standards.

24        Either of those events did not occur.

25        So, consequently, now we're left with the concept

1    of judicial fact finding.  And I know there is a prior

2    conviction exception that is talked about in Booker.  I know

3    our own First Circuit when confronted with this, as the

4    United States Attorney has pointed out, has affirmed the

5    United States Supreme Court precedent while recognizing it

6    is highly doubtful and in great disrepute in saying the

7    First Circuit feels obligated to still follow it.

8         I'm not debating what the Assistant United States

9    Attorney submitted in her sentencing brief on the First

10   Circuit's position, but I am also aware of other courts that

11   have taken the language of Justice Souter, of Justice

12   Scalia, Justice Thomas -- without Justice Thomas' vote, that

13   five-to-four majority opinion would have been void, and he

14   has tried to, in numerous decisions, to have that case

15   revisited as both an Apprendi issue and now a Booker issue,

16   and from the case law it clearly applies to mandatory

17   minimums.

18        And so that area of the law is in tremendous flux,

19   and I suggest the next time the Supreme Court hears that, or

20   has an opportunity to decide it, it will rule that in

21   mandatory minimum cases where a triggering will occur to

22   take somebody into the mandatory minimum and not to a safety

23   valve, that that has to be affirmatively pled and admitted.

24        It was not in this case, and, therefore, I have

25   submitted that this Court has the authority under Booker to

1    declare that the Guidelines are advisory on this point and

2    to give Dr. Arndt credit for the safety valve.

3              I then go on to postulate that if that's true,

4    there are other grounds that this Court can utilize in

5    helping itself to come to an appropriate Guideline sentence.

6              First of all, I contend that when this offense

7    conduct occurred, the 2002 Guidelines book was in effect.

8    The 2003 Guidelines book did not take effect until late

9    October of 2003, and then subsequently the 2004 Guidelines

10   book and now the 2006.

11             It's the position of the Probation Department that

12   the 2006 Guidelines book now governs because that's when

13   Dr. Arndt is being sentenced.

14             The rule is, as I understand it and as has been

15   recently affirmed by our First Circuit in Thurston, that the

16   Guidelines in effect at the time of the offense conduct

17   should govern it if it is more lenient, and the Guidelines

18   in effect in 2002 were more lenient.

19             First of all, in 2002 there was no First Circuit

20   decision.  There was no guideline which stated that a

21   criminal history that overstates the seriousness of the

22   offense cannot be applied to a safety valve situation.

23             Subsequently, the Guidelines were amended, after

24   the offense conduct occurred in this case, to prohibit a

25   departure based upon criminal history overstates the

1   seriousness.  But at the time of the offense conduct, that

2   guideline as written by the Commission and approved by

3   Congress did not restrict the Guidelines at all to safety

4   valve cases.  Some circuits did, but the First Circuit was

5   absolutely silent on that issue.

6          So we then make a presentation as to why -- as to

7   what Dr. Arndt's criminal history is.

8          The only conviction that brought him, in our

9   judgment, to Criminal History I was a misdemeanor

10  conviction, where he sought to aid, illegally,

11  inappropriately, his lover, who was faced with deportation

12  back to a country that actively discriminated again

13  homosexuals.  He tried to protect him from being deported.

14         He was originally charged with a felony, as the

15  government points out, but the Court in its wisdom said that

16  it would accept a plea to a misdemeanor, the United States

17  Attorney's Office agreed, and gave Dr. Arndt three years'

18  probation.

19         The triggering event in this whole series, in this

20  indictment before the Court, is a serious activity of

21  conduct that the defendant is charged with committing from

22  the spring of 2003 up until including the beginning of

23  August of 2003, dealing with the sale of methamphetamine,

24  very serious offenses, that bring his guideline calculation

25  very high and trigger potentially a mandatory minimum.

1          The government in its wisdom in the same indictment

2     chose also to charge Dr. Arndt, while he was still a

3     physician, with writing scripts for Oxycondone to a drug

4     dealer by the name of Charles Ghera, who Dr. Arndt was

5     buying crystal meth from at the time as a user.

6          Dr. Arndt has admitted that Charles Ghera was not a

7     patient; that he didn't see Charles Ghera in his office, and

8     met Charles Ghera as somebody who he would buy crystal meth

9     from.  Dr. Arndt has pled guilty to those offenses.

10          What raises his criminal history is that towards

11     the end, over the last few months of his probation -- his

12     probation ended in January of 2002.  So there was one event

13     in January and two more, I believe, in January of 2002.

14     These scripts were written.  And that triggered, according

15     to the Guidelines, an increase of his criminal history from

16     I to III.  The triggering event was a misdemeanor, but while

17     on probation.

18          So in a way he's being doubled punished, because he

19     was punished originally for his first misdemeanor offense.

20     He is being punished for the Oxycodone offenses, which he

21     pled guilty to, and now the triggering event under the

22     Guidelines which could take him out of the safety valve.

23          You will hear testimony that but for the long

24     preexisting mental illness that Dr. Arndt has suffered from,

25     at least since the age of 13, 14, or 15 years old, he would

not have committed this offense conduct, and that the

bipolar disorder that Dr. Arndt suffers from was very

severe; and when he was a young man, a young boy, really, he

began self-medicating with drugs, which caused him at a very

young age to attempt suicide twice, for which he was

hospitalized for weeks, put on medication, and then

antipsychotic medication.

From there he had other offenses that dealt with

antisocial behavior, dealing when he was 19 years old, to a

street offense in California that he engaged in in order to

buy money -- in order to have money for drugs.

According to Dr. Amador, this man has not been drug

free since he was 14 or 15 years old until basically he's

been locked up under these charges since June of 2004; that

for basically 25 years he's been using drugs, and he's been

using drugs as a direct consequence of this underlying

mental illness to deal with a severe depression that bipolar

disorder brings on.  And these drugs have ranged from

marijuana, to LSD, to angel dust, to cocaine, to heroin, to

methamphetamine, and, most recently, to smoking crystal

meth, which gave the defendant the highest level of relief

he had ever experienced.

And what complicates this matter, of course, is

that while this was occurring and that while he was a

chronic drug abuser, he was able to achieve in some parts of

his life great excellence, great academic achievement, and
great promise as a physician.

He is not the only physician that has become drug
addicted with serious problems, and Dr. Amador will talk to
you about Dr. Fayne's specialty in treating drug-addicted
physicians, and how he headed a very famous program in New
York City dealing with drug-addicted physicians, and his
opinion of the root cause of Dr. Arndt's drug addiction.

So these facts, I believe, coupled with Dr. Arndt's
history, I think will lead the Court to conclude that his
criminal history does overstate the seriousness of his
level, that could cause this Court, one, under this
authority under Booker, to grant the safety valve and then
apply the criminal history standard, or under the sentencing
standards outlined in Booker that the Court should follow as
set out in the statute and as reemphasized recently in the
Thurston case.  That was the second time it was decided this
summer, which the First Circuit laid out, for Mr. Thurston
it said, you know, we've reversed the district court before,
twice before, and each time it is granting Mr. Thurston
these downward departures that we don't think are allowed
under the Guidelines but under Booker.  Even though they
don't meet the technical standards of the written
Guidelines, they still qualify as variances under Booker and
under the statute, and outlined for the district court what

1    it could use to reduce the five-year sentence to some

2    30-some-odd months, applying what they said were flawed

3    traditional downward departures.

4         Most recently the First Circuit this summer decided

5    the Feliz case.  Your Honor was the sentencing judge in that

6    case, and that was a safety valve case in which the

7    government contended, and this Court found, that the

8    defendant did not meet the requirements of the safety valve

9    because he did not proffer truthfully all the information;

10   again, one of the prongs of the safety valve.  And the First

11   Circuit went on to analyze this Court's ruling and affirmed

12   this Court's finding that the safety valve did not apply;

13   That the Court was correct in its analysis in saying that

14   the safety valve did not apply because it did not meet one

15   of these prongs.

16        The First Circuit then stated, "What is left is the

17   contention that the Court misunderstood Booker when it

18   imposed sentence.  Booker, of course, rendered the

19   Guidelines advisory, giving the district courts a freer hand

20   to fashion appropriate sentences.  The Court here, however,

21   did not exercise its new-found freedom, concluding the

22   Guidelines-recommended sentence was appropriate."

23        I then state in the sentencing brief, The language

24   of the First Circuit is clear and unequivocal, that this

25   Court has the authority to apply Booker for Dr. Arndt even

1    if it determines that he's not eligible for the safety valve

2    relief under the Guidelines."

3         I don't think the First Circuit announces

4    nullities.  Here it's saying this summer Judge Stearns was

5    correct saying the safety valve did not apply, but he had

6    also freedom under Booker to fashion an appropriate

7    sentence.  The Court, however, did not exercise its

8    new-found freedom.

9         If this court -- if the district courts had no

10   freedom to apply Booker adjustments to safety valve

11   ineligible cases, why would the First Circuit state that

12   language?  It is clear.  It is unequivocal.

13        So, one, in summary, our legal argument to allow

14   Dr. Arndt freedom from the mandatory minimum is based upon

15   the doctrine of constitutional avoidance and our analysis of

16   the appropriate Supreme Court cases in light of Booker and

17   Fan Fan and Apprendi.  And, two, even if this Court finds or

18   reasons that it will not apply that standard to give -- to

19   say that Dr. Arndt is safety valve eligible, the First

20   Circuit case of the United States v. Feliz gives the Court

21   that authority to apply the statutory standards that's

22   allowed to consider these other -- to give Dr. Arndt

23   sentencing relief.

24        And the sentencing relief that we're talking about

25   is based upon a combination of factors.  One, that his

1    criminal history overstates the seriousness of the offense;

2    the significant vulnerability in prison that Dr. Arndt has

3    experienced and will experience.  He has been held in

4    federal detainee custody since June of 2004, basically in

5    three institutions, Norfolk, Bridgewater Hospital, Plymouth,

6    and then back to Norfolk.  The Court has seen that when he

7    was first incarcerated he was suicidal, and they had to put

8    him on a suicide watch and they had to send him to the State

9    Hospital.

10           The Guideline in effect at the time of the offense

11   conduct allows for the Court to consider it.  I set out the

12   cases, the leading cases, the United States Supreme Court

13   case of Koon.  I talk about even the notorious Noriega case,

14   where he had to be held in solitary confinement because of

15   who he was and the Court said, Wait a second, we're going to

16   reduce his sentence basically by 25 percent because that's

17   cruel.

18           The Police Officer, Volpe, who was charged in the

19   notorious case out in New York of taking a Haitian immigrant

20   and doing all kinds of unspeakable things to the immigrant

21   while the immigrant was in police custody, the court, even

22   under those horrific conditions, provided a downward

23   departure because of what Volpe faced in prison.

24           Dr. Amador will also testify, as the case law

25   indicates, in his professional opinion about the

1    vulnerability that Dr. Arndt will face in prison.

2         We also talk about extraordinary acceptance of

3    responsibility.  As your Honor knows, the 2003 Guidelines

4    that went into effect at the end of October of 2003 outlawed

5    that departure.  However, the Guidelines in effect for the

6    offense conduct allowed that departure, and if your Honor

7    looks at the plea agreement in this case, both the defense

8    and the government stipulate that the appropriate Guidelines

9    book is the 2002 book.  It's stated in black-and-white

10   language.  Both sides agreed to that.

11        And under the 2002 Guidelines book, when the

12   offense conduct in this case took place, it allowed for

13   extraordinary acceptance of responsibility.

14        Now, the government has claimed that Dr. Arndt pled

15   guilty because of the overwhelming nature of the facts

16   against him.

17        Dr. Arndt pled guilty because he said he was

18   guilty.  Dr. Arndt had defenses which he decided not to

19   pursue because of his conviction of what he had done, and

20   when he was given an opportunity by this Court, that many

21   defendants would have availed themselves to do, to start the

22   system anew, to refight, he said no.  I know what I've done.

23   I know what I pled guilty to, and if it results in a harsher

24   sentence to me, different than the one I anticipated, that's

25   why I pled guilty, because I am guilty.

1          If your Honor looks at the cases that I have cited

2     to justify this departure, it will find very similar cases

3     where other courts have said like conduct warrants a

4     departure for that level of acceptance of responsibility.

5          I think Dr. Arndt's statement to the Court as we

6     outline -- as we restate in the sentencing brief, is very

7     compelling.  But there are cases where defendants persisted

8     in pleading guilty despite the fact that a codefendant's

9     motion to suppress was granted.  There were other defendants

10    who entered an Alford plea, an Alford plea, where he left

11    open the concept of admitting real guilt but yet testified

12    at another's trial and admitted his full participation in

13    the case in order to exonerate an innocent person.  So he

14    exposed himself to greater punishment by his willingness to

15    testify.  The Court felt that that defendant by doing that,

16    by compromising the effectiveness of that Alford plea and

17    preserving that level of doubt, showed an extraordinary

18    level of acceptance of responsibility and, therefore,

19    decided to grant a downward departure.

20          We've cited all these cases.

21          When Dr. Arndt gave the proffer to the United

22    States, the plea agreement was alive and valid.  That was

23    being negotiated.  It had not yet been finalized, and we

24    understood as one of the requirements for a safety valve he

25    had to proffer truthfully.

1          He came in, and according to the government, as

2     they stated in the plea agreement a number of months later,

3     he did proffer truthfully.  The one element of the safety

4     valve the government has complete control over is that

5     proffer, and they say it right in the plea agreement that he

6     did proffer truthfully.  At the end of that proffer there

7     was some discussion about the government meeting again.  I

8     don't necessarily mean the United States Attorney's Office,

9     but the agents were interested in additional intelligence.

10    And while Ms. Lie was still on the case, before the issue of

11    the plea agreement and whether the safety valve still

12    applied or not, there were discussions about bringing

13    Dr. Arndt in again to discuss issues.  And those

14    conversations continued after the whole issue of the

15    validity of the safety valve came into question.  They

16    weren't initiated then.  They were continued then.

17         And when the current Assistant United States

18    Attorney, Ms. Rue, took over, we tried on numerous occasions

19    to schedule times when Dr. Arndt could be debriefed on the

20    issues that are articulated in the government's sentencing

21    memorandum.

22         I agree with the characterization, not necessarily

23    the conclusions, about the information he had that we had

24    proffered in a letter to the government.  And as little as a

25    number of weeks ago after this case has been continued,

1       according to the Assistant United States Attorney, she was

2       still trying to set up such a meeting.

3              So I disagree with the government's

4       characterization that Dr. Arndt's attempt to come in again

5       to provide information about how crystal meth is distributed

6       in the gay community and the unique ways he feels it could

7       be fought, additional background information on numerous

8       individuals associated with the crystal meth drug

9       trafficking trade in Greater Boston, his own ideas about

10      drug trafficking as applied to crystal meth being applied,

11      there is no better spokesman for somebody who understands

12      now, in the light of hindsight, the devilish and evil

13      quality of that drug than Dr. Arndt.  So I disagree with

14      that characterization.

15             So I believe those two characteristics, one, his

16      steadfast orders to me that he wasn't going to game or

17      manipulate the system, that he was not going to disrupt

18      these proceedings by starting again from zero, by accepting

19      the consequences of possibly flawed legal advice, and,

20      number two, of his sincere efforts to cooperate.

21             And then the last ground is diminished capacity.

22             The 2002 Guidelines were amended in 2003 to make

23      the granting of a downward departure on account of

24      diminished capacity more difficult because a different prong

25      was added, that besides the requirement that the defendant

1    suffer from a substantial mental illness, that there was a

2    causal effect between the mental illness and the crime.

3         And even though I contend the 2002 Guidelines

4    govern, Dr. Amador's report is premised on the Guidelines in

5    effect now, the more stringent test for the downward

6    departure for diminished capacity.

7         So with that preface, that is why I would like to

8    call Dr. Amador to the stand, your Honor.

9              THE COURT:  You may do so.

10             MR. DELINSKY:  Thank you.

11        Dr. Amador.

12                   **XAVIER AMADOR, sworn**

13             THE CLERK:  Please state your name for the

14   record, and would you spell your last name, please.

15             THE WITNESS:  Xavier, X-A-V-I-E-R, Amador,

16   A-M-A-D-O-R.

17                   **DIRECT EXAMINATION**

18   BY MR. DELINSKY

19   Q    Dr. Amador, what is your occupation?

20   A    I'm a clinical psychologist.

21   Q    And briefly, what's you educational background?

22   A    I have a BA in Psychology from State University of New

23   York, a Master's Degree in Clinical Psycholgy from New York

24   University, and a Ph.D. in Clinical Psychology from New York

25   University.

```
1    Q    And how long have you had your Ph.D.?

2    A    Since 1989.

3    Q    And what professional training have you had?

4    A    Well, a range of experiences that are common in clinical

5    training for a Ph.D., externships, internships in

6    neuropsychology, substance abuse certainly, family therapy.

7    A wide range.

8    Q    And what teaching positions have you had?

9    A    I was in the Department of Psychiatry at Columbia

10   University, College of Physicians and Surgeons, from 1989

11   until 2002.

12           During most of that same period, I was an adjunct

13   at Columbia University in the Department of Clinical

14   Psychology, where I still am a professor there, and I've had

15   other adjunct positions at other universities in the area.

16   Q    What specialty, if any, have you had in your field?

17   A    Well, my clinical practice is general, so I see all

18   sorts of patients.  I certainly see patients with mood

19   disorders and substance abuse disorders.

20           But my academic and research career has been

21   focused on two main issues:  Reliability of diagnoses.  So

22   I've worked on the DSM, the diagnostic manual that we all

23   have used for over a decade; and then more specifically I've

24   worked on the problem of poor insight, people with bipolar

25   disorder, schizophrenia, people who don't believe they're
```

1    ill, and the nature of their problem and its effect on

2    judgment.

3    Q    Have you written in the field on schizophrenia and/or

4    bipolar disorders?

5    A    Yes, about a little over a hundred peer-reviewed

6    articles on schizophrenia and bipolar disorder.

7         I have three books on those, on mood disorders.

8    One of them focuses entirely on the problem of lack of

9    insight.  That's called, "I Am Not Sick.  I Don't Need

10   Help."

11   Q    Previous to --

12   A    Actually two of them focus on it.  Another one is a

13   peer-reviewed one, sorry, "Insight in Psychosis."

14   Q    Previous to your appearance here today before the Court,

15   have you been qualified to render opinions about mental

16   states in the federal district courts of the United States,

17   in the military courts of the United States, and in the

18   state courts of the United States?

19   A    Yes, approximately 15 times.

20        I'm sorry to interrupt.  Could I get some water?

21   Q    Yes.

22        (Pause in proceedings.)

23   Q    Now, I asked you to examine Dr. Arndt to render an

24   opinion in this case; is that correct?

25   A    Yes.

1   Q    And prior to doing so, did I explain to you the

2   diminished capacity sentencing guideline in effect as of the

3   offense conduct and then subsequently in effect as of now?

4   A    Yes.

5   Q    And did I ask you to render an opinion based on the

6   diminished capacity guideline in effect now, even though it

7   was more strict than the Guidelines in effect at the time of

8   the offense conduct?

9   A    Yes, you did.

10  Q    Have you rendered an opinion in this case?

11  A    I have.

12  Q    And what did you do in order to render an opinion?

13  A    Well, I met with Dr. Arndt a number of times over a

14  period of two years, four times total I believe, three times

15  by the time I wrote my report, and then again yesterday.

16        I reviewed a large number of documents that I won't

17  go through the list now.  It's appended to my report.

18        I did a very extensive psychosocial history,

19  determined that he has had a mental disorder since the age

20  of approximately 13, most notably bipolar disorder with

21  frequent episodes of depression, major depressive disorder,

22  and multiple or problem substance abuse since that age.  He

23  has really been struggling with trying to -- with addiction

24  for about 30 years.

25  Q    And do you have an opinion as to whether Dr. Arndt

1    suffers from a diminished capacity?

2    A    Yes.

3              I'm sorry.  You did ask me that.

4              As a result of those disorders, I believe he does.

5    I believe that certainly with respect to the offenses that

6    we're discussing here today --

7                   MS. RUE:  Objection, your Honor.

8                   THE COURT:  Overruled.

9    A    -- that he evidenced diminished capacity to employ the

10   power of reason and to control his behavior as a result of

11   those disorders that I just listed.

12   Q    Now, do you have an opinion as to whether or not

13   Dr. Arndt suffers from a significantly reduced -- suffered

14   from a significantly reduced mental capacity at the time of

15   the offenses?

16   A    Yes.

17             As I said, during the time of the offenses that

18   we're here about today, that I understand that we're here

19   today for the Court to hear evidence about, he did suffer

20   from diminished capacity.

21   Q    And do you have an opinion as to whether or not the

22   significantly reduced mental capacity contributed

23   substantially to the commission of these offenses?

24   A    I do.

25             I feel certain within a reasonable degree of

1    professional certainty he would not have done any of these

2    offenses had he not had this mood disorder and the

3    concomitant substance abuse disorder.

4    Q    Can you outline for the Court your reasons for these

5    conclusions?

6    A    When doing this kind of assessment, I am looking at the

7    defendant's entire life history.  So the best place to start

8    is when I first identified this, and I can do it very

9    briefly, because, as the Judge mentioned, I wrote a detailed

10   report about it.

11            But Mr. Arndt when he was 13 years old was

12   suffering from Ehlers-Danlos syndrome.  It's

13   E-H-L-E-R-S - D-A-N-L-O-S, I believe.

14            We know, and I'm not sure we knew this back in the

15   mid '70s, that this is associated with a number of

16   psychiatric disorders, including depression.  And, in fact,

17   that's what I was able to elicit.

18            I also, in addition to interviewing Dr. Arndt, read

19   interviews that were done by an investigator of various

20   people in his life.  I interviewed his parents as well.

21            And what clearly emerged was that he had his first

22   episode of major depression at the age of 13.

23            At the time he, because of the social context he

24   was in, had his first introduction to drugs, smoking

25   marijuana, barbiturates.

1          He shortly after that, because of the EDS, the

2     syndrome I just mentioned, had major surgery.  It's a

3     disorder of the connective tissue in the body.  He had major

4     problems with a dislocation of his shoulder.  He had surgery

5     and was in a body cast for about three months at the age of

6     15.  Sunk into a very deep depression.  He was given opiates

7     to manage the pain postoperative and then in the months

8     after that.

9          So in addition to barbiturates that he was getting,

10    he also learned, I think, a very unfortunate lesson, that

11    the opiates not only helped him with his physical pain, but

12    they also helped him with his depression.

13          And the thing about depression and clinical

14    depression is it's not just a depressed mood.  We're talking

15    about a constellation of the systems that go on for a couple

16    of weeks or longer.

17          So what I say to family members when I'm trying to

18    explain depression in a relative is think of your absolute

19    most depressing moment, perhaps the death of a loved one,

20    and that goes on for weeks and months.  And, in addition,

21    you hate yourself.  You're filled with self-loathing.  In

22    addition to that you see absolutely no future whatsoever, no

23    hope of relief.  Your judgment is impaired.  We know there

24    is cognitive impairment with depression.  And it's a highly

25    fatal disease, bipolar depression especially.  About

```
 1    15 percent of sufferers die from the disease.  The brain

 2    essentially short circuits the will to live.  Judgment is so

 3    severely impaired, reason is so severely impaired, that

 4    people who are ill with this illness, like David Arndt was

 5    at the age of 15, cannot look at their future, cannot see

 6    hope, cannot see any other choice but to end their lives.

 7         He studied his father's medical books and slit his

 8    wrists vertically.  He drank vodka and took barbiturates,

 9    and he would have died had his sister not found him.

10    Q    What, if anything, does the medical literature indicate

11    as a causal connection between the Ehlers-Danlos syndrome

12    and subsequent mental illness?

13    A    That children and adolescents with this disorder are, as

14    many as 70 percent in one study, suffer from depression and

15    anxiety disorders and related psychiatric disorders.

16         In addition to that, Dr. Arndt has a number of risk

17    factors for developing mood disorders and substance abuse

18    disorders.  He has first-degree relatives also with mood

19    disorders and with substance abuse disorders, which

20    increases his risk from 4 to 6 percent higher than the

21    average person.

22         So he's got this medical illness that causes 70

23    percent of suffers to develop psychiatric illnesses.  He has

24    a family history, genetic vulnerability.

25         He learns really a terrible lesson at the age of
```

1    15, and this is linked to social stressors.  He was outed as

2    a homosexual, lost all his friends.

3            And, as I said, when you're in the midst of a

4    clinical depression, this is not normal depression, your

5    judgment can be very severely impaired to the point that

6    your vision is tunnel vision.  You see one possible

7    solution, to end the pain.  And that solution in this

8    instance, it wasn't the only time he tried, was to take his

9    own life.

10   Q    I take it that after the first suicide attempt there was

11   a subsequent suicide attempt by pills, overdose of pills?

12   A    There was.

13   Q    And was he put on antipsychotic medication?

14   A    At that time he was, yes.

15   Q    And prior to that time he was hospitalized in a private

16   mental facility for a number of weeks?

17   A    He was and unfortunately, and hindsight is 20/20, the --

18   and this had to do with the time as well.  This was in the

19   mid '70s, and we really as a field didn't understand that

20   bipolar disorder was pretty common in children.

21           They missed a bipolar diagnosis, and they gave him

22   antidepressant medication, which did nothing for the

23   irritability, particularly his irritability that people

24   picked up on later.

25           Nor did they do anything about the substance abuse.

1  There was nothing that I saw that indicated there was any,

2  even despite some knowledge that there was substance abuse,

3  any intervention.  There was no referral.  There was no

4  opportunity for him, because he couldn't go on his own.

5  Nobody referred him to a substance abuse program.  He didn't

6  get that when he was inpatient.  He didn't get that

7  subsequently.  He did get some family therapy and some

8  psychoanalysis, which is not appropriate treatment for

9  substance abuse disorders.

10 Q   And then he went to the Cambridge School of Weston, and

11 what happened with his drug usage during his high school

12 years?

13 A   At that point it not only didn't abate, in some respects

14 his repertoire broadened, because many of the kids there

15 were using drugs; and he was exposed to even more elicit

16 drug use, and he didn't receive treatment in that context

17 for the drug use.

18 Q   And that drug use in high school, did that include angel

19 dust and LSD and marijuana, mushrooms and cocaine?

20 A   Yes.

21 Q   Then subsequently, after he went for a period of time to

22 the University of Massachusetts, he went to transfer to a

23 college out in California; is that correct?

24 A   That's correct, San Francisco.

25 Q   And what then occurred that justifies your reasons for

```
 1    your opinion?

 2    A    What was clear to me is when he's clinically depressed,

 3    and starting with this first major episode, which I don't

 4    think ever really resolved fully -- there was some relief

 5    with the antidepressant medication, but in the context of

 6    continued drug use, a person can't get fully recovered from

 7    depression.

 8         He goes to San Francisco and continues to use drugs

 9    and is so myopically focused, his reason is so impaired,

10    that it gets to the point where he prostitutes himself to

11    maintain a drug habit at the age of 19.

12         Not getting treatment again for drug abuse, what

13    Mr. Arndt showed is classic.  Fifty percent of all people

14    with bipolar disorder don't understand their illness.  This

15    is a symptom of the illness.  This is not coping strategy.

16    This is not everyday denial.  And it's common sense.

17    Anybody who knows anybody with bipolar disorder or a

18    substance abuse problem, a chronic one, knows what I'm

19    talking about.

20         But we also now know, and "we" meaning the

21    scientific community, understand this is a symptom of the

22    illness.  It's related to frontal lobe dysfunction.  It is

23    not a coping strategy.  It is not response to the illness.

24    It's a bona fide symptom of the illness, like a delusion,

25    like depressed mood, like loss of appetite, like suicidal
```

1    ideation.

2         And his illness, I have to say in characterizing

3    the syndrome, his major lack of insight -- and the technical

4    term is anosognosia, A-N-O-S-O-G-N-O-S-I-A.  And anosognosia

5    is a syndrome that's related to frontal lobe dysfunction,

6    which we know is highly common in people with bipolar

7    disorder and certain kinds of substance abuse.  Frontal

8    lobes are shut down.  He is not aware he's got a substance

9    abuse problem.  That's abundantly clear from the very

10   beginning, from the onset of his illness 30 years ago, both

11   illnesses, mood disorder and his substance abuse disorders.

12   Q    And what happened subsequently?

13   A    He got somewhat of a handle on his substance abuse in

14   the sense that he was able to finish college.  He was able

15   to excel.  He was able to do volunteer work.  All of the

16   recommendations I read for medical school and subsequent

17   placement he had as a medical doctor clearly is that he was

18   very bright and a compassionate, empathic person.

19        Not that he was without flaws.  He certainly had

20   some problems but, for the most part, he was able to

21   succeed.

22        And his account of his drug usage at that time

23   confirms that.

24        He was using drugs recreationally.

25        Very importantly, he was not clinically depressed.

1              The depression had finally run its course.  He was

2    not dealing with the kinds of depressive symptoms that he

3    was dealing with when he was a teenager and throughout his

4    20s and early 30s.

5              And I think that is clearly why he was able to get

6    a handle on the drug use.

7              Again, people around him, you know, at least from a

8    distance never -- from a distance never would guess that

9    this highly accomplished, intelligent person who seemed to

10   be functioning in a world is doing okay.

11             If he was clinically depressed, I think it would

12   have been a different story.

13   Q   You relate in your report that after graduating Harvard

14   Medical School he did his internship at Beth Israel Hospital

15   and then he did his residency in the joint Harvard

16   Orthopaedic Program; is that correct?

17   A   Yes.

18   Q   And then he went and did a special spine fellowship at

19   Tulane University?

20   A   That's correct.

21   Q   And what happened there?

22   A   This -- the Tulane period, and this was back in 1998, is

23   another very significant period of time for him, and for one

24   main reason -- two main reasons.  Sorry.

25             He's getting depressed again.  He is clearly

1   getting depressed.  He gets the fellowship.  His long-time

2   partner, his lover, doesn't want to go with him to Tulane.

3   He's depressed about that, and his depression -- and about

4   some other things.  But the point is this is not a normal

5   depression.  He gets into another very severe episode of

6   depression, and like when he was 15, he can't see past, you

7   know, what's right in front of him.  And what's right in

8   front of him is one thing, ending the pain, stopping the

9   self-loathing, stopping the depression, stopping the

10  excruciating pain that comes with a severe episode of major

11  depression.

12          So he plans a suicide at Tulane.  He's going to

13  tape up the windows and turn on the gas, and like when he

14  was 15, he just wants it to stop.

15          And, unfortunately or fortunately, depending on how

16  you look at it, he is introduced to smoking crystal

17  methamphetamine, and he has described to me and to the

18  parole officer who did the report and to Dr. Michael Fayne

19  and others, his experience of smoking crystal

20  methamphetamine for the first time, and it's very similar to

21  other reports I've heard with this difference, it's a

22  depressed patient that's describing smoking it.

23          What he describes is for once not having that pain,

24  for once not feeling the self-loathing, not feeling

25  depressed.

1   He feels like he feels when he's doing surgery.  He

2   feels like God, and he is not talking about the arrogance of

3   God.  He's talking about being at peace.

4   Unfortunately, as I think most people realize,

5   especially when taken in this form, it's a highly addictive

6   drug, behaviorally, psychologically, and physiologically.

7   And this really starts about a five-year term of escalating

8   use of crystal meth and smoking it.

9   Q   And the conduct that occurred that resulted in his

10  conviction in the federal district court in New Orleans for

11  filing a false affidavit, did that occur after he was using

12  the -- smoking the crystal meth?

13  A   Yes, it did, because he went to Los Angeles, and that's

14  where a friend of his turned him on to it.

15  But it also occurred in the context of a very

16  severe clinical depression, and from that period of time,

17  going on for another five years, we're looking at somebody

18  who, like when he was 15 to 19, is not getting relief from

19  the depression, because he's abusing drugs.

20  And he's getting prescribed antidepressants.  He

21  actually was in therapy for four years, and in therapy he

22  comes in and he talks about in great detail his past drug

23  use, and the therapist never follows up on it.

24  I looked at four years of therapy.  There is not

25  follow-up on a very forthcoming patient describing a long

1    history of drug use and abuse.  He lied to his therapist.

2    He said, But I'm not doing it anymore.  I'm just using Xanax

3    occasionally.

4         Any therapist with training in substance abuse

5    disorders doesn't take that statement as the final word,

6    because we know that people when they are addicted lose the

7    ability oftentimes to be -- to use their rational judgment.

8    And here he is asking for help for his depression.  As a

9    doctor he should know he can't continue to use drugs, yet he

10   lies to his therapist.

11        But unfortunately for Dr. Arndt, in fairness to

12   somebody who is an addict at this point and clinically

13   depressed and looking for help, his therapist never

14   follows-up with him, by the therapist's account.  He never

15   really challenges him, asks him, Are you sure you're not

16   using?

17        He notes the depression that goes on for four

18   years, never asks him, Are you sure you're not out partying

19   at night, and so there is no follow-up.  There is no

20   opportunity there in that relationship.

21   Q   What is the mechanism, if any, between Dr. Arndt being a

22   physician using drugs, serious, dangerous drugs, and not

23   realizing and not being able to change his behavior?

24   A   That was important in my opinion about the diminished

25   capacity.

1    Dr. Arndt for many years has had the responsibility

2    of deciding how much of a drug is okay.  Any drug can be

3    abused.  And given the anosognosia, his lack of insight, he

4    doesn't have a problem, when he told his therapist I'm not

5    using anymore, I am sure he knew he was lying to his

6    therapist.  But I also believe that he didn't, and I know

7    this from talking to him about it, he didn't understand he

8    had a problem.  He had anosognosia.  He had no clue he had a

9    problem, and he didn't want to get sidetracked.  He was

10    handling it.  From his perspective, he could handle this.

11    He was, in a sense, prescribing the medication for himself.

12

13    He knew it was illegal.  I'm not say that my

14    opinion was that he wasn't sane, but he didn't understand

15    the price he was paying.  He certainly didn't understand how

16    it was impairing his judgment, and in his judgment this is

17    okay.

18    And he is not alone in this.  We see this in a lot

19    of physicians who abuse, and he is interacting with

20    physicians at that time, several of whom are abusing,

21    colleagues who are abusing crystal meth simultaneously.  So

22    he was not alone.

23    Q    What additional stressors, if any, enter his life in

24    2001?

25    A    Well, the -- we call it the Licensing Board in New York,

```
 1   the medical board that --
 2   Q    The Board of Registration in Medicine in Massachusetts?
 3   A    Thank you.
 4             Starts their investigation -- well, no.  That was
 5   actually a little bit later.
 6   Q    Well, as a result of Dr. Arndt's conviction for the
 7   offense in New Orleans, he had to reregister in 2000.  For
 8   the first time he had to disclose the conviction, and as a
 9   result of that, did you know that the Board of Registration
10   in Medicine began an investigation of the status of his
11   license to practice medicine?
12   A    Yes.
13             And that was very distressing, and this was one of
14   several social stressors for him at that time.  And again
15   this appears in the therapy notes.  It appears in our
16   conversations.
17             He was obsessing about it.  He couldn't stop
18   thinking about it.  The depression started at Tulane, was
19   never -- had never abated, had never been properly treated.
20   Q    During this period of time, what, if anything, was
21   occurring with his use of crystal meth?
22   A    It got to the --
23   Q    -- the smoking of crystal meth?
24   A    It got to the point that it was daily use.  And similar
25   again to what happened when he was 15, when he starts using
```

marijuana and barbiturates daily, there is no longer any
semblance of control over it.  And the vicious cycle is
self-loathing and depression, and he smokes the pipe and he
feels okay, which, biologically is making his depression
worse and impairing his ability to recover.

Q   And even though he was on for part of that period still
federal probation?

A   Yes.

    Remarkable lack of judgment.

Q   Yes.

A   But, again, his anosognosia -- I mean, to use a common
term, it's denial.  It's neurologically based denial.  It is
so extreme he is convinced he can handle it.  He doesn't
have normal judgment at that point in time and certainly has
no ability to stop himself.  I mean, he's facing major
consequences.  He cannot stop himself.

Q   And then did you learn in the spring/early summer of
2002 the financial problems he was having in paying for
attorneys to defend him in the Board of Registration cases,
that that led to his leaving the surgery at Mt. Auburn
Hospital that led to his suspension to practice medicine in
the summer of 2002?

A   Yes.

    At that time he was paying two attorneys -- one was
for immigration to help his partner stay in the country, and

1    the other one was for this investigation on his license --

2    and showing remarkably poor judgment, went and cashed a

3    check while the surgery was still going on, left the

4    hospital and went to a bank to pay an attorney who would

5    only accept cash because he had bounced two previous checks.

6    Q   And as a result of the temporary suspension -- or his

7    suspension from the practice of medicine, what affect did

8    that have on Dr. Arndt regarding his drugs use?

9    A   Escalated it.

10        And, again, I can't talk about the escalation

11   without noting that it is secondary to the depression.  He

12   became depressed and despairing.  And I mean clinically

13   depressed.

14        And right with that is an immediate myopic desire

15   to relieve the depression, and he starts to use -- smoke the

16   crystal meth on a daily basis, multiple times a day it

17   eventually escalates to.

18   Q   You have stated that this diminished capacity was in

19   effect during the time that the offense conduct took place,

20   and what relationship, if any, did this significantly

21   reduced mental capacity have in relationship to the

22   voluntary use of drugs?  Was his use of drugs during this

23   period of time voluntary on involuntary?

24   A   In my opinion it was involuntary.

25   Q   Why?

1    A    A couple of reasons.

2            First of all, if you look at the history, you can

3    see periods where he gains control.  So there is just the

4    heuristic.  Empirically, you look at a person.  Can they

5    show some control, a desire to stop, cut back, and they

6    actually succeed.

7            But, second, we see a clear progression from severe

8    clinical depression to drug use.  There has been a lot of

9    research on this.  I have had a lot of clinical experience

10   with this.

11           There are people who are primary substance abusers

12   that are people with mood disorders who are medicating their

13   substance abuse, and if you do a thorough-enough history,

14   you can untangle -- the chicken or the egg, which came

15   first?  And there's a very clear pattern of escalating,

16   severely maladaptive use being on the heels of an episode of

17   major depression.

18   Q    So it's your opinion that his drug usage of crystal meth

19   during the time period of the offense conduct was

20   involuntary?

21   A    Yes.

22   Q    You asked Dr. Fayne to render an opinion in this case

23   also?

24   A    I did.  I thought it was important to get someone like

25   Dr. Fayne, if not Dr. Fayne.

1    Q    Can you tell the Court who Dr. Fayne is and what his

2    qualifications are?

3    A    Dr. Fayne is a clinical psychologist in New York City,

4    and for about a decade he was the director of the Smithers

5    Drug and Alcohol Treatment Center in New York, and also the

6    go-to person when you had a physician who was impaired.   So

7    when I had worked with physicians who came in ostensibly for

8    things like depression and I realized there were substance

9    abuse problems, I would make them go to Dr. Fayne's groups.

10   He's had a lot of experience in this area.   He's done

11   research in this area, and I thought that for two reasons,

12   one, it's just always good to get a second opinion, but the

13   other one was with respect to the prognosis.   I wanted to

14   know what he thought.

15   Q    Did Dr. Fayne render an opinion that agreed with yours?

16   A    Yes.

17   Q    And what is --

18   A    I don't think -- did he opine specifically about

19   diminished capacity?   He certainly talked about the

20   involuntary use of drugs, yes.

21   Q    What was the prognosis that Dr. Fayne had for Dr. Arndt?

22   A    Good, with specific parameters in place.

23   Q    Would you describe those parameters?

24   A    The parameters that should be in place, certainly during

25   incarceration, he really needs to be in a drug program,

1    substance abuse program.

2            Upon release, at a minimum once a week, he needs to

3    see a drug abuse counselor.  He also needs to see somebody

4    for the mood disorder.  That would be for medication or

5    other psychotherapy.

6            So two appointments once a week, and some kind of

7    12-Step program I think would be highly appropriate.  If not

8    a 12-Step program, some other daily therapeutic community is

9    appropriate.

10           The critical period for people with this kind of --

11   this severe substance abuse problem is that first year when

12   they're out.  That's when you have most of the recidivism.

13   So the more structure that Dr. Arndt can have when he gets

14   out, especially that first year, if not the first couple of

15   years, the much higher likelihood he will succeed.

16           What Dr. Fayne has talked to me about over the

17   years and reaffirmed in his report, is that the research is

18   clear that physicians have a much higher long-term recovery

19   rate than the rest of the world.  You look at other people

20   that are of comparable socioeconomic status, you compare

21   education, you control for race, IQ, and all that.  The fact

22   that they're physicians actually bodes well for recovery.

23   Q   What have been your own observations from the time you

24   first met Dr. Arndt until you saw him yesterday?

25   A   Well, many things.

1          First of all, clinically he was far more ill when I
2    first met him, depressed, disheveled and showing signs of
3    somatic symptoms, thought disorder.  His thinking was
4    impaired.

5          I have seen a remarkable change since he has gotten
6    treatment for the depression, and I do have some ongoing
7    concerns that there is assessment of the bipolar illness.
8    But beyond that, I think that the last two times I've seen
9    him especially, his thinking is clear, his mood is good, his
10   affect is good, he's hopeful, he has a vision for his life.

11         So clinically, and certainly by his own subjective
12   report, he is probably doing better than he ever has because
13   he is not using drugs.
14   Q    So is this -- the period since he has been incarcerated,
15   is that the longest period of his life since he was 14 or 15
16   years old he's been drug free?
17   A    Since the age of 13, this is the first time in his life
18   he has gone more than a week without using drugs, and he has
19   had two and a half years -- a little over two years.

20         I've seen a big change in terms of his addictive
21   personality.  With addicts you'll see a lot of
22   externalization, blaming the lover, blaming the system,
23   blaming the government, blaming so and so, and Dr. Arndt did
24   some of that when I first met him.  And if we were having
25   this hearing two years ago or a year and a half ago, I would

1    be giving you a different prognosis than I am today.

2              And that's one of the reasons I wanted Dr. Fayne to

3    come in, because I saw a big change with the Lexapril, which

4    is an antidepressant treatment that he was given.

5              But I also don't think it's just that.  I think

6    that with increased time where he's not -- where his brain

7    is not being pickled, frankly, by elicit drugs -- in fact,

8    he even said this to me yesterday.  He said he feels like

9    he's thinking more clearly than he ever has before, and he

10   feels it's a result of being washed out of having these

11   drugs in his symptom all the time.

12             And there's studies of that.  You see people's

13   memory improve, all sorts of cognition improvements the

14   longer they're dried out.

15             So all those things together, I think he's talking

16   about his addiction completely differently, not just

17   yesterday, not just last year or the time before that.  He

18   is understanding his responsibility.  He's understanding how

19   he was taken over by this.

20             We have a lot of metaphors we talk about when we

21   treat people.  One is denial possession.  The other is

22   shutting the frontal lobes off.  That's physiologically what

23   happens.  He understands that, and he understands he cannot

24   control it; and, more importantly, he now understands that

25   even when he was doing his residency and not getting in

1    trouble, he wasn't controlling it then.

2         And that's a big difference than the conversation I

3    first had with him.  He wants to be able to be in control.

4    "There's long periods where I could control it."  But he

5    understands now he actually wasn't controlling it.  He was

6    breaking the law.  He was breaking the trust of his patients

7    and his mentors.  I mean, he sees it completely differently

8    now than he did when I first met him.

9    Q   I just have two more quick questions.

10        I showed you Dr. Biolio's letter to the Court

11   yesterday, didn't I?

12   A   Yes, sir.

13   Q   And Dr. Biolio is a Ph.D. and nurse practitioner in the

14   Norfolk County House of Correction, and he treated Dr. Arndt

15   when he came in and referred him to a psychiatrist when he

16   felt Dr. Arndt was suicidal and going to die.  And I take it

17   in the letter from Dr. Biolio he said in over 20 years this

18   is the first time he has ever written a letter.

19        What is consistent with your diagnosis and your

20   prognosis for Dr. Arndt that you also saw, if any, in

21   Dr. Biolio's letter to the Court?

22   A   There are two things that were highly consistent, and

23   frankly, it's just always reassuring to see things that are

24   consistent; and if they're not consistent, you have to

25   rethink things, make sure you did everything appropriately.

1      But what he said in his letter matches what I have

2  seen, which is that Dr. Arndt is far better clinically with

3  respect to his mood disorder.  The treatment has worked.

4      With respect to his attitudes about his addiction,

5  with respect to his ability to actually recover from this

6  and do well, he describes many of the same things I

7  described and is hopeful for him as I am.

8  Q    What effect -- what have you learned about Dr. Arndt's

9  religious studies, and what effect, if any, do his religious

10  studies have on his future?

11  A    Dr. Arndt has a very active mind and was drawn into

12  Talmudic studies with the reverend -- the rabbi who has been

13  visiting him, and has taught himself Hebrew.  But I've also

14  learned, and what's most interesting to me clinically, what

15  he wanted to talk to me about -- and I've forgotten the

16  Hebrew word, I'm sorry, because I wanted to remember it, but

17  it has to do with offenses and the importance of rules.

18      As many people know, the more orthodox forms of

19  many religions, Judaism being one of them, there is a lot of

20  rules about how to live your life.

21      And he was very -- I was just very struck by his

22  desire to try to not bend rules, and had a very interesting

23  exchange about the magazine that you gave him that was

24  potentially breaking the rules, and he didn't want to do

25  that.

1          I think he understands -- why I am smiling, why I

2    think that is a hopeful sign is, frankly, he is humbled by

3    his addiction.  He understands he can't bend the rules.  He

4    understands every time he bends rules he hurts people,

5    himself, as much if not more than anyone, but his focus has

6    been on other people for the most part.

7    Q    So is it fair to say that with his underlying mental

8    illness and his proclivity for depression and soothing that

9    depression with drugs, that he will have to be vigilant

10   lifetime and have basic therapeutic structure over time?

11   A    He will have to be vigilant of everyone and anyone in

12   his life, whether it's the courts, his family or his

13   friends, he has to be vigilant.  This is a life-long

14   disease.  He doesn't walk out the door cured, and he needs

15   to be vigilant, but also the community that's attached to

16   him needs to be vigilant.

17          I'm not trying to dilute his responsibility.  It's

18   just -- it doesn't work unless there's help.

19   Q    And then finally my last question.

20          To what extent, if any, did Dr. Arndt's reduced

21   mental capacity contribute to the commission of these

22   offenses?

23   A    Again, I am sure within a reasonable degree of

24   professional certainty he would not have done any of these

25   crimes had he not had these disorders and had they not been,

```
 1    both of these disorders, exacerbated, the mood disorder and
 2    the substance abuse disorder.
 3                    MR. DELINSKY:  Thank you.
 4              No further questions.
 5                    THE COURT:  Ms. Rue.
 6                    MS. RUE:  Thank you, your Honor.
 7                          CROSS-EXAMINATION
 8    Q   Dr. Amador, you said that you reviewed the therapist's
 9    notes.
10              Those were the notes from Richard Caplin; is that
11    right?
12    A   Yes.
13    Q   Did you actually speak with Dr. [sic] Caplin?
14    A   No.
15              It's "Mr." Caplin.
16    Q   Mr. Caplin?
17    A   No.
18    Q   You found that he did not follow-up on the depression?
19    A   I'm sorry?
20    Q   You found that Mr. Caplan did not follow-up on
21    Mr. Arndt's depression?
22    A   No.  What I said was if I -- and if I misspoke, I
23    apologize.
24              That he did not follow-up on the substance abuse
25    problem.  In fact, he wrote extensively about how depressed
```

1    Mr. Arndt was.

2    Q    And you found indicia of substance abuse in Mr. Caplan's

3    notes?

4    A    During the intake evaluation, during the first couple of

5    meetings, yes.

6    Q    And it was malpractice for him not to have followed-up

7    on that?

8    A    I don't think that I use that term.  I think it was

9    inappropriate.  I think clinically that if you are faced

10   with a clinical history that includes significant

11   polysubstance abuse, you are absolutely obligated to assess

12   that early and in an ongoing way for the entire time you're

13   working with that patient.  Because substance abuse

14   disorders are diseases that last a lifetime.  Exactly what I

15   said earlier.

16   Q    And in your view Mr. Caplan did not do that?

17   A    Absolutely.

18   Q    And he had an obligation to do that?

19   A    Yes, I believe so.

20   Q    And you've spoken with Mr. Caplan about that?

21   A    No.

22   Q    You referred Mr. Caplan to the appropriate boards for

23   his failure to do so?

24   A    I didn't say he committed malpractice, but I do think it

25   was inappropriate.

1    Q    You would agree with me, would you not, meth is

2    generally, for anyone, a highly addictive drug?

3    A    A percolin drug and highly addictive.

4    Q    Damaging?

5    A    Yes.

6    Q    For anyone?

7    A    Yes.

8    Q    It is a drug that causes thought disorders in anyone who

9    smokes it?

10   A    Yes.

11   Q    It is a drug that causes long-term health problems for

12   anyone who is addicted to it?

13   A    Long-term health problems generally --

14   Q    Yes.

15   A    -- wide range?

16        Sure.

17   Q    It is a drug that causes lack of judgment for anyone who

18   uses it on a permanent basis?

19   A    Can cause lack of judgment, yes.

20   Q    There are people who don't have lack of judgment when

21   they're using meth?

22   A    Well, it depends on your lack of judgment.  This is not

23   a unitary construct judgment.  It's what instance or what

24   scenario you have.

25   Q    Some people use it and their judgment is just fine?

1    A    Sometimes the judgment in some areas can be fine and

2    other areas impaired.

3              I mean, people who use --

4    Q    No.

5    A    I'm sorry.

6    Q    Mr. Arndt told you that he was able to avoid using drugs

7    while he was doing surgery; is that right?

8    A    That's correct.

9    Q    And you have accepted that?  You've assumed that that

10   was true?

11   A    I don't have any reason to assume it's not true.  I have

12   some reason to assume it is true.  I have not seen any

13   reports from coworkers or reprimands, and I've looked at

14   hospital records, that he's never been written up for being

15   caught with a pipe in his locker or that he stepped out for

16   20 minutes to go to the bathroom, and people find him out in

17   back smoking, no reports of that.

18   Q    So in your view he was able to control his drug usage

19   while he was a surgeon?

20   A    To some extent, yes.

21   Q    And you agree that he then had volition over his drug

22   usage during that time?

23   A    If he chose not to smoke crystal meth prior to surgery,

24   absolutely.  He's showing voluntary -- he's showing control.

25   Q    Now, you state in your report that he was 38 when he was

1    first alleged to have committed a criminal act?

2    A   (No response.)

3    Q   Page 18 of your report.  Do you have your report in

4    front of you?

5    A   I do.

6          Could you direct me?

7    Q   The top paragraph on page 18, At 38 years, worried that

8    he would be expelled from the country, David submits a

9    fraudulent affidavit in support of this application.  This

10   is the first time he is alleged to have committed a criminal

11   act.

12         Those are your words; is that right?

13   A   That's correct.

14   Q   But you were aware that he used marijuana at age 13?

15   A   Yes.

16   Q   You were aware that he used LSD at age 14?

17   A   Yes, and I was aware he was a prostitute in

18   San Francisco at age 19.

19   Q   And he was charged with that?

20   A   No, I wasn't aware of that until yesterday, actually.  I

21   didn't see that, but Mr. Arndt told me about it.

22   Q   You indicated that the source of your information that

23   you relied on for your report included the PSR; is that

24   right?

25   A   Yes.  I didn't see that in the first version.  I may

1   have missed it if it was there.

2   Q   So when the PSR sets forth his criminal charges, you

3   didn't pay attention to them?

4   A   If it's in the initial PRS that I reviewed last year,

5   then I certainly missed it.

6       I wouldn't characterize my attention span as not

7   paying attention to it, but I would have missed it if it was

8   there last year.

9           MS. RUE:  May I approach, your Honor?

10          THE COURT:  You may.

11  Q   I've handed you a document which I will represent is the

12  presentence report prepared in this case, and at the bottom

13  of it it has a date, does it not, indicating when it was

14  prepared?

15  A   Yes.  September 13, 2005.

16  Q   And there's a blank after the word "revised"; is that

17  correct?

18  A   Correct.

19  Q   So this was, in fact, the PSR that you reviewed; is that

20  right?

21  A   It certainly appears to be, yes.

22  Q   And turning to page 18, paragraph 66, it reports that he

23  was charged with prostitution in 1979 at age 19?

24  A   Yes.

25  Q   You were aware that Mr. Arndt was married; is that

```
 1   right?
 2   A    I'm sorry, that he was?
 3   Q    You were aware that he was married?
 4   A    Yes.
 5   Q    You were aware that he was gay?
 6   A    Yes.
 7   Q    And the woman was gay; she was homosexual?
 8   A    Yes.
 9   Q    He married her to get her into the country?
10   A    Yes.  That's what he told me.
11   Q    And, in fact, the marriage had so little substance to it
12   you didn't even put it in your chronology; is that right?
13   A    I didn't find it relevant.
14   Q    You didn't find it relevant?  He was married for five
15   years and that wasn't relevant?
16   A    Married in the way you described, not as husband and
17   wife, yes.
18   Q    Arndt is capable of telling the difference between right
19   and wrong; is that right?
20   A    Yes.
21   Q    He knew that LSD was illegal?
22   A    Yes.
23   Q    He knew that marijuana was illegal?
24   A    Yes.
25   Q    He knew that cocaine was illegal?
```

```
 1   A    Yes.

 2   Q    He knew that methamphetamine was illegal?

 3   A    Yes.

 4   Q    He knew that stealing cocaine from his housesitter was

 5   illegal?

 6   A    Yes.

 7   Q    He knew that writing prescriptions for people who were

 8   not patients was illegal?

 9   A    Yes.

10   Q    You believe that Arndt was forthcoming about his prior

11   offenses when he talked with you; is that right?

12   A    Yes.

13   Q    He admitted to you that he had sold methamphetamine?

14   A    Yes.

15   Q    He admitted to you that he had given Oxycodone

16   prescriptions for one of his methamphetamine suppliers?

17   A    That's correct.

18   Q    He admitted that he used Ketamine while on probation?

19   A    Yes.

20   Q    And you found that relevant?

21   A    Yes.

22   Q    You found it relevant to your finding that he was

23   forthcoming, he was being honest, that he was accepting his

24   drug use?

25   A    The last example, yes.
```

1    Q    Yes.

2            You are familiar with the safety valve, are you

3    not?

4    A    Yes.

5    Q    You know that to qualify for the safety valve a person

6    has to be fully forthcoming with the government?

7    A    Yes.

8    Q    That if the government asks about a topic and the person

9    holds back, the government can simply report to the court,

10   this person wasn't forthcoming, the safety valve does not

11   apply?

12   A    That's my understanding, yes.

13   Q    And you understand then if the safety valve doesn't

14   apply, a minimum mandatory sentence is in place and a judge

15   is stuck with that?

16   A    That's my understanding, yes.

17   Q    And the defendant is stuck with that?

18   A    Yes.

19   Q    So when Arndt provided information about his drug use on

20   probation, the government already knew about it, and it was

21   in his self-interest to report it, wasn't it?

22   A    Yes.

23   Q    And Arndt was obtaining methamphetamine from Charles

24   Ghera?

25   A    Yes.

```
 1    Q    He was providing Oxycontin scripts to Charles Ghera?

 2    A    That's correct.

 3    Q    And Ghera was charged with distribution of ketamine?

 4    A    Yes.  I'm aware of all that.

 5    Q    Ghera was one of the witnesses against Arndt?

 6    A    Yes.

 7    Q    So it would be natural for Arndt to provide information

 8    about a person who was a witness against him, wouldn't it?

 9    A    Could you repeat?

10         Could you be -- I am not sure what you mean by

11    "natural".

12    Q    It would be in his interest?

13    A    His interests, yes.  Absolutely.  Sure.

14    Q    You have received information from Arndt about his

15    leaving the patient on the OR table; is that right?

16    A    Yes.

17    Q    You have no independent knowledge about that; is that

18    right?

19    A    Other than news reports.  I would have to double check

20    my sources.  I believe that's it.

21    Q    You didn't interview the attorney that he said he was

22    depositing money for?

23    A    No.

24    Q    You didn't have an independent basis to know whether he

25    was going to deposit money for an attorney or deposit money
```

```
1     to pay for methamphetamine?
2     A    That's correct.
3                    MS. RUE:  Nothing further.
4                    THE COURT:  Mr. Delinsky, anything further?
5                    MR. DELINSKY:  I'm done, your Honor.  Thank
6     you.
7                    THE COURT:  Thank you very much, Doctor.
8                    THE WITNESS:  Thank you.
9              (Witness excused.)
10                   THE COURT:  Apparently there's some request
11    for a recess.  So let me honor that, and let's take a brief
12    ten-minute recess.
13                   THE CLERK:  All rise.
14             Court is in recess.
15             (Recess.)
16                   THE CLERK:  All rise.
17             Court is open.  You may be seated.
18                   THE COURT:  Mr. Delinsky, do you have anything
19    further by way of witnesses?
20                   MR. DELINSKY:  No, I do not, your Honor.
21                   THE COURT:  Okay.
22             Before I call on Dr. Arndt, if he wishes to speak,
23    do counsel wish to add anything based on the hearing?
24                   MS. RUE:  Yes, your Honor.
25             Your Honor, the defendant has made a presentation
```

1    that he is entitled to a downward departure as well as a

2    Booker adjustment based on his diminished capacity.

3            The government submits that based on his testimony

4    that simply is not the case, and US v. Williams, which is

5    891 F.2d, 962, a First Circuit case from 1989, the First

6    Circuit specifically rejected under the Guidelines voluntary

7    drug use as a reason for a downward departure.

8            It's true whether it's addiction.  It's true

9    whether it's voluntary drug use, and there is no question

10   here, even conceded by the psychologist who just testified,

11   that this is drug use that started out as voluntary.  And he

12   was voluntarily using drugs when he was trading

13   methamphetamine for Oxycondone prescriptions.  He was

14   voluntarily using methamphetamine and Ketamine and whatever

15   other host of drugs while he was on probation.  He was

16   voluntarily snorting methamphetamine for 15 years.  He was

17   voluntarily smoking methamphetamine.

18           There is no question here that the guideline

19   applies that was applied by the First Circuit in

20   US v. Williams.

21           In that case the court, the First Circuit actually,

22   reversed a sentencing court that had engaged in a downward

23   departure for drug addiction.  The First Circuit in that

24   case noted that in enacting the Sentencing Guidelines and

25   the legislation enacted, Congress sought to achieve three

1    primary sentencing goals:  Honesty, uniformity, and

2    proportionality.

3         So here where Booker guides the landscape and now

4    the Court has the ability if not to downward departure for

5    voluntary drug use, to depart under 3553, the government

6    submits in order for the Court to do so it would have to

7    find that there are clearly identified and persuasive

8    reasons to downwardly depart that exceed the need for

9    proportionality, that exceeded the need for honesty and

10   uniformity in the sentencing system, and those simply don't

11   exist here.

12        This is a defendant who has had every opportunity

13   thrust to him.  He got breaks through the criminal justice

14   system.  He married, brought in somebody illegally, learned

15   from that that he could do this, and lied on someone's

16   immigration application, which should have been a felony.

17   It was charged as a felony.  He contested it on grounds that

18   he wasn't getting equal rights as a homosexual to bring his

19   lover into the country.  When he lost that, he then was able

20   to plead to a misdemeanor, which arguably was going to allow

21   him to keep his license, and he got three years' probation.

22   And during that probation he used cocaine.  He used meth.

23   He started trading meth for Oxycontin.  He started illegally

24   submitting drug scripts to his methamphetamine supplier.

25        This is a defendant who's had opportunities to

1    conform his conduct to the law and he chose not to.

2         Under the case law of the First Circuit, under

3    3553, for respect for the law, the seriousness of the

4    offense, deterrence and parody of like defendants, your

5    Honor, we submit the Guidelines sentence is appropriate.

6         THE COURT:  Mr. Delinsky, do you have anything

7    further to add?

8         MR. DELINSKY:  Yes.  Yes, your Honor, just

9    briefly.

10        The voluntary use of drugs is no excuse for the

11   commission of crime.  I know that.  I think Dr. Amador gave

12   a long, detailed and persuasive analysis of David Arndt that

13   traced the foundations of his serious mental illness,

14   approximately from the age of 13 or before, and described

15   its origins, described a childhood illness that has a high

16   correlation to mental illness, described certain genetic

17   characteristics, described a clinician's review of it,

18   described two early serious attempts at suicide with

19   hospitalizations, and clearly rendered an opinion that

20   Dr. Arndt has diminished capacity.

21        No one is saying that Dr. Arndt lacks the ability

22   to know right from wrong.  This is not an insanity case.  No

23   one is saying that Dr. Arndt was some robot, but what

24   Dr. Amador said, and remains uncontradicted, that his drug

25   usage vis-a-vis the crimes in question was involuntary, and

1   that there was an underlying mental illness.

2        So the case that's cited by the government, which I

3   well know, is completely inapposite of this, because there

4   was no evidence submitted in that case to this underlying

5   mental illness and the causal connection between a detailed

6   medical history with drug addiction.  And Dr. Amador clearly

7   laid out the requirements of diminished capacity.

8        With respect to the presentence report, your Honor,

9   on page 22, paragraph 79, the defendant voluntarily

10  disclosed in his interview to the probation officer that on

11  April 17, 1982, he married Shirla Nobombi [ph.] in Bombay,

12  India.  He reports that he married Shirla as a means to help

13  her leave India because of her fear of prosecution for being

14  a homosexual.  This marriage concluded with a divorce on

15  September 11, 1987, and the defendant notes no children were

16  born to this marital union.

17        From what I understand, Ms. Nobombi would have been

18  subject to great abuse and potential harm if she remained in

19  her country to live her lifestyle.  She is a United States

20  citizen, and she has a very high position in private

21  business today in the United States.

22        The ability of this Court to craft a sentence that

23  can find justice has been enhanced by Booker and by the case

24  law of the First Circuit.

25        I have tried to structure my argument and the brief

1    that I filed not based upon a whimsical desire for this

2    Court to show mercy, but to try to show under established

3    principles of the Guidelines as guidance why Dr. Arndt

4    qualifies for relief.  And if he qualifies for relief under

5    the Guidelines, under well-recognized departures and/or

6    adjustments, that's not in violation of the statute.  That's

7    in conformance with the statute.

8              As your Honor knows, the Guidelines as originally

9    written limit all, except for very limited areas, personal

10   characteristics of the defendant as grounds for adjustments.

11   That's all been changed by Booker because of the reference

12   to the statute and the criteria under the statute.

13             I had written two questions for myself to try to

14   answer for the Court.

15             One, why did David Arndt do what he did; and, two,

16   why, if this Court takes a chance on him, he won't do it

17   again?

18             I think it's clear and uncontradicted that David

19   Arndt has a disease that in our society is very difficult to

20   understand, and it's complex when it's applied in the law,

21   mental illness, and how that mental illness relates to and

22   has a causal effect on crime.

23             If he had a serious disability, a life-threatening

24   illness that impaired his ability to go forward, all kinds

25   of arguments could be made.  But the evidence is

1    uncontradicted that he has had a serious mental illness

2    since he was a young boy, and it has affected and distorted

3    his entire life.

4           And but for the mental illness, Dr. Amador said he

5    would not be here before this Court today.

6           Why should this Court take a chance on him?

7           Should this Court just throw away the keys and say,

8    okay, follow the government's recommendation, 170 months,

9    which is almost 15 years in prison, or say, does this man

10   have some hope of salvation?

11          What has he demonstrated to the Court?

12          I don't think Dr. Biolio, who said he's never

13   written a letter before in 20 years except for this letter,

14   as somebody who can con a correctional officer.  I don't

15   think Dr. Amador was conned.  I don't think Dr. Silen was

16   conned, who talked about what this young man was when he

17   left medical school, what his potential was.  And I don't

18   think the rabbi is making up stories as to his serious

19   commitment in his studies.

20          There is a fine line between hope and punishment

21   for the sake of punishment.  The law as we know it now

22   provides that the Guidelines have to give this Court

23   guidance.  It's a body of law, it's a body of precedence,

24   that this Court should look to, but the Guidelines are

25   advisory.

1        The First Circuit has recognize that even in the

2   case of the safety valve the courts now have, quote/unquote,

3   Booker discretion.

4        I think, taking the lessons from the Thurston case,

5   I have tried to tailor traditional departures justified

6   under the Guidelines, which I believe we have met, to give

7   the Court an opportunity by applying the advisory Guidelines

8   or applying the lessons of Booker and taking these

9   additional factors and applying it to the statute, that this

10  man is entitled to justice that the Guidelines itself do not

11  provide, and this is a perfect case of why this case is out

12  of the "heartland."

13       You have before you a sophisticated, talented,

14  human being who has a disease, and Dr. Amador has testified

15  in detail how that disease has affected his life; and from

16  the time he was 13 years old he began to abuse drugs to

17  relieve the serious pain that he was suffering from, and

18  Dr. Amador spoke about the recurrence of depression

19  throughout his life, and how that depression evidenced

20  itself and what it was like.  And that's the bipolar aspect

21  of the disease, the depressive aspect, as opposed to the

22  manic aspect.

23       We are not saying that Dr. Arndt deserves no

24  punishment.  He does deserve punishment.  He does deserve

25  incarceration, but I believe he deserves incarceration with

1    a hope that at his age of his mid 40s he will not be an old

2    man when he leaves for essentially a nonviolent crime for

3    which he has a causal effect because of this underlying

4    mental illness, a man that is otherwise good and decent and

5    whose untreated mental illness, which Dr. Amador said was

6    biological, and its denial that there was a biological

7    component to it, an organic component, and he described the

8    medical term for it, that that should be taken into

9    consideration by this Court.

10           I feel that if Dr. Arndt is put into the inpatient

11   drug treatment program that the federal prison system has

12   with strict conditions thereafter when he is released of

13   supervised release, that will -- that this Court now has

14   with its -- with the drug treatment provisions of the Drug

15   Court, with weekly drug counselors, weekly meetings with a

16   doctor to deal with the manic aspect of the disease, with

17   serious structure, that there is hope that this man can

18   contribute something positively to society.  He's a decent

19   person.  He has a capacity.

20           And this case, from a personal level, has affected

21   me greatly, because I have sought in some respects to try to

22   find a way to persuade this Court that locking this man up

23   for 10 or 15 years would idly thwart and undermine our whole

24   system of sentencing, and consequently I have recommended a

25   sentence of five years' incarceration.

1          And I would also add I would make a recommendation,

2     if the Court would be so inclined to do it, that the Court

3     recommend to the Bureau of Prisons that he do his time at

4     Fort Dix.  Fort Dix has -- it's one of the few institutions

5     that has the inpatient drug treatment program.  Plus, it's

6     one of the very few institutions in the country that has an

7     active religious Jewish community where he can continue his

8     studies and also continue his learning of fences and

9     boundaries which is, in itself, therapeutic.

10          So I would ask the Court to make a recommendation

11    that his place of incarceration be Fort Dix.  There are

12    various levels there, your Honor.  I won't ask the Court to

13    make a recommendation, just that it be at Fort Dix, and let

14    the department of prisons determine at what level, but

15    recommend that in-house drug treatment program.

16          I think that the recommendation that I have made is

17    based upon the law and it's principled and it's articulate.

18          Thank you.

19          THE COURT:  Dr. Arndt, you are not required to

20    address the Court, but you have the right to if you choose.

21          THE DEFENDANT:  I'd like to.

22          I want to begin by expressing my sincere gratitude

23    to the United States Attorney's Office, to the federal

24    agencies, the officers who have been involved in my case.

25    While protecting the public from me, you saved my life.

1    Were it not for your efforts and intervention, I'm

2    absolutely certain I would not be alive today.

3        At the time of my arrest I was completely out of

4    control.  I do not believe that anything short of

5    incarceration would have successfully interrupted my

6    substance abuse, and I will never be able to ever adequately

7    express my gratitude, for you, quite literally, saved my

8    life.  Thank you.

9        There are no words that can right the wrongs that I

10   have committed, that can undo the harm that I have done or

11   the hurt that I have caused.  Nevertheless, I want to take

12   this opportunity to apologize.

13       First and foremost, I want to apologize to my

14   loving parents, to my family, to my friends, for the

15   terrible hurt and sadness and disappointment and the

16   unmanageable worry that I have caused them.

17       I want to apologize to my instructors, my

18   professors, my mentors, my professional colleagues, and most

19   of all, my patients, for my unconscionable and

20   incomprehensible betrayal of their sacred trust and their

21   faith in me.

22       I want to apologize to my community for bringing

23   poison into its midst.

24       I apologize to society at large for having so

25   thoughtlessly squandered the extraordinary gifts and

1      opportunities that life had lavished on me and this society

2      had provided me.

3              And, of course, I apologize to the Court for my

4      presence before you here today.

5              At the time of my arrest, I had managed to become

6      everything I would not wish to be in this life.  I cannot

7      convey the sadness, the shame, the regret that I feel.

8              Please know with all of my heart and with all of my

9      soul I am, and will forever be, terribly, terribly sorry.

10             It is my ardent hope in the days remaining that I

11     may be able to create some opportunities to give some

12     service to others.  I would want to try to repair some of

13     the harm and hurt I have caused to those who have loved me,

14     those who have trusted me and put their faith in me, and to

15     those who I have lived among.  I am determined to try in

16     some small fashion to make amends.

17             Thank you for allowing me to speak today.

18             THE COURT:  Thank you, Dr. Arndt.

19             All right.  It's a very difficult and very

20     troubling case, and I do not mean to prolong the

21     proceedings.

22             I am going to impose a provisional sentence, but

23     there is one issue that has been raised that I do not think

24     was sufficiently addressed either to the extent that I think

25     I can make a final determination as a matter of law as to

the authority that I have under Booker with respect to the safety valve provision, or frame I think well enough, if I decided this issue adversely to the defendant, for the Court of Appeals to really understand the issue that I had in mind.

The facts of this case almost defy one's imagination.  There is a popular television program that I have seen, "House" I think it is, which deals with the issue of drug-addicted physicians, among other social issues it raises; and I have a feeling if I tried to outline this story of how Dr. Arndt came before this Court as a plot, for even a program on the edge as that one is, I think it would be thought to be beyond one's imagination as plausible.

It is a tragic, tragic story to see a life with so much promise end up in the ruins that at least for some period of time it had.

I take some comfort in Dr. Amador's assessment that there's been real progress, and some comfort in Dr. Arndt's words of some recognition that he was on the verge of self-annihilation through the course of conduct he chose to follow.

There are three important findings I want to make now.

I was very impressed with Dr. Amador's testimony, and I accept his diagnosis that Dr. Arndt is drug dependent

1    and that that dependency can in a meaningful sense be

2    explained or ascribed to a longstanding history of bipolar

3    disorder.

4        I am also persuaded that while his illness does not

5    rise to, as is appropriately conceded by the defendant, a

6    lack of criminal responsibility in the legal sense of the

7    term, the illness did contribute to a diminished capacity

8    sufficient to cast meaningful doubt on whether he would have

9    committed the crimes at issue but for the illness.

10       The guidelines as calculated by the government and

11   by the probation officer I think are correct, and I think

12   the applicable guideline result is 151 to 188 months, and

13   that the government's recommendation appropriately is within

14   the range that the guideline calculation produces.

15       When, however, I compare the advisory result that

16   the Guidelines counsel against the common law factors as

17   they are set out in the relevant statute, which we all know

18   is 3553(a), I think the Guidelines exercise or produces a

19   sentence that in my mind is more than sufficient and is

20   greater than necessary, to somewhat turn the words of the

21   statute around, to fit the circumstances of this case.

22       In looking at the common law and the statutory

23   practice, I, of course, considered the seriousness of the

24   offense and the community's need for deterrence of crimes of

25   this type, and these are factors that weigh very heavily in

1    favor of the government's recommendation in this case.

2          I have also weighed, however, the need to protect

3    the public from future crimes by this defendant, which I

4    think is largely minimal, and, more appropriately, the

5    ability to select a sentence that provides the appropriate

6    rehabilitative and treatment services that will make this

7    defendant restore his life.

8          The complicating factor, however, is the safety

9    valve provision.  Without the safety valve, Congress has

10   enacted a ten-year mandatory minimum sentence.

11         One argument was developed in the briefs, and on

12   that argument the government is surely correct.

13   Almendarez-Torres is the law in this circuit.  While I might

14   as a trial court wish that I had the authority and the power

15   to correct errors of the Court of Appeals, that is not an

16   authority that I have and not one that I would be inclined

17   to assert, absent some clear statement and direction from

18   the Court of Appeals itself.  And it seems to me that the

19   government is right.  They could not have been clearer, the

20   view of the First Circuit not simply in panel but *en banc*;

21   that is, until the Supreme Court tells me otherwise,

22   Almendarez-torres remains the law of the United States.

23         Here I want to be very careful.  There was a second

24   argument raised which really was not addressed in the

25   defendant's brief in anything but passing, although it was

1      begun to be developed in Mr. Delinsky's argument.

2              Understandably, the government really had no

3      opportunity to respond to it.  The argument is this.  With

4      respect to the safety valve, does Booker really allow the

5      Court to have discretion to disregard a mandatory minimum

6      sentence in the context of the safety valve if the Court

7      finds that a criminal history point calculation in Guideline

8      language produces a result that is not consistent with the

9      seriousness of the offenses reflected?

10             The way the statute is written -- and here I am

11     looking as 3553(f), which is the provision which

12     incorporates the safely valve, it references the statute --

13     allows a court to make exceptions to the mandatory minimum

14     sentence if certain conditions apply, and the one at issue

15     here is the condition that a defendant not have more than

16     one criminal history point as determined under the

17     Guidelines.

18             Does Booker reach that language, or does it not, or

19     does, in fact, the statute -- the underlying statute that

20     addresses the mandatory minimum and imposes it in all cases

21     but those to where this exception applies?  Does Booker give

22     the Court the authority to consider a sentence that

23     technically would not comply with the safety valve as the

24     Guidelines determine its contours?

25             What I am going to do today, because, again, I do

1   not think it fair to unnecessarily prolong the proceedings,

2   although I do think it fair to give every consideration I

3   can to the defendant and to the government before deciding

4   this issue, and, if it is to be framed as an issue for

5   appeal, I also want the record to be very clear as to the

6   decision that I have made on this issue.  So I am going to

7   provisionally impose the mandatory minimum sentence today.

8   I am going to stay execution of the sentence to give the

9   parties an opportunity to brief the issue that I have

10  described.

11          Let me ask you both.  Have I described it clearly

12  enough that you understand --

13          MS. RUE:  Yes, your Honor.

14          MR. DELINSKY:  Yes.

15          THE COURT:  -- what I am reaching at?

16          Then I've accomplished at least that.

17          But, again, rather than unnecessarily prolong the

18  proceeding, if I can decide on the basis of what you show me

19  that the provisional sentence is the correct one, or at

20  least the one I think is correct, that will be the sentence.

21          If I'm persuaded otherwise, we will renew the

22  sentencing.  But, again, I want to phrase this as carefully

23  as I can.  I want to make clear that I would have considered

24  a different sentence, had I had more freedom than I, at

25  least at the moment, think I have.  And, who knows, perhaps

1        I do.

2               Mr. Arndt, if you would stand, please.

3               Mr. Arndt, pursuant to the provisions of the

4    Sentencing Reform Act of 1984, and after having considered

5    and applied the sentencing factors enumerated at 18 United

6    States Code, Section 3553(a), it is the judgment of the

7    Court that you be committed to the custody of the Bureau of

8    Prisons for a term of 120 months, this term to be served

9    concurrently on all counts of conviction.

10               The Court will make a judicial recommendation that

11    you participate in the 500-Hour Comprehensive Drug Treatment

12    Program.

13               Upon release from custody, you will be placed on

14    supervised release for a term of five years.  This term will

15    consist of terms of five years on Counts One and Two, and

16    terms of three years on Counts Three through Nine, all to be

17    served concurrently.

18               Within 72 hours of release from custody of the

19    Bureau of Prisons, you shall report in person to the

20    Probation Office in the district to which you are released.

21               While on supervised release, you will not commit

22    any federal, state, or local crime.

23               You will refrain from any unlawful use of a

24    controlled substance or alcohol.  You will submit to one

25    drug test within 15 days of release from custody and at

1    least two periodic drug tests thereafter, not to exceed 104

2    tests per year, as directed by your probation officer.

3           You will, as the law requires, submit to the

4    collection of a DNA sample as directed, again, by your

5    probation officer.

6           You will comply with the standard conditions

7    described at United States Sentencing Guideline

8    Section 5D1.3(c), and shall comply with the following

9    special conditions:

10          You are prohibited, as the law requires, from

11   possessing a firearm or other dangerous weapon.

12          You will participate in a program for substance

13   abuse as directed by the United States Probation Office.

14   That program, again, may included testing, not to exceed 104

15   drug tests per year, to determine whether you have reverted

16   to the use of alcohol or drugs.

17          You will be required to contribute to the cost of

18   services for such treatment based upon your ability to pay

19   or the availability of a third-party payor.

20          You will participate in a mental health treatment

21   program if directed to do so by the United States Probation

22   Office.  Again, you may be required to contribute to the

23   cost of this program based upon your financial capacity to

24   do so or the availability of a third-party payor.

25          It is further ordered that you pay to the United

1   States a special assessment of $900.  That shall be due

2   immediately.

3          I do not understand that a fine is being

4   recommended by the government, and it does not appear that

5   the defendant has the capacity to pay a fine.

6                  MS. RUE:  That's correct, your Honor.

7                  THE COURT:  The Court will waive imposition of

8   a fine as part of the sentence.

9          Sentencing having been imposed, I will now suspend

10  execution of the sentence and permit the parties, 21 days --

11                 MR. DELINSKY:  Yes.

12                 THE COURT:  -- to brief the issue identified?

13                 MS. RUE:  Your Honor, I will be out of the

14  country from January 5 through January 23.

15                 THE COURT:  If you can wait?

16                 MR. DELINSKY:  Yes.

17                 THE COURT:  I mean, it is important enough.

18                 MR. DELINSKY:  Yes.

19                 THE COURT:  All right.

20         February 1st --

21                 MS. RUE:  Yes, your Honor.

22                 THE COURT:  -- briefing will be completed on

23  the issue that the Court identified.

24         Anything further?

25                 MS. RUE:  Your Honor, if I could actually have

1    through February 5th?

2                    THE COURT:  All right, February 5th.

3                    MS. RUE:  I have an evidentiary hearing on

4    January 31.

5                    THE COURT:  All right.

6                    MR. DELINSKY:  Thank you, your Honor.

7                    THE COURT:  Thank you.

8              Mr. Arndt, we may be seeing one another again.  We

9    will see what the briefing results in.

10                   MR. DELINSKY:  Thank you.

11                   MS. RUE:  Thank you.

12                   THE COURT:  Thank you very much, counsel.

13             Is Dr. Amador still here?

14                   MR. DELINSKY:  Yes.

15                   THE COURT:  I had a question, Doctor.  I found

16   your testimony very interesting.

17             At one point you drew a distinction between what

18   you called clinical and normal depression.  I have never

19   heard the term "normal depression" used before.  What was --

20                   DR. AMADOR:  Everybody gets depressed.

21                   THE COURT:  Was that the distinction between

22   normal mood swings?

23                   DR. AMADOR:  Clinical depression is depression

24   that lasts two weeks, more days than not most of the day.

25             In addition, you have a constellation of other

symptoms, like you're not sleeping perhaps -- you don't have

to have all of them, just four of them -- poor appetite,

difficulty concentrating, loss of libido, feelings of

worthlessness, suicidality, feeling like you wish you were

dead.

     Four of those with depressed mood for a couple of

weeks, you've now transitioned from a normal depressed

state, everybody gets depressed, to the disorder of

depression.

          THE COURT:  But this distinction between

"normal" and "clinical" is an accepted medical distinction?

          DR. AMADOR:  Oh, sure.

          THE COURT:  I just had not heard it before.

     Thank you.  That was just personal inquiry.

          THE CLERK:  All rise.

     Court is in recess.

     (Proceedings adjourned.)


                    **I N D E X**

WITNESS:                DIRECT   CROSS    REDIRECT    RECROSS

XAVIER AMADOR

By Mr. Delinsky        21

By Ms. Rue                        49

               E X H I B I T S

                  (None.)

1

2

3                    **C E R T I F I C A T E**

4

5          I, James P. Gibbons, Official Court Reporter for

6   the United States District Court for the District of

7   Massachusetts, do hereby certify that the foregoing pages

8   are a true and accurate transcription of my shorthand notes

9   taken in the aforementioned matter to the best of my skill

10  and ability.

11

12   /s/James P. Gibbons                    February 28, 2018
         James P. Gibbons

13

14

15

16                JAMES P. GIBBONS, CSR, RPR, RMR
                     Official Court Reporter
17                 1 Courthouse Way, Suite 7205
                   Boston, Massachusetts 02210
18                    jmsgibbons@yahoo.com

19

20

21

22

23

24

25